**23-15531**

IN THE

# United States Court of Appeals

## FOR THE NINTH CIRCUIT

◆◆◆

DAVID ANTHONY STEBBINS, DBA Acerthorn,

*Plaintiff-Appellant,*

—v.—

KARL POLANO, DBA Sofiannp; FREDERICK ALLISON,
DBA InitiativeKookie; RAUL MATEAS, DBA TGP482;
ALPHABET, INC.; DISCORD, INC.; AMAZON.COM, INC.; YOUTUBE, LLC,

*Defendants-Appellees,*

—and—

FACEBOOK, INC.,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

---

## ADDENDUM TO BRIEF FOR DEFENDANTS-APPELLEES
## ALPHABET, INC. AND YOUTUBE, LLC

---

JEREMY P. AUSTER
WILSON SONSINI GOODRICH
  & ROSATI
1301 Avenue of the Americas,
  40th Floor
New York, New York 10019
(212) 999-5800

*Attorneys for Defendants-Appellees
  Alphabet, Inc. and YouTube, LLC*

## TABLE OF CONTENTS

PAGE

Federal Rule of Civil Procedure 11...................................Add.1

Federal Rule of Civil Procedure 24.................................Add.10

Federal Rule of Civil Procedure 41.................................Add.14

Federal Rule of Civil Procedure 60.................................Add.18

Federal Rule of Civil Procedure 201 ..............................Add.22

17 U.S.C. § 101.....................................................Add.23

17 U.S.C. § 102.....................................................Add.29

17 U.S.C. § 107.....................................................Add.35

17 U.S.C. § 410.....................................................Add.44

17 U.S.C. § 411.....................................................Add.46

17 U.S.C. § 512.....................................................Add.48

28 U.S.C. § 1915....................................................Add.57

U.S. Const. Art. I, § 8, Cl. 8. ....................................Add.59

Northern District of California Local Rule 7-9.....................Add.83

**Add.1**

## Rule 11. Signing Pleadings, Motions, and Other Papers; Representations to the Court; Sanctions

**(a) Signature.** Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name—or by a party personally if the party is unrepresented. The paper must state the signer's address, e-mail address, and telephone number. Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit. The court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention.

**(b) Representations to the Court.** By presenting to the court a pleading, written motion, or other paper— whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

   **(1)** it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

   **(2)** the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

   **(3)** the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

   **(4)** the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

**(c) Sanctions.**

   **(1)** *In General.* If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

   **(2)** *Motion for Sanctions.* A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

   **(3)** *On the Court's Initiative.* On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).

   **(4)** *Nature of a Sanction.* A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for

**Add.2**

USCS Fed Rules Civ Proc R 11, Part 1 of 2

effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

**(5)** *Limitations on Monetary Sanctions.* The court must not impose a monetary sanction:

    **(A)** against a represented party for violating Rule 11(b)(2); or

    **(B)** on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned.

**(6)** *Requirements for an Order.* An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction.

**(d) Inapplicability to Discovery.** This rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37.

## History

As amended April 28, 1983, eff. Aug. 1, 1983; March 2, 1987, eff. Aug. 1, 1987; April 22, 1993, eff. Dec. 1, 1993; April 30, 2007, eff. Dec. 1, 2007.

Annotations

## Notes

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

**Other provisions:**

  **Notes of Advisory Committee.** This is substantially the content of former Equity Rules 24 (Signature of Counsel) and 21 (Scandal and Impertinence) consolidated and unified. Compare former Equity Rule 36 (Officers Before Whom Pleadings Verified). Compare to similar purposes, English Rules Under the Judicature Act (The Annual Practice, 1937) O. 19, r 4, and *Great Australian Gold Mining Co. v. Martin,* L. R., 5 Ch. Div. 1, 10 (1877). Subscription of pleadings is required in many codes. 2 Minn. Stat. (Mason, 1927) § 9265; N.Y.R.C.P. (1937) Rule 91; 2 N.D. Comp. Laws Ann. (1913) § 7455.

This rule expressly continues any statute which requires a pleading to be verified or accompanied by an affidavit, such as:

U.S.C., Title 28 former:

§ 381 (Preliminary injunctions and temporary restraining orders).

§ 762 (Suit against the United States).

U.S.C., Title 28, former § 829 (now § 1927) (Costs; attorney liable for, when) is unaffected by this rule.

For complaints which must be verified under these rules, see Rules 23(b) (Secondary Action by Shareholders) and 65 (Injunctions).

For abolition of the rule in equity that the averments of an answer under oath must be overcome by the testimony of two witnesses or of one witness sustained by corroborating circumstances, see Pa. Stat. Ann. (Purdon, 1931) see 12 P.S. Pa., § 1222; for the rule in equity itself, see *Greenfield v. Blumenthal, 69 F.2d 294 ( 3d Cir. 1934).*

# Add.3

USCS Fed Rules Civ Proc R 11, Part 1 of 2

**Notes of Advisory Committee on 1983 amendments.** Since its original promulgation, Rule 11 has provided for the striking of pleadings and the imposition of disciplinary sanctions to check abuses in the signing of pleadings. Its provisions have always applied to motions and other papers by virtue of incorporation by reference in Rule 7(b)(2). The amendment and the addition of Rule 7(b)(3) expressly confirms this applicability.

Experience shows that in practice Rule 11 has not been effective in deterring abuses. See 6 Wright & Miller, Federal Practice and Procedure: Civil § 1334 (1971). There has been considerable confusion as to (1) the circumstances that should trigger striking a pleading or motion or taking disciplinary action, (2) the standard of conduct expected of attorneys who sign pleadings and motions, and (3) the range of available and appropriate sanctions. See Rodes, Ripple & Mooney, Sanctions Imposable for Violations of the *Federal Rules of Civil Procedure 64– 65*, Federal Judicial Center (1981). The new language is intended to reduce the reluctance of courts to impose sanctions, see Moore, Federal Practice P 7.05, at 1547, by emphasizing the responsibilities of the attorney and reenforcing those obligations by the imposition of sanctions.

The amended rule attempts to deal with the problem by building upon and expanding the equitable doctrine permitting the court to award expenses, including attorney's fees, to a litigant whose opponent acts in bad faith in instituting or conducting litigation. See, e.g., *Roadway Express, Inc. v. Piper, 447 U.S. 752 [65 L. Ed. 2d 488] (1980)*; *Hall v. Cole, 412 U.S. 1, 5 [36 L. Ed. 2d 702] (1973)*. Greater attention by the district courts to pleading and motion abuses and the imposition of sanctions when appropriate, should discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses.

The expanded nature of the lawyer's certification in the fifth sentence of amended Rule 11 recognizes that the litigation process may be abused for purposes other than delay. See, e.g., *Browning Debenture Holders' Committee v. DASA Corp., 560 F.2d 1078 ( 2d Cir. 1977)*.

The words "good ground to support" the pleading in the original rule were interpreted to have both factual and legal elements. See, e.g., *Heart Disease Research Foundation v. General Motors Corp., 15 Fed. R. Serv. 2d 1517, 1519 (S.D.N.Y. 1972)*. They have been replaced by a standard of conduct that is more focused.

The new language stresses the need for some prefiling inquiry into both the facts and the law to satisfy the affirmative duty imposed by the rule. The standard is one of reasonableness under the circumstances. See *Kinee v. Abraham Lincoln Fed. Sav. & Loan Ass'n, 365 F.Supp. 975 (E.D. Pa. 1973)*. This standard is more stringent than the original good-faith formula and thus it is expected that a greater range of circumstances will trigger its violation. See *Nemeroff v. Abelson, 620 F.2d 339 ( 2d Cir. 1980)*.

The rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories. The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted. Thus, what constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading, motion, or other paper; whether the pleading, motion, or other paper was based on a plausible view of the law; or whether he depended on forwarding counsel or another member of the bar.

The rule does not require a party or an attorney to disclose privileged communications or work product in order to show that the signing of the pleading, motion, or other paper is substantially justified. The provisions of Rule 26(c), including appropriate orders after in camera inspection by the court, remain available to protect a party claiming privilege or work product protection.

Amended Rule 11 continues to apply to anyone who signs a pleading, motion, or other paper. Although the standard is the same for unrepresented parties, who are obliged themselves to sign the pleadings, the court has sufficient discretion to take account of the special circumstances that often arise in pro se situations. See *Haines v. Kerner, 404 U.S. 519 [30 L. Ed. 2d 652] (1972)*.

**Add.4**

USCS Fed Rules Civ Proc R 11, Part 1 of 2

The provision in the original rule for striking pleadings and motions as sham and false has been deleted. The passage has rarely been utilized, and decisions thereunder have tended to confuse the issue of attorney honesty with the merits of the action. See generally Risinger, Honesty in Pleading and its Enforcement: Some "Striking" Problems with _Fed. R. Civ. P. 11_, _61_ Minn. L. Rev. 1 (1976). Motions under this provision generally present issues better dealt with under Rules 8, 12, or 56. See _Murchison v. Kirby, 27 F.R.D. 14 (S.D.N.Y. 1961)_; 5 Wright & Miller, Federal Practice and Procedure: Civil § 1334 (1969).

The former reference to the inclusion of scandalous or indecent matter, which is itself strong indication that an improper purpose underlies the pleading, motion, or other paper, also has been deleted as unnecessary. Such matter may be stricken under Rule 12(f) as well as dealt with under the more general language of amended Rule 11.

The text of the amended rule seeks to dispel apprehensions that efforts to obtain enforcement will be fruitless by insuring that the rule will be applied when properly invoked. The word "sanctions" in the caption, for example, stresses a deterrent orientation in dealing with improper pleadings, motions or other papers. This corresponds to the approach in imposing sanctions for discovery abuses. See _National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639 [49 L. Ed. 2d 747] (1976)_ (per curiam). And the words "shall impose" in the last sentence focus the court's attention on the need to impose sanctions for pleading and motion abuses. The court, however, retains the necessary flexibility to deal appropriately with violations of the rule. It has discretion to tailor sanctions to the particular facts of the case, with which it should be well acquainted.

The reference in the former text to wilfulness as a prerequisite to disciplinary action has been deleted. However, in considering the nature and severity of the sanctions to be imposed, the court should take account of the state of the attorney's or party's actual or presumed knowledge when the pleading or other paper was signed. Thus, for example, when a party is not represented by counsel, the absence of legal advice is an appropriate factor to be considered.

Courts currently appear to believe they may impose sanctions on their own motion. See _North American Trading Corp. v. Zale Corp., 73 F.R.D. 293 (S.D.N.Y. 1979)_. Authority to do so has been made explicit in order to overcome the traditional reluctance of courts to intervene unless requested by one of the parties. The detection and punishment of a violation of the signing requirement, encouraged by the amended rule, is part of the court's responsibility for securing the system's effective operation.

If the duty imposed by the rule is violated, the court should have the discretion to impose sanctions on either the attorney, the party the signing attorney represents, or both, or on an unrepresented party who signed the pleading, and the new rule so provides. Although Rule 11 has been silent on the point, courts have claimed the power to impose sanctions on an attorney personally, either by imposing costs or employing the contempt technique. See 5 Wright & Miller, Federal Practice and Procedure: Civil § 1334 (1969); 2A Moore, Federal Practice P 11.02, at 2104 n.8. This power has been used infrequently. The amended rule should eliminate any doubt as to the propriety of assessing sanctions against the attorney.

Even though it is the attorney whose signature violates the rule, it may be appropriate under the circumstances of the case to impose a sanction on the client. See _Browning Debenture Holders' Committee v. DASA Corp.,_ supra. This modification brings Rule 11 in line with practice under Rule 37, which allows sanctions for abuses during discovery to be imposed upon the party, the attorney, or both.

A party seeking sanctions should give notice to the court and the offending party promptly upon discovering a basis for doing so. The time when sanctions are to be imposed rests in the discretion of the trial judge. However, it is anticipated that in the case of pleadings the sanctions issue under Rule 11 normally will be determined at the end of the litigation, and in the case of motions at the time when the motion is decided or shortly thereafter. The procedure obviously must comport with due process requirements. The particular format to be followed should depend on the circumstances of the situation and the severity of the sanction under consideration. In many situations the judge's participation in the proceedings provides him with full knowledge of the relevant facts and little further inquiry will be necessary.

# Add.5

USCS Fed Rules Civ Proc R 11, Part 1 of 2

To assure that the efficiencies achieved through more effective operation of the pleading regimen will not be offset by the cost of satellite litigation over the imposition of sanctions, the court must to the extent possible limit the scope of sanction proceedings to the record. Thus, discovery should be conducted only by leave of the court, and then only in extraordinary circumstances.

Although the encompassing reference to "other papers" in new Rule 11 literally includes discovery papers, the certification requirement in that context is governed by proposed new Rule 26(g). Discovery motions, however, fall within the ambit of Rule 11.

**Notes of Advisory Committee on 1993 amendments.** Purpose of revision. This revision is intended to remedy problems that have arisen in the interpretation and application of the 1983 revision of the rule. For empirical examination of experience under the 1983 rule, see, e.g., New York State Bar Committee on Federal Courts, Sanctions and Attorneys' Fees (1987); T. Willging, The Rule 11 Sanctioning Process (1989); American Judicature Society, Report of the Third Circuit Task Force on *Federal Rule of Civil Procedure 11* (S. Burbank ed., 1989); E. Wiggins, T. Willging, and D. Stienstra, Report on Rule 11 (Federal Judicial Center 1991). For book-length analyses of the case law, see G. Joseph, Sanctions: The Federal Law of Litigation Abuse (1989); G. Solovy, The Federal Law of Sanctions (1991); G. Vairo, Rule 11 Sanctions: Case Law Perspectives and Preventative Measures (1991).

The rule retains the principle that attorneys and pro se litigants have an obligation to the court to refrain from conduct that frustrates the aims of Rule 1. The revision broadens the scope of this obligation, but places greater constraints on the imposition of sanctions and should reduce the number of motions for sanctions presented to the court. New subdivision (d) removes from the ambit of this rule all discovery requests, responses, objections, and motions subject to the provisions of Rule 26 through 37.

*Note to Subdivision (a).* Retained in this subdivision are the provisions requiring signatures on pleadings, written motions, and other papers. Unsigned papers are to be received by the Clerk, but then are to be stricken if the omission of the signature is not corrected promptly after being called to the attention of the attorney or pro se litigant. Correction can be made by signing the paper on file or by submitting a duplicate that contains the signature. A court may require by local rule that papers contain additional identifying information regarding the parties or attorneys, such as telephone numbers to facilitate facsimile transmissions, though, as for omission of a signature, the paper should not be rejected for failure to provide such information.

The sentence in the former rule relating to the effect of answers under oath is no longer needed and has been eliminated. The provision in the former rule that signing a paper constitutes a certificate that it has been read by the signer also has been eliminated as unnecessary. The obligations imposed under subdivision (b) obviously require that a pleading, written motion, or other paper be read before it is filed or submitted to the court.

*Note to Subdivisions (b) and (c).* The subdivisions restate the provisions requiring attorneys and pro se litigants to conduct a reasonable inquiry into the law and facts before signing pleadings, written motions, and other documents, and mandating sanctions for violation of these obligations. The revision in part expands the responsibilities of litigants to the court, while providing greater constraints and flexibility in dealing with infractions of the rule. The rule continues to require litigants to "stop-and-think" before initially making legal or factual contentions. It also, however, emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable and by generally providing protection against sanctions if they withdraw or correct contentions after a potential violation is called to their attention.

The rule applies only to assertions contained in papers filed with or submitted to the court. It does not cover matters arising for the first time during oral presentations to the court, when counsel may make statements that would not have been made if there had been more time for study and reflection. However, a litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit. For example, an attorney who during a pretrial conference insists on a claim or defense should be viewed as "presenting to the court" that contention and would be subject to the obligations of subdivision (b) measured as of that time. Similarly, if after a notice of removal is filed, a party urges in federal court

**Add.6**

USCS Fed Rules Civ Proc R 11, Part 1 of 2

the allegations of a pleading filed in state court (whether as claims, defenses, or in disputes regarding removal or remand), it would be viewed as "presenting"—and hence certifying to the district court under Rule 11—those allegations.

The certification with respect to allegations and other factual contentions is revised in recognition that sometimes a litigant may have good reason to believe that a fact is true or false but may need discovery, formal or informal, from opposing parties or third persons to gather and confirm the evidentiary basis for the allegation. Tolerance of factual contentions in initial pleadings by plaintiffs or defendants when specifically identified as made on information and belief does not relieve litigants from the obligation to conduct an appropriate investigation into the facts that is reasonable under the circumstances; it is not a license to join parties, make claims, or present defenses without any factual basis or justification. Moreover, if evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule not to persist with that contention. Subdivision (b) does not require a formal amendment to pleadings for which evidentiary support is not obtained, but rather calls upon a litigant not thereafter to advocate such claims or defenses.

The certification is that there is (or likely will be) "evidentiary support" for the allegation, not that the party will prevail with respect to its contention regarding the fact. That summary judgment is rendered against a party does not necessarily mean, for purposes of this certification, that it had no evidentiary support for its position. On the other hand, if a party has evidence with respect to a contention that would suffice to defeat a motion for summary judgment based thereon, it would have sufficient "evidentiary support" for purposes of Rule 11.

Denials of factual contentions involve somewhat different considerations. Often, of course, a denial is premised upon the existence of evidence contradicting the alleged fact. At other times a denial is permissible because, after an appropriate investigation, a party has no information concerning the matter or, indeed, has a reasonable basis for doubting the credibility of the only evidence relevant to the matter. A party should not deny an allegation it knows to be true; but it is not required, simply because it lacks contradictory evidence, to admit an allegation that it believes is not true.

The changes is subdivisions (b)(3) and (b)(4) will serve to equalize the burden of the rule upon plaintiffs and defendants, who under Rule 8(b) are in effect allowed to deny allegations by stating that from their initial investigation they lack sufficient information to form a belief as to the truth of the allegation. If, after further investigation or discovery, a denial is no longer warranted, the defendant should not continue to insist on that denial. While sometimes helpful, formal amendment of the pleadings to withdraw an allegation or denial is not required by subdivision (b).

Arguments for extensions, modifications, or reversals of existing law or for creation of new law do not violate subdivision (b)(2) provided they are "nonfrivolous." This establishes an objective standard, intended to eliminate any "empty-head pure-heart" justification for patently frivolous arguments. However, the extent to which a litigant has researched the issues and found some support for its theories even in minority opinions, in law review articles, or through consultation with other attorneys should certainly be taken into account in determining whether paragraph (2) has been violated. Although arguments for a change of law are not required to be specifically so identified, a contention that is so identified should be viewed with greater tolerance under the rule.

The court has available a variety of possible sanctions to impose for violations, such as striking the offending paper; issuing an admonition, reprimand, or censure; requiring participation in seminars or other educational programs; ordering a fine payable to the court; referring the matter to disciplinary authorities (or, in the case of government attorneys, to the Attorney General, Inspector General, or agency head), etc. See Manual for Complex Litigation, Second, § 42.3. The rule does not attempt to enumerate the factors a court should consider in deciding whether to impose a sanction or what sanctions would be appropriate in the circumstances; but, for emphasis, it does specifically note that a sanction may be nonmonetary as well as monetary. Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person,

**Add.7**

USCS Fed Rules Civ Proc R 11, Part 1 of 2

is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants: all of these may in a particular case be proper considerations. The court has significant discretion in determining what sanctions, if any, should be imposed for a violation, subject to the principle that the sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons.

Since the purpose of Rule 11 sanctions is to deter rather than to compensate, the rule provides that, if a monetary sanction is imposed, it should ordinarily be paid into court as a penalty. However, under unusual circumstances, particularly for (b)(1) violations, deterrence may be ineffective unless the sanction not only requires the person violating the rule to make a monetary payment, but also directs that some or all of this payment be made to those injured by the violation. Accordingly, the rule authorizes the court, if requested in a motion and if so warranted, to award attorney's fees to another party. Any such award to another party, however, should not exceed the expenses and attorneys' fees for the services directly and unavoidably caused by the violation of the certification requirement. If, for example, a wholly unsupportable count were included in a multi-count complaint or counterclaim for the purpose of needlessly increasing the cost of litigation to an impecunious adversary, any award of expenses should be limited to those directly caused by inclusion of the improper count, and not those resulting from the filing of the complaint or answer itself. The award should not provide compensation for services that could have been avoided by an earlier disclosure of evidence or an earlier challenge to the groundless claims or defenses. Moreover, partial reimbursement of fees may constitute a sufficient deterrent with respect to violations by persons having modest financial resources. In cases brought under statutes providing for fees to be awarded to prevailing parties, the court should not employ cost-shifting under this rule in a manner that would be inconsistent with the standards that govern the statutory award of fees, such as stated in *Christiansburg Garment Co. v. EEOC, 434 U.S. 412 [54 L. Ed. 2d 648] (1978)*.

The sanction should be imposed on the persons—whether attorneys, law firms, or parties—who have violated the rule or who may be determined to be responsible for the violation. The person signing, filing, submitting, or advocating a document has a nondelegable responsibility to the court, and in most situations should be sanctioned for a violation. Absent exceptional circumstances, a law firm is to be held also responsible when, as a result of a motion under subdivision (c)(1)(A), one of its partners, associates, or employees is determined to have violated the rule. Since such a motion may be filed only if the offending paper is not withdrawn or corrected within 21 days after service of the motion, it is appropriate that the law firm ordinarily be viewed as jointly responsible under established principles of agency. This provision is designed to remove the restrictions of the former rule. *Cf. Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. 120 [107 L. Ed. 2d 438] (1989)* (1983 version of Rule 11 does not permit sanctions against law firm of attorney signing groundless complaint).

The revision permits the court to consider whether other attorneys in the firm, co-counsel, other law firms, or the party itself should be held accountable for their part in causing a violation. When appropriate, the court can make an additional inquiry in order to determine whether the sanctions should be imposed on such persons, firms, or parties either in addition to or, in unusual circumstances, instead of the person actually making the presentation to the court. For example, such an inquiry may be appropriate in cases involving governmental agencies or other institutional parties that frequently impose substantial restrictions on the discretion of individual attorneys employed by it.

Sanctions that involve monetary awards (such as a fine or an award of attorney's fees) may not be imposed on a represented party for violations of subdivision (b)(2), involving frivolous contentions of law. Monetary responsibility for such violations is more properly placed solely on the party's attorneys. With this limitation, the rule should not be subject to attack under the Rules Enabling Act. See *Willy v. Coastal Corp., 503 U.S. 131 [117 L. Ed. 2d 280] (1992)*; *Business Guides, Inc. v. Chromatic Communications Enter. Inc., 498 U.S. 533 [112 L. Ed. 2d 1140]* (1991). This restriction does not limit the court's power to impose sanctions or remedial orders may have collateral financial consequences upon a party, such as dismissal of a claim, preclusion of a defense, or preparation of amended pleadings.

# Add.8

USCS Fed Rules Civ Proc R 11, Part 1 of 2

Explicit provision is made for litigants to be provided notice of the alleged violation and an opportunity to respond before sanctions are imposed. Whether the matter should be decided solely on the basis of written submissions or should be scheduled for oral argument (or, indeed, for evidentiary presentation) will depend on the circumstances. If the court imposes a sanction, it must, unless waived, indicate its reasons in a written order or on the record; the court should not ordinarily have to explain its denial of a motion for sanctions. Whether a violation has occurred and what sanctions, if any, to impose for a violation are matters committed to the discretion of the trial court; accordingly, as under current law, the standard for appellate review of these decisions will be for abuse of discretion. See *Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 [110 L. Ed. 2d 359] (1990)* (noting, however, that an abuse would be established if the court based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence).

The revision leaves for resolution on a case-by-case basis, considering the particular circumstances involved, the question as to when a motion for violation of Rule 11 should be served and when, if filed, it should be decided. Ordinarily the motion should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely. In other circumstances, it should not be served until the other party has had a reasonable opportunity for discovery. Given the "safe harbor" provisions discussed below, a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention).

Rule 11 motions should not be made or threatened for minor, inconsequential violations of the standards prescribed by subdivision (b). They should not be employed as a discovery device or to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes. Nor should Rule 11 motions be prepared to emphasize the merits of a party's position, to exact an unjust settlement, to intimidate an adversary into withdrawing contentions that are fairly debatable, to increase the costs of litigation, to create a conflict of interest between attorney and client, or to seek disclosure of matters otherwise protected by the attorney-client privilege or the work-product doctrine. As under the prior rule, the court may defer its ruling (or its decision as to the identity of the persons to be sanctioned) until final resolution of the case in order to avoid immediate conflicts of interest and to reduce the disruption created if a disclosure of attorney-client communications is needed to determine whether a violation occurred or to identify the person responsible for the violation.

The rule provides that requests for sanctions must be made as a separate motion, i.e., not simply included as an additional prayer for relief contained in another motion. The motion for sanctions is not, however, to be filed until at least 21 days (or such other period as the court may set) after being served. If, during this period, the alleged violation is corrected, as by withdrawing (whether formally or informally) some allegations or contention, the motion should not be filed with the court. These provisions are intended to provide a type of "safe harbor" against motions under Rule 11 in that a party will not be subject to sanctions on the basis of another party's motion unless, after receiving the motion, it refuses to withdraw that position or to acknowledge candidly that it does not currently have evidence to support a specified allegation. Under the former rule, parties were sometimes reluctant to abandon a questionable contention lest that be viewed as evidence of a violation of Rule 11; under the revision, the timely withdrawal of a contention will protect a party against a motion for sanctions.

To stress the seriousness of a motion for sanctions and to define precisely the conduct claimed to violate the rule, the revision provides that the "safe harbor" period begins to run only upon service of the motion. In most cases, however, counsel should be expected to give informal notice to the other party, whether in person or by a telephone call or letter, of a potential violation before proceeding to prepare and serve a Rule 11 motion.

As under former Rule 11, the filing of a motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions. However, service of a cross motion under Rule 11 should rarely be needed since under the revision the court may award to the person who prevails on a motion under Rule 11—whether the movant or the target of the motion—reasonable expenses, including attorney's fees, incurred in presenting or opposing the motion.

The power of the court to act on its own initiative is retained, but with the condition that this be done through a show cause order. This procedure provides the person with notice and an opportunity to respond. The revision provides that a monetary sanction imposed after a court-initiated show cause order be limited to a penalty payable to the

**Add.9**

USCS Fed Rules Civ Proc R 11, Part 1 of 2

court and that it be imposed only if the show cause order is issued before any voluntary dismissal or an agreement of the parties to settle the claims made by or against the litigant. Parties settling a case should not be subsequently faced with an unexpected order from the court leading the monetary sanctions that might have affected their willingness to settle or voluntarily dismiss a case. Since show cause orders will ordinarily be issued only in situations that are akin to a contempt of court, the rule does not provide a "safe harbor" to a litigant for withdrawing a claim, defense, etc., after a show cause order has been issued on the court's own initiative. Such corrective action, however, should be taken into account in deciding what sanction to impose if, after consideration of the litigant's response, the court concludes that a violation has occurred.

*Note to Subdivision (d).* Rules 26(g) and 37 establish certification standards and sanctions that apply to discovery disclosures, requests, responses, objections, and motions. It is appropriate that Rules 26 through 37, which are specially designed for the discovery process, govern such documents and conduct rather than the more general provisions of Rule 11. Subdivision (d) has been added to accomplish this result.

Rule 11 is not the exclusive source for control of improper presentations of claims, defenses, or contentions. It does not supplant statutes permitting awards of attorney's fees to prevailing parties or alter the principles governing such awards. It does not inhibit the court in punishing for contempt, in exercising its inherent powers, or in imposing sanctions, awarding expenses, or directing remedial action authorized under other rules or under *28 U.S.C. § 1927*. See *Chambers v. NASCO, 501 U.S. 32 [115 L. Ed. 2d 27]* (1991). *Chambers* cautions, however, against reliance upon inherent powers if appropriate sanctions can be imposed under provisions such as Rule 11, and the procedures specified in Rule 11—notice, opportunity to respond, and findings—should ordinarily be employed when imposing a sanction under the court's inherent powers. Finally, it should be noted that Rule 11 does not preclude a party from initiating an independent action for malicious prosecution or abuse of process.

**Notes of Advisory Committee on 2007 amendments.** The language of Rule 11 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

Providing an e-mail address is useful, but does not of itself signify consent to filing or service by e-mail.

## NOTES TO DECISIONS

I.IN GENERAL

1.Generally

2.Constitutionality

3.Purpose

4.Relationship to other laws

5.—*15 USCS § 78u-4(c)*

6.—*28 USCS § 1927*

7.—*28 USCS § 2072*

8.—*28 USCS § 2412*

9.—State procedural rules

10.—Federal Rules of Bankruptcy Procedure

**Add.10**

## *USCS Fed Rules Civ Proc R 24, Part 1 of 2*

Current through changes received September 1, 2023.

*USCS Federal Rules Annotated  >  Federal Rules of Civil Procedure  >  Title IV. Parties*

## Rule 24. Intervention

**(a) Intervention of Right.**  On timely motion, the court must permit anyone to intervene who:

**(1)** is given an unconditional right to intervene by a federal statute; or

**(2)** claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

**(b) Permissive Intervention.**

**(1)** *In General.* On timely motion, the court may permit anyone to intervene who:

**(A)** is given a conditional right to intervene by a federal statute; or

**(B)** has a claim or defense that shares with the main action a common question of law or fact.

**(2)** *By a Government Officer or Agency.* On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on:

**(A)** a statute or executive order administered by the officer or agency; or

**(B)** any regulation, order, requirement, or agreement issued or made under the statute or executive order.

**(3)** *Delay or Prejudice.* In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

**(c) Notice and Pleading Required.**  A motion to intervene must be served on the parties as provided in Rule 5. The motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought.

## History

Amended Dec. 27, 1946, eff. March 19, 1948; Dec. 29, 1948, eff. Oct. 20, 1949; Jan. 21, 1963, eff. July 1, 1963; Feb. 28, 1966, eff. July 1, 1966; March 2, 1987, eff. Aug. 1, 1987; April 30, 1991, eff. Dec. 1, 1991; April 12, 2006, eff. Dec. 1, 2006; April 30, 2007, eff. Dec. 1, 2007.

Annotations

## Notes

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

**Other provisions:**

**Add.11**

USCS Fed Rules Civ Proc R 24, Part 1 of 2

 **Notes of Advisory Committee on Rules.** The right to intervene given by the following and similar statutes is preserved, but the procedure for its assertion is governed by this rule:

USC, Title 28, former:

USC, Title 40:

Compare with the last sentence of former Equity Rule 37 (Parties Generally—Intervention). This rule amplifies and restates the present federal practice at law and in equity. For the practice in admiralty see Admiralty Rules 34 (How Third Party May Intervene) and 42 (Claims Against Proceeds in Registry). See generally Moore and Levi, Federal Intervention: The Right to Intervene and Reorganization (1936), 45 Yale LJ 565. Under the codes two types of intervention are provided, one for the recovery of specific real or personal property (2 Ohio Gen. Code Ann (Page, 1926) § 11263; Wyo Rev Stat Ann (Courtright, 1931) § 89-522), and the other allowing intervention generally when the applicant has an interest in the matter in litigation (1 Colo Stat Ann (1935) Code Civ Proc § 22; La Code Pract (Dart, 1932) Arts 389–394; Utah Rev Stat Ann (1933) § 104-3-24). The English intervention practice is based upon various rules and decisions and falls into the two categories of absolute right and discretionary right. For the absolute right see English Rules Under the Judicature Act (The Annual Practice, 1937) O. 12, r 24 (admiralty), r 25 (land), r 23 (probate); O. 57, r 12 (execution); J. A. (1925) §§ 181, 182, 183(2) (divorce); In re Metropolitan Amalgamated Estates, Ltd. (1912) 2 Ch 497 (receivership); Wilson v Church, 9 Ch D 552 (1878) (representative action). For the discretionary right see O. 16, r 11 (nonjoinder) and Re Fowler, 142 L. T. Jo. 94 (Ch 1916), Vavasseur v Krupp, 9 Ch D 351 (1878) (persons out of the jurisdiction).

**Notes of Advisory Committee on 1946 amendments to Rules.** *Note to Subdivision (a).* The addition to subdivision (a)(3) covers the situation where property may be in the actual custody of some other officer or agency—such as the Secretary of the Treasury—but the control and disposition of the property is lodged in the court wherein the action is pending.

*Note to Subdivision (b).* The addition in subdivision (b) permits the intervention of governmental officers or agencies in proper cases and thus avoids exclusionary constructions of the rule. For an example of the latter, see *Matter of Bender Body Co., Ref. Ohio 1941, 47 F Supp 224*, aff'd as moot, *ND Ohio 1942, 47 F Supp 224, 234*, holding that the Administrator of the Office of Price Administration, then acting under the authority of an Executive Order of the President, could not intervene in a bankruptcy proceeding to protest the sale of assets above ceiling prices. Compare, however, *Securities and Exchange Commission v United States Realty & Improvement Co, 1940, 310 US 434, 84 L Ed 1293, 60 S Ct 1044*, where permissive intervention of the Commission to protect the public interest in an arrangement proceeding under Chapter XI of the Bankruptcy Act was upheld. See also dissenting opinion in *Securities and Exchange Commission v Long Island Lighting Co., CCA 2d, 1945, 148 F2d 252*, judgment vacated as moot and case remanded with direction to dismiss complaint, *1945, 325 US 833, 89 L Ed 1961, 65 S Ct 1085*. For discussion see Commentary, Nature of Permissive Intervention Under Rule 24b, 1940, 3 Fed Rules Serv 704; Berger, Intervention by Public Agencies in Private Litigation in the Federal Courts, 1940, 50 Yale L. J. 65.

Regarding the construction of subdivision (b)(2), see *Allen Calculators, Inc. v National Cash Register Co., 1944, 322 US 137, 88 L Ed 1188, 64 S Ct 905*.

**Notes of Advisory Committee on 1948 amendments to Rules.** The amendment substitutes the present statutory reference.

**Notes of Advisory Committee on 1963 amendments to Rules.** This amendment conforms to the amendment of Rule 5(a). See the Advisory Committee's Note to that amendment.

**Notes of Advisory Committee on 1966 amendments to Rules.** *Note to Subdivision (a).* In attempting to overcome certain difficulties which have arisen in the application of present Rule 24(a)(2) and (3), this amendment draws upon the revision of the related Rules 19 (joinder of persons needed for just adjudication) and 23 (class actions), and the reasoning underlying that revision.

**Add.12**

USCS Fed Rules Civ Proc R 24, Part 1 of 2

Rule 24(a)(3) as amended in 1948 provided for intervention of right where the applicant established that he would be adversely affected by the distribution or disposition of property involved in an action to which he had not been made a party. Significantly, some decided cases virtually disregarded the language of this provision. Thus Professor Moore states: "The concept of a fund has been applied so loosely that it is possible for a court to find a fund in almost any in personam action." 4 Moore's Federal Practice, par 24.09 [3], at 55 (2d ed 1962), and see, e.g., *Formulabs, Inc. v Hartley Pen Co. 275 F2d 52 (9th Cir 1960)*. This development was quite natural, for Rule 24(a)(3) was unduly restricted. If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene, and his right to do so should not depend on whether there is a fund to be distributed or otherwise disposed of. Intervention of right is here seen to be a kind of counterpart to Rule 19(a)(2)(i) on joinder of persons needed for a just adjudication: where, upon motion of a party in an action, an absentee should be joined so that he may protect his interest which as a practical matter may be substantially impaired by the disposition of the action, he ought to have a right to intervene in the action on his own motion. See Louisell & Hazard, Pleading and Procedure: State and Federal 749–50 (1962).

The general purpose of original Rule 24(a)(2) was to entitle an absentee, purportedly represented by a party, to intervene in the action if he could establish with fair probability that the representation was inadequate. Thus, where an action is being prosecuted or defended by a trustee, a beneficiary of the trust should have a right to intervene if he can show that the trustee's representation of his interest probably is inadequate; similarly a member of a class should have the right to intervene in a class action if he can show the inadequacy of the representation of his interest by the representative parties before the court.

Original Rule 24(a)(2), however, made it a condition of intervention that "the applicant is or may be bound by a judgment in the action," and this created difficulties with intervention in class actions. If the "bound" language was read literally in the sense of res judicata, it could defeat intervention in some meritorious cases. A member of a class to whom a judgment in a class action extended by its terms (see Rule 23(c)(3), as amended) might be entitled to show in a later action, when the judgment in the class action was claimed to operate as res judicata against him, that the "representative" in the class action had not in fact adequately represented him. If he could make this showing, the class-action judgment might be held not to bind him. See *Hansberry v Lee, 311 US 32, 85 L Ed 22, 61 S Ct 115, 132 ALR 741 (1940)*. If a class member sought to intervene in the class action proper, while it was still pending, on grounds of inadequacy of representation, he could be met with the argument: if the representation was in fact inadequate, he would not be "bound" by the judgment when it was subsequently asserted against him as res judicata, hence he was not entitled to intervene; if the representation was in fact adequate, there was no occasion or ground for intervention. See *Sam Fox Publishing, Co. v United States, 366 US 683, 6 L Ed 2d 604, 81 S Ct 1309 (1961)*; cf. *Sutphen Estates, Inc. v United States, 342 US 19, 96 L Ed 19, 72 S Ct 14 (1951)*. This reasoning might be linguistically justified by original Rule 24 (a)(2); but it could lead to poor results. Compare the discussion in *International M. & I. Corp. v Von Clemm, 301 F2d 857 (2d Cir 1962)*; *Atlantic Refining Co. v Standard Oil Co. 304 F2d 387 (DC Cir 1962)*. A class member who claims that his "representative" does not adequately represent him, and is able to establish that proposition with sufficient probability, should not be put to the risk of having a judgment entered in the action which by its terms extends to him, and be obliged to test the validity of the judgment as applied to his interest by a later collateral attack. Rather he should, as a general rule, be entitled to intervene in the action.

The amendment provides that an applicant is entitled to intervene in an action when his position is comparable to that of a person under Rule 19(a)(2)(i), as amended, unless his interest is already adequately represented in the action by existing parties. The Rule 19(a)(2)(i) criterion imports practical considerations, and the deletion of the "bound" language similarly frees the rule from undue preoccupation with strict considerations of res judicata.

The representation whose adequacy comes into question under the amended rule is not confined to formal representation like that provided by a trustee for his beneficiary or a representative party in a class action for a member of the class. A party to an action may provide practical representation to the absentee seeking intervention although no such formal relationship exists between them, and the adequacy of this practical representation will then have to be weighed. See International M. & I. Corp. v Von Clemm, and Atlantic Refining Co. v Standard Oil Co., both supra; *Wolpe v Poretsky, 144 F2d 505 (DC Cir 1944)*, cert den *323 US 777, 85 L Ed 22, 61 S Ct 115, 132 ALR 741 (1944)*; cf. *Ford Motor Co. v Bisanz Bros., 249 F2d 22 (8th Cir 1957)*; and generally, Annot, 84 ALR2d 1412 (1961).

# Add.13

USCS Fed Rules Civ Proc R 24, Part 1 of 2

An intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings.

*Note to Subdivision (c).* This amendment conforms to the amendment of Rule 5(a). See the Advisory Committee's Note to that amendment.

**Notes of Advisory Committee on 1987 amendments to Rules.** The amendments are technical. No substantive change is intended.

**Notes of Advisory Committee on 1991 amendment of Rule.** Language is added to bring Rule 24(c) into conformity with the statute cited, resolving some confusion reflected in district court rules. As the text provides, counsel challenging the constitutionality of legislation in an action in which the appropriate government is not a party should call the attention of the court to its duty to notify the appropriate governmental officers. The statute imposes the burden of notification on the court, not the party making the constitutional challenge, partly in order to protect against any possible waiver of constitutional rights by parties inattentive to the need for notice. For this reason, the failure of a party to call the court's attention to the matter cannot be treated as a waiver.

**Notes of Advisory Committee on 2006 amendments.** New Rule 5.1 replaces the final three sentences of Rule 24(c), implementing the provisions of *28 U.S.C. § 2403*. Section 2403 requires notification to the Attorney General of the United States when the constitutionality of an Act of Congress is called in question, and to the state attorney general when the constitutionality of a state statute is drawn into question.

**Notes of Advisory Committee on 2007 amendments.** The language of Rule 24 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

The former rule stated that the same procedure is followed when a United States statute gives a right to intervene. This statement is deleted because it added nothing.

## NOTES TO DECISIONS

I.IN GENERAL

1.Generally

2.Construction

3.Applicability

4.—Bankruptcy or reorganization proceedings

5.Standing to intervene

6.—United States is party

7.—Other particular circumstances

8.Scope of issues available to intervenors

9.—Particular issues and proceedings

10.Effect of dismissal of main action or party

II.JURISDICTION

11.Generally

**Add.14**

*USCS Fed Rules Civ Proc R 41, Part 1 of 2*

Current through changes received September 1, 2023.

*USCS Federal Rules Annotated  >  Federal Rules of Civil Procedure  >  Title VI. Trials*

## Rule 41. Dismissal of Actions

**(a) Voluntary Dismissal.**

**(1)** *By the Plaintiff.*

**(A)** Without a Court Order. Subject to Rules 23(e), 23.1(c), 23.2, and 66 and any applicable federal statute, the plaintiff may dismiss an action without a court order by filing:

**(i)** a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or

**(ii)** a stipulation of dismissal signed by all parties who have appeared.

**(B)** Effect. Unless the notice or stipulation states otherwise, the dismissal is without prejudice. But if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits.

**(2)** *By Court Order; Effect.* Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper. If a defendant has pleaded a counterclaim before being served with the plaintiff's motion to dismiss, the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication. Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.

**(b) Involuntary Dismissal; Effect.** If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule—except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits.

**(c) Dismissing a Counterclaim, Crossclaim, or Third-Party Claim.** This rule applies to a dismissal of any counterclaim, crossclaim, or third-party claim. A claimant's voluntary dismissal under Rule 41(a)(1)(A)(i) must be made:

**(1)** before a responsive pleading is served; or

**(2)** if there is no responsive pleading, before evidence is introduced at a hearing or trial.

**(d) Costs of a Previously Dismissed Action.** If a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court:

**(1)** may order the plaintiff to pay all or part of the costs of that previous action; and

**(2)** may stay the proceedings until the plaintiff has complied.

## History

# Add.15

USCS Fed Rules Civ Proc R 41, Part 1 of 2

Amended Dec. 27, 1946, eff. March 19, 1948; Jan. 21, 1963, eff. July 1, 1963; Feb. 28, 1966, eff. July 1, 1966; Dec. 4, 1967, eff. July 1, 1968; March 2, 1987, eff. Aug. 1, 1987; April 30, 1991, eff. Dec. 1, 1991; April 30, 2007, eff. Dec. 1, 2007.

Annotations

## Notes

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

**Other provisions:**

 **Notes of Advisory Committee on Rules.** *Note to Subdivision (a).* Compare Ill Rev Stat (1937) ch 110, § 176, and English Rules Under the Judicature Act (The Annual Practice, 1937) O. 26.

Provisions regarding dismissal in such statutes as   USC, Title 8, § 164  [now § 1329] (Jurisdiction of district courts in immigration cases) and   USC, Title 31, § 232 [now § 3730] (Liability of persons making false claims against United States; suits) are preserved by paragraph (1).

 *Note to Subdivision (b).* This provides for the equivalent of a nonsuit on motion by the defendant after the completion of the presentation of evidence by the plaintiff. Also, for actions tried without a jury, it provides the equivalent of the directed verdict practice for jury actions which is regulated by Rule 50.

**Notes of Advisory Committee on 1946 amendments.** *Note to Subdivision (a).* The insertion of the reference to Rule 66 correlates Rule 41(a)(1) with the express provisions concerning dismissal set forth in amended Rule 66 on receivers.

The change in Rule 41(a)(1)(i) gives the service of a motion for summary judgment by the adverse party the same effect in preventing unlimited dismissal as was originally given only to the service of an answer. The omission of reference to a motion for summary judgment in the original rule was subject to criticism. 3 Moore's Federal Practice, 1938, 3037–3038, n 12. A motion for summary judgment may be forthcoming prior to answer, and if well taken will eliminate the necessity for an answer. Since such a motion may require even more research and preparation than the answer itself, there is good reason why the service of the motion, like that of the answer, should prevent a voluntary dismissal by the adversary without court approval.

The word "generally" has been stricken from Rule 41(a)(1)(ii) in order to avoid confusion and to conform with the elimination of the necessity for special appearance by original Rule 12(b).

*Note to Subdivision (b).* In some cases tried without a jury, where at the close of plaintiff's evidence the defendant moves for dismissal under Rule 41(b) on the ground that plaintiff's evidence is insufficient for recovery, the plaintiff's own evidence may be conflicting or present questions of credibility. In ruling on the defendant's motion, questions arise as to the function of the judge in evaluating the testimony and whether findings should be made if the motion is sustained. Three circuits hold that as the judge is the trier of the facts in such a situation his function is not the same as on a motion to direct a verdict, where the jury is the trier of the facts, and that the judge in deciding such a motion in a non-jury case may pass on conflicts of evidence and credibility, and if he performs that function of evaluating the testimony and grants the motion on the merits, findings are required. *Young v United States, CCA9th, 1940, 111 F2d 823*; *Gary Theatre Co. v Columbia Pictures Corporation, CCA 7th, 1941, 120 F2d 891*; *Bach v Friden Calculating Machine Co., Inc. CCA6th, 1945, 148 F2d 407*. *Cf. Mateas v Fred Harvey, a Corporation, CCA9th, 1945, 146 F2d 989*. The Third Circuit has held that on such a motion the function of the court is the same as on a motion to direct in a jury case, and that the court should only decide whether there is evidence which would support a judgment for the plaintiff, and, therefore, findings are not required by *Rule 52. Federal Deposit Insurance Corp. v Mason, CCA3d, 1940, 115 F2d 548*; *Schad v Twentieth Century-Fox Film Corp. CCA3d 1943, 136 F2d 991*. The added sentence in Rule 41(b) incorporates the view of the Sixth, Seventh and Ninth Circuits. See also 3

# Add.16

USCS Fed Rules Civ Proc R 41, Part 1 of 2

Moore's Federal Practice, 1938, Cum Supplement § 41.03, under "Page 3045"; Commentary, The Motion to Dismiss in Non-Jury Cases, 1946, 9 Fed Rules Serv, Comm Pg 41b.14.

**Notes of Advisory Committee on 1963 amendments.** Under the present text of the second sentence of this subdivision, the motion for dismissal at the close of the plaintiff's evidence may be made in a case tried to a jury as well as in a case tried without a jury. But, when made in a jury-tried case, this motion overlaps the motion for a directed verdict under Rule 50(a), which is also available in the same situation. It has been held that the standard to be applied in deciding the Rule 41(b) motion at the close of the plaintiff's evidence in a jury-tried case is the same as that used upon a motion for a directed verdict made at the same stage; and, just as the court need not make findings pursuant to Rule 52(a) when it directs a verdict, so in a jury-tried case it may omit these findings in granting the Rule 41(b) motion. See generally *O'Brien v Westinghouse Electric Corp., 293 F2d 1, 5–10 (3d Cir 1961)*.

As indicated by the discussion in the O'Brien case, the overlap has caused confusion. Accordingly, the second and third sentences of Rule 41(b) are amended to provide that the motion for dismissal at the close of the plaintiff's evidence shall apply only to non-jury cases (including cases tried with an advisory jury). Hereafter the correct motion in jury-tried cases will be the motion for a directed verdict. This involves no change of substance. It should be noted that the court upon a motion for a directed verdict may in appropriate circumstances deny that motion and grant instead a new trial, or a voluntary dismissal without prejudice under Rule 41(a)(2). See 6 Moore's Federal Practice P 59.08 [5] (2d ed 1954); cf. *Cone v West Virginia Pulp & Paper Co., 330 US 212, 217, 67 S Ct 752, 91 L Ed 849 (1947)*.

The first sentence of Rule 41(b), providing for dismissal for failure to prosecute or to comply with the Rules or any order of court, and the general provisions of the last sentence remain applicable in jury as well as non-jury cases.

The amendment of the last sentence of Rule 41(b) indicates that a dismissal for lack of an indispensable party does not operate as an adjudication on the merits. Such a dismissal does not bar a new action, for it is based merely "on a plaintiff's failure to comply with a precondition requisite to the Court's going forward to determine the merits of his substantive claim." See *Costello v United States, 365 US 265, 284–288, 81 S Ct 534, 5 L Ed 2d 551* & n 5 (1961); *Mallow v Hinde, 12 Wheat (25 US) 193, 6 L Ed 599 (1827)*; Clark, Code Pleading 602 (2d ed 1947); Restatement of Judgments § 49, comm. a, b (1942). This amendment corrects an omission from the rule and is consistent with an earlier amendment, effective in 1948, adding "the defense of failure to join an indispensable party" to clause (1) of Rule 12(h).

**Notes of Advisory Committee on 1966 amendments.** The terminology is changed to accord with the amendment of Rule 19. See that amended rule and the Advisory Committee's Note thereto.

**Notes of Advisory Committee on 1968 amendments.** The amendment corrects an inadvertent error in the reference to amended Rule 23.

**Notes of Advisory Committee on 1991 amendment.** Language is deleted that authorized the use of this rule as a means of terminating a non-jury action on the merits when the plaintiff has failed to carry a burden of proof in presenting the plaintiff's case. The device is replaced by the new provisions of Rule 52(c), which authorize entry of judgment against the defendant as well as the plaintiff, and earlier than the close of the case of the party against whom judgment is rendered. A motion to dismiss under Rule 41 on the ground that a plaintiff's evidence is legally insufficient should now be treated as a motion for judgment on partial findings as provided in Rule 52(c).

**Notes of Advisory Committee on 2007 amendments.** The language of Rule 41 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

When Rule 23 was amended in 1966, Rules 23.1 and 23.2 were separated from Rule 23. Rule 41(a)(1) was not then amended to reflect the Rule 23 changes. In 1968 Rule 41(a)(1) was amended to correct the cross-reference to what had become Rule 23(e), but Rules 23.1 and 23.2 were inadvertently overlooked. Rules 23.1 and 23.2 are now added to the list of exceptions in Rule 41(a)(1)(A). This change does not affect established meaning. Rule 23.2 explicitly incorporates Rule 23(e), and thus was already absorbed directly into the exceptions in Rule 41(a)(1). Rule

**Add.17**

USCS Fed Rules Civ Proc R 41, Part 1 of 2

23.1 requires court approval of a compromise or dismissal in language parallel to Rule 23(e) and thus supersedes the apparent right to dismiss by notice of dismissal.

## NOTES TO DECISIONS

**I.IN GENERAL**

**1.Generally**

**II.VOLUNTARY DISMISSAL [RULE 41(a)]**

**A.In General**

**2.Generally**

**3.Purpose**

**4.Dismissal of fewer than all claims or causes**

**5.—Effect of *FRCP 15***

**6.—Particular cases**

**7.Dismissal of action against fewer than all defendants**

**8.—Effect of *FRCP 21***

**9.—Notice dismissal, generally**

**10.—Stipulation dismissal**

**11.—Order of court**

**12.—Nondiverse parties**

**13.—Other particular cases**

**14.Miscellaneous**

**B.Without Court Order [Rule 41(a)(1)]**

**1.In General**

**15.Generally**

**16.Purpose**

**17.Right to dismissal**

**18.—Merits considered or decided**

**19.—Joinder of issue**

**20.Other particular cases**

**21.Miscellaneous**

**Add.18**

*USCS Fed Rules Civ Proc R 60, Part 1 of 3*

Current through changes received September 1, 2023.

*USCS Federal Rules Annotated > Federal Rules of Civil Procedure > Title VII. Judgment*

## Rule 60. Relief from a Judgment or Order

**(a) Corrections Based on Clerical Mistakes; Oversights and Omissions.**  The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

**(b) Grounds for Relief from a Final Judgment, Order, or Proceeding.**  On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

**(1)**  mistake, inadvertence, surprise, or excusable neglect;

**(2)**  newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

**(3)**  fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

**(4)**  the judgment is void;

**(5)**  the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

**(6)**  any other reason that justifies relief.

**(c) Timing and Effect of the Motion.**

**(1)**  *Timing.* A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.

**(2)**  *Effect on Finality.* The motion does not affect the judgment's finality or suspend its operation.

**(d) Other Powers to Grant Relief.**  This rule does not limit a court's power to:

**(1)**  entertain an independent action to relieve a party from a judgment, order, or proceeding;

**(2)**  grant relief under *28 U.S.C. § 1655* to a defendant who was not personally notified of the action; or

**(3)**  set aside a judgment for fraud on the court.

**(e) Bills and Writs Abolished.**  The following are abolished: bills of review, bills in the nature of bills of review, and writs of coram nobis, coram vobis, and audita querela.

## History

Amended Dec. 27, 1946, eff. March 19, 1948; Dec. 29, 1948, eff. Oct. 20, 1949; March 2, 1987, eff. Aug. 1, 1987; April 30, 2007, eff. Dec. 1, 2007.

Annotations

# Add.19

USCS Fed Rules Civ Proc R 60, Part 1 of 3

## Notes

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

**Other provisions:**

**Notes of Advisory Committee.** *Note to Subdivision (a).* See former Equity Rule 72 (Correction of Clerical Mistakes in Orders and Decrees); Mich. Court Rules Ann. (Searl, 1933) Rule 48, § 3; 2 Wash. Rev. Stat. Ann. (Remington, 1932) § 464(3); Wyo. Rev. Stat. Ann. (Courtright, 1931) § 89-2301(3). For an example of a very liberal provision for the correction of clerical errors and for amendment after judgment, see Va. Code Ann. (Michie, 1936) §§ 6329, 6333.

*Note to Subdivision (b).* Application to the court under this subdivision does not extend the time for taking an appeal, as distinguished from the motion for new trial. This section is based upon Calif. Code Civ. Proc. (Deering, 1937) § 473. See also N.Y.C.P.A. (1937) § 108; 2 Minn. Stat. (Mason, 1927) § 9283.

For the independent action to relieve against mistake, etc., see Dobie, Federal Procedure, pages 760–765, compare 639; and Simkins, Federal Practice, ch CXXI (pp 820–830) and ch. CXXII (pp 831–834), compare § 214.

**Notes of Advisory Committee on 1946 amendments.** *Note to Subdivision (a).* The amendment incorporates the view expressed in *Perlman v. 322 West Seventy-Second Street Co., Inc., 127 F.2d 716 ( 2d Cir. 1942)* ; 3 Moore's Federal Practice, 1938, 3276, and further permits correction after docketing, with leave of the appellate court. Some courts have thought that upon the taking of an appeal the district court lost its power to act. See *Schram v. Safety Investment Co., 45 F. Supp. 636 (E.D. Mich. 1942)*; also *Miller v. United States, 114 F2d 267 ( 7th Cir. 1940)*.

*Note to Subdivision (b).* When promulgated, the rules contained a number of provisions, including those found in Rule 60(b), describing the practice by a motion to obtain relief from judgments, and these rules, coupled with the reservation in Rule 60(b) of the right to entertain a new action to relieve a party from a judgment, were generally supposed to cover the field. Since the rules have been in force, decisions have been rendered that the use of bills of review, coram nobis, or audita querela, to obtain relief from final judgments is still proper, and that various remedies of this kind still exist although they are not mentioned in the rules and the practice is not prescribed in the rules. It is obvious that the rules should be complete in this respect and define the practice with respect to any existing rights or remedies to obtain relief from final judgments. For extended discussion of the old common law writs and equitable remedies, the interpretation of Rule 60, and proposals for change, see Moore and Rogers, Federal Relief from Civil Judgments, 1946, 55 Yale L. J. 623. See also 3 Moore's Federal Practice, 1938, 3254 et seq.; Commentary, Effect of Rule 60b on Other Methods of Relief From Judgment, 1941, 4 Fed. Rules Serv. 942, 945; *Wallace v. United States, 142 F.2d 240 ( 2d Cir. 1944),* cert. denied, *323 U.S. 712, 89 L. Ed. 573, 65 S. Ct. 37 (1944).*

The reconstruction of Rule 60(b) has for one of its purposes a clarification of this situation. Two types of procedure to obtain relief from judgments are specified in the rules as it is proposed to amend them. One procedure is by motion in the court and in the action in which the judgment was rendered. The other procedure is by a new or independent action to obtain relief from a judgment, which action may or may not be begun in the court which rendered the judgment. Various rules, such as the one dealing with a motion for new trial and for amendment of judgments, Rule 59, one for amended findings, Rule 52, and one for judgment notwithstanding the verdict, Rule 50(b), and including the provisions of Rule 60(b) as amended, prescribe the various types of cases in which the practice by motion is permitted. In each case there is a limit upon the time within which resort to a motion is permitted, and this time limit may not be enlarged under Rule 6(b). If the right to make a motion is lost by the expiration of the time limits fixed in these rules, the only other procedural remedy is by a new or independent action to set aside a judgment upon those principles which have heretofore been applied in such an action. Where the independent action is resorted to, the limitations of time are those of laches or statutes of limitations. The Committee has endeavored to ascertain all the remedies and types of relief heretofore available by coram nobis,

# Add.20

USCS Fed Rules Civ Proc R 60, Part 1 of 3

coram vobis, audita querela, bill of review, or bill in the nature of a bill of review. See Moore and Rogers, Federal Relief from Civil Judgments, 1946, 55 Yale L. J. 623, 659–682. It endeavored then to amend the rules to permit, either by motion or by independent action, the granting of various kinds of relief from judgments which were permitted in the federal courts prior to the adoption of these rules, and the amendment concludes with a provision abolishing the use of bills of review and the other common law writs referred to, and requiring the practice to be by motion or by independent action.

To illustrate the operation of the amendment, it will be noted that under Rule 59(b) as it now stands, without amendment, a motion for new trial on the ground of newly discovered evidence is permitted within ten days after the entry of the judgment, or after that time upon leave of the court. It is proposed to amend Rule 59(b) by providing that under that rule a motion for new trial shall be served not later than ten days after the entry of the judgment, whatever the ground be for the motion, whether error by the court or newly discovered evidence. On the other hand, one of the purposes of the bill of review in equity was to afford relief on the ground of newly discovered evidence long after the entry of the judgment. Therefore, to permit relief by a motion similar to that heretofore obtained on bill of review. Rule 60(b) as amended permits an application for relief to be made by motion, on the ground of newly discovered evidence, within one year after judgment. Such a motion under Rule 60(b) does not affect the finality of the judgment, but a motion under Rule 59, made within 10 days, does affect finality and the running of the time for appeal.

If these various amendments, including principally those to Rule 60(b), accomplish the purpose for which they are intended, the federal rules will deal with the practice in every sort of case in which relief from final judgments is asked, and prescribe the practice. With reference to the question whether, as the rules now exist, relief by coram nobis, bills of review, and so forth, is permissible, the generally accepted view is that the remedies are still available, although the precise relief obtained in a particular case by use of these ancillary remedies is shrouded in ancient lore and mystery. See *Wallace v. United States, 142 F.2d 240 ( 2d Cir. 1944)*, cert. denied, *323 U.S. 712, 89 L. Ed. 573, 65 S. Ct. 37 (1944)*; *Fraser v. Doing, 130 F.2d 617 ( D.C. Cir. 1942)*; *Jones v. Watts, 142 F.2d 575 ( 5th Cir. 1944)*; *Preveden v. Hahn, 36 F. Supp. 952 (S.D.N.Y. 1941)*; *Cavallo v. Agwilines, Inc.,* 6 Fed. Rules Serv. 60b. *31, Case 2, 2 F.R.D. 526 (S.D.N.Y. 1942)*; *McGinn v. United States,* 6 Fed. Rules Serv. 60b. *51, Case 3, 2 F.R.D. 562 (D. Mass. 1942)*; *City of Shattuck, Oklahoma ex rel. Versluis v. Oliver,* 8 Fed. Rules Serv. 60b.31, Case 3 (W. D. Okla. 1945); Moore and Rogers, Federal Relief from Civil Judgments, 1946, 55 Yale L. J. 623, 631–653; 3 Moore's Federal Practice, 1938, 3254 et seq.; Commentary, Effect of Rule 60b on Other Methods of Relief from Judgment, op cit supra. *Cf. Norris v. Camp, 144 F.2d 1 ( 10th Cir. 1944)*; *Reed v. South Atlantic Steamship Co. of Delaware, 2 F.R.D. 475,* 6 Fed. Rules Serv. 60b.31, Case 1 (D. Del. 1942); *Laughlin v. Berens,* 8 Fed. Rules Serv. 60b. 51, Case 1, 73 W.L.R. 209 (D. D.C. 1945).

The transposition of the words "the court" and the addition of the word "and" at the beginning of the first sentence are merely verbal changes. The addition of the qualifying word "final" emphasizes the character of the judgments, orders or proceedings from which Rule 60(b) affords relief; and hence interlocutory judgments are not brought within the restrictions of the rule, but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires.

The qualifying pronoun "his" has been eliminated on the basis that it is too restrictive, and that the subdivision should include the mistake or neglect of others which may be just as material and call just as much for supervisory jurisdiction as where the judgment is taken against the party through his mistake, inadvertence, etc.

Fraud, whether intrinsic or extrinsic, misrepresentation, or other misconduct of an adverse party are express grounds for relief by motion under amended subdivision (b). There is no sound reason for their exclusion. The incorporation of fraud and the like within the scope of the rule also removes confusion as to the proper procedure. It has been held that relief from a judgment obtained by extrinsic fraud could be secured by motion within a "reasonable time," which might be after the time stated in the rule had run. *Fiske v. Buder, 125 F.2d 841 (8th Cir. 1942)*; see also inferentially *Bucy v. Nevada Construction Co., 125 F.2d 213 ( 9th Cir. 1942)*. On the other hand, it has been suggested that in view of the fact that fraud was omitted from original Rule 60(b) as a ground for relief, an independent action was the only proper remedy. Commentary, Effect of Rule 60(b) on Other Methods of Relief From Judgment, 1941, 4 Fed Rules Serv 942, 945. The amendment settles this problem by making fraud an

**Add.21**

USCS Fed Rules Civ Proc R 60, Part 1 of 3

express ground for relief by motion; and under the saving clause, fraud may be urged as a basis for relief by independent action insofar as established doctrine permits. See Moore and Rogers, Federal Relief from Civil Judgments, 1946, 55 Yale L. J. 623, 653–659; 3 Moore's Federal Practice, 1938, 3267 et seq. And the rule expressly does not limit the power of the court, when fraud has been perpetrated upon it, to give relief under the saving clause. As an illustration of this situation, see *Hazel-Atlas Glass Co. v. Hartford Empire Co., 322 U.S. 238, 88 L. Ed. 1250, 64 S. Ct. 997 (1944)*.

The time limit for relief by motion in the court and in the action in which the judgment was rendered has been enlarged from six months to one year.

It should be noted that Rule 60(b) does not assume to define the substantive law as to the grounds for vacating judgments, but merely prescribes the practice in proceedings to obtain relief. It should also be noted that under § 200(4) of the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C. Appendix, §§ 501 et seq. [§ 520(4)], a judgment rendered in any action or proceeding governed by the section may be vacated under certain specified circumstances upon proper application to the court.

**Notes of Advisory Committee on 1948 amendments.** The amendment substituted the reference to "*Title 28, U.S.C., § 1655*" in the next to the last sentence of subdivision (b), for the reference to "Section 57 of the Judicial Code, *U.S.C., Title 28, § 118*."

**Notes of Advisory Committee on 2007 amendments.** The language of Rule 60 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

The final sentence of former Rule 60(b) said that the procedure for obtaining any relief from a judgment was by motion as prescribed in the Civil Rules or by an independent action. That provision is deleted as unnecessary. Relief continues to be available only as provided in the Civil Rules or by independent action.

## NOTES TO DECISIONS

I.IN GENERAL

A.General Considerations

1.Purpose

1.Generally

2.Effect on appeal

2.Construction

a.In General

3.Generally

b.With Other Rules

4.Generally

5.Federal Rules of Appellate Procedure

6.Bankruptcy rules

7.*FRCivP 59(e)*

# Add.22

**Rule 201.  Judicial Notice of Adjudicative Facts**

(a)  **Scope of rule.**  This rule governs only judicial notice of adjudicative facts in civil case

(b)  **Kinds of facts.**  A judicially noticed fact must be one not subject to reasonable dispute
the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination b
reasonably be questioned.

(c)  **When discretionary.**  A court may take judicial notice, whether requested or not.

(d)  **When mandatory.**  A court shall take judicial notice if requested by a party and suppl

(e)  **Opportunity to be heard.**  A party is entitled upon timely request to an opportunity to
notice and the tenor of the matter noticed. In the absence of prior notification, the request may l

(f)  **Time of taking notice.**  Judicial notice may be taken at any stage of the proceeding.

(g)  **Instructing jury.**  The court shall instruct the jury to accept as conclusive any fact jud

(Amended effective January 1, 1990.)

*Committee Comment - 1989*

### *Rule 201(a)*

*The rule governing judicial notice is applicable only to civil cases. The status of the law g
cases is unsettled and not appropriate for codification. While it is understood that a trial judge
in a criminal case, it is less clear the extent to which the court can take judicial notice of uncon
facts establishing venue. See e.g. State v. White, 300 N.W.2d 176 (Minn. 1980); State v. Trezona
courts should rely on applicable case law to determine the appropriate use of judicial notice in*

*This rule is limited to judicial notice of "adjudicative" facts, and does not govern judicial
between adjudicative and legislative facts was developed by Professor Kenneth C. Davis. An Ap
Administrative Process, 55 Harv.L.Rev. 364, 404-407 (1942); Judicial Notice, 55 Colum.L.Rev.
(3d ed. 1972).*

*Adjudicative facts generally are the type of facts decided by juries. Facts about the parties
the facts that give rise to the controversy, are adjudicative facts.*

*Legislative facts involve questions of law and policy and normally are decided by the cour
173 N.W.2d 416, 419, 420 (1969) where the Court notices the effect which various courses of c
marriage relationship. See also McCormack v. Hankscraft Co., 278 Minn. 322, 338, 154 N.W.2
liability to those injured by its products more adequately meets public policy demands to protec
harm created by mass production and complex marketing conditions." The Committee was in a
rule of evidence in not limiting judicial notice of legislative facts. See United States Supreme C*

### *Rule 201(b)*

*Minnesota has traditionally limited judicial notice of adjudicative facts to situations incap
v. Clousing, 205 Minn. 296, 301, 285 N.W. 711, 714, 123 A.L.R. 465 (1939). This includes matt
determination. See Bollenbach v. Bollenbach, 285 Minn. 418, 429, 175 N.W.2d 148, 156 (1970)
Application of Baldwin, 218 Minn. 11, 16, 17, 15 N.W.2d 184, 187 (1944).*

### *Rule 201(c), (d)*

**Add.23**

*United States Code Service > TITLE 17. COPYRIGHTS (§§ 101 — 1511) > CHAPTER 1. Subject Matter and Scope of Copyright (§§ 101 — 122)*

## § 101. Definitions

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

An "anonymous work" is a work on the copies or phonorecords of which no natural person is identified as author.

An "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

The "*Berne Convention*" is the Convention for the Protection of Literary and Artistic Works, signed at Berne, Switzerland, on September 9, 1886, and all acts, protocols, and revisions thereto.

The "best edition" of a work is the edition, published in the United States at any time before the date of deposit, that the Library of Congress determines to be most suitable for its purposes.

A person's "children" are that person's immediate offspring, whether legitimate or not, and any children legally adopted by that person.

A "collective work" is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.

A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

A "computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

"Copyright owner", with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.

A "Copyright Royalty Judge" is a Copyright Royalty Judge appointed under section 802 of this title [*17 USCS § 802*], and includes any individual serving as an interim Copyright Royalty Judge under such section.

**Add.24**

17 USCS § 101

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

A "device", "machine", or "process" is one now known or later developed.

A "digital transmission" is a transmission in whole or in part in a digital or other non-analog format.

To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially.

An "establishment" is a store, shop, or any similar place of business open to the general public for the primary purpose of selling goods or services in which the majority of the gross square feet of space that is nonresidential is used for that purpose, and in which nondramatic musical works are performed publicly.

The term "financial gain" includes receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works.

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

A "food service or drinking establishment" is a restaurant, inn, bar, tavern, or any other similar place of business in which the public or patrons assemble for the primary purpose of being served food or drink, in which the majority of the gross square feet of space that is nonresidential is used for that purpose, and in which nondramatic musical works are performed publicly.

The "*Geneva Phonograms Convention*" is the *Convention for the Protection of Producers of Phonograms Against Unauthorized Duplication of Their Phonograms*, concluded at Geneva, Switzerland, on October 29, 1971.

The "gross square feet of space" of an establishment means the entire interior space of that establishment, and any adjoining outdoor space used to serve patrons, whether on a seasonal basis or otherwise.

The terms "including" and "such as" are illustrative and not limitative.

An "international agreement" is—

    **(1)** the *Universal Copyright Convention*;

    **(2)** the *Geneva Phonograms Convention*;

    **(3)** the *Berne Convention*;

    **(4)** the WTO Agreement;

    **(5)** the *WIPO Copyright Treaty*;

    **(6)** the *WIPO Performances and Phonograms Treaty*; and

    **(7)** any other copyright treaty to which the United States is a party.

A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

**Add.25**

17 USCS § 101

"Literary works" are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied.

The term "motion picture exhibition facility" means a movie theater, screening room, or other venue that is being used primarily for the exhibition of a copyrighted motion picture, if such exhibition is open to the public or is made to an assembled group of viewers outside of a normal circle of a family and its social acquaintances.

"Motion pictures" are audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any.

To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.

A "performing rights society" is an association, corporation, or other entity that licenses the public performance of nondramatic musical works on behalf of copyright owners of such works, such as the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), and SESAC, Inc.

"Phonorecords" are material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "phonorecords" includes the material object in which the sounds are first fixed.

"Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

For purposes of section 513, a "proprietor" is an individual, corporation, partnership, or other entity, as the case may be, that owns an establishment or a food service or drinking establishment, except that no owner or operator of a radio or television station licensed by the Federal Communications Commission, cable system or satellite carrier, cable or satellite carrier service or programmer, provider of online services or network access or the operator of facilities therefor, telecommunications company, or any other such audio or audiovisual service or programmer now known or as may be developed in the future, commercial subscription music service, or owner or operator of any other transmission service, shall under any circumstances be deemed to be a proprietor.

A "pseudonymous work" is a work on the copies or phonorecords of which the author is identified under a fictitious name.

"Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

To perform or display a work "publicly" means—

    **(1)** to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

    **(2)** to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public

**Add.26**

17 USCS § 101

capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

"Registration", for purposes of sections 205(c)(2), 405, 406, 410(d), 411, 412, and 506(e) [*17 USCS §§ 205(c)(2)*, *405*, *406*, *410(d)*, *411*, *412*, and *506(e)*], means a registration of a claim in the original or the renewed and extended term of copyright.

"Sound recordings" are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied.

"State" includes the District of Columbia and the Commonwealth of Puerto Rico, and any territories to which this title is made applicable by an Act of Congress.

A "transfer of copyright ownership" is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

A "transmission program" is a body of material that, as an aggregate, has been produced for the sole purpose of transmission to the public in sequence and as a unit.

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

A "treaty party" is a country or intergovernmental organization other than the United States that is a party to an international agreement.

The "United States", when used in a geographical sense, comprises the several States, the District of Columbia and the Commonwealth of Puerto Rico, and the organized territories under the jurisdiction of the United States Government.

For purposes of section 411 [*17 USCS § 411*], a work is a "United States work" only if—

**(1)** in the case of a published work, the work is first published—

**(A)** in the United States;

**(B)** simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;

**(C)** simultaneously in the United States and a foreign nation that is not a treaty party; or

**(D)** in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States;

**(2)** in the case of an unpublished work, all the authors of the work are nationals, domiciliaries, or habitual residents of the United States, or, in the case of an unpublished audiovisual work, all the authors are legal entities with headquarters in the United States; or

**(3)** in the case of a pictorial, graphic, or sculptural work incorporated in a building or structure, the building or structure is located in the United States.

A "useful article" is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a "useful article".

The author's "widow" or "widower" is the author's surviving spouse under the law of the author's domicile at the time of his or her death, whether or not the spouse has later remarried.

The "*WIPO Copyright Treaty*" is the *WIPO Copyright Treaty* concluded at Geneva, Switzerland, on December 20, 1996.

# Add.27

17 USCS § 101

The "*WIPO Performances and Phonograms Treaty*" is the *WIPO Performances and Phonograms Treaty* concluded at Geneva, Switzerland, on December 20, 1996.

A "work of visual art" is—

**(1)** a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or

**(2)** a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author.

A work of visual art does not include—

**(A)**

**(i)** any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base, electronic information service, electronic publication, or similar publication;

**(ii)** any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container;

**(iii)** any portion or part of any item described in clause (i) or (ii);

**(B)** any work made for hire; or

**(C)** any work not subject to copyright protection under this title.

A "work of the United States Government" is a work prepared by an officer or employee of the United States Government as part of that person's official duties.

A "work made for hire" is—

**(1)** a work prepared by an employee within the scope of his or her employment; or

**(2)** a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of *Public Law 106-113*, nor the deletion of the words added by that amendment—

**(A)** shall be considered or otherwise given any legal significance, or

**(B)** shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination,

by the courts or the Copyright Office. Paragraph (2) shall be interpreted as if both section 2(a)(1) of the Work Made For Hire and Copyright Corrections Act of 2000 and section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of

# Add.28

17 USCS § 101

*Public Law 106-113*, were never enacted, and without regard to any inaction or awareness by the Congress at any time of any judicial determinations.

The terms "WTO Agreement" and "WTO member country" have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act [*19 USCS § 3501*].

## History

**HISTORY:**

Oct. 19, 1976, *P. L. 94-553*, Title I, § 101, *90 Stat 2541*; Dec. 12, 1980, *P. L. 96-517*, § 10(a), *94 Stat. 3028*; Oct. 31, 1988, *P. L. 100-568*, § 4(a)(1), *102 Stat. 2854*; Dec. 1, 1990, *P. L. 101-650*, Title VI, § 602, Title VII, § 702, *104 Stat. 5128*, 5133; June 26, 1992, *P. L. 102-307*, Title I, § 102(b)(2), *106 Stat. 266*; Oct. 28, 1992, *P. L. 102-563*, § 3(b), *106 Stat. 4248*; Nov. 1, 1995, *P. L. 104-39*, § 5(a), *109 Stat. 348*; Nov. 13, 1997, *P. L. 105-80*, § 12(a)(3), *111 Stat. 1534*; Dec. 16, 1997, *P. L. 105-147*, § 2(a), *111 Stat. 2678*; Oct. 27, 1998, *P. L. 105-298*, Title II, § 205, *112 Stat. 2833*; Oct. 28, 1998, *P. L. 105-304*, Title I, § 102(a), *112 Stat. 2861*; Aug. 5, 1999, *P. L. 106-44*, § 1(g)(1), *113 Stat. 222*; Nov. 29, 1999, *P. L. 106-113*, Div B, § 1000(a)(9), *113 Stat. 1536*; Oct. 27, 2000, *P. L. 106-379*, § 2(a), *114 Stat. 1444*; Nov. 2, 2002, *P. L. 107-273*, Div C, Title III, Subtitle B, § 13210(5), *116 Stat. 1909*; Nov. 30, 2004, *P. L. 108-419*, § 4, *118 Stat. 2361*; April 27, 2005, *P. L. 109-9*, Title I, § 102(c), *119 Stat. 220*; Dec. 9, 2010, *P. L. 111-295*, § 6(a), *124 Stat. 3181*.

Annotations

## Notes

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

**Prior law and revision:**

**Explanatory notes:**

**Short titles:**

**References in text:**

**Effective date of section:**

**Amendment Notes**

**1980.**

**1988.**

**1990.**

**1992.**

**1995.**

**1997.**

**1998.**

**Add.29**

### *17 USCS § 102*

Current through Public Law 118-13, approved August 7, 2023.

*United States Code Service > TITLE 17. COPYRIGHTS (§§ 101 — 1511) > CHAPTER 1. Subject Matter and Scope of Copyright (§§ 101 — 122)*

## § 102. Subject matter of copyright: In general

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

   (1) literary works;

   (2) musical works, including any accompanying words;

   (3) dramatic works, including any accompanying music;

   (4) pantomimes and choreographic works;

   (5) pictorial, graphic, and sculptural works;

   (6) motion pictures and other audiovisual works;

   (7) sound recordings; and

   (8) architectural works.

(b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

## History

**HISTORY:**

Oct. 19, 1976, *P. L. 94-553*, Title I, § 101, *90 Stat 2544*; Dec. 1, 1990, *P. L. 101-650*, Title VII, § 703, *104 Stat. 5133*.

Annotations

## Notes

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

   **Prior law and revision:**

   **Effective date of section:**

   **Amendment Notes**

**Add.30**

17 USCS § 102

**1990.**

**Prior law and revision:**

HOUSE REPORT NO. 94-1476.

"Original works of authorship". The two fundamental criteria of copyright protection—originality and fixation in tangible form—are restated in the first sentence of this cornerstone provision. The phrase "original works of authorship," which is purposely left undefined, is intended to incorporate without change the standard of originality established by the courts under the present copyright statute. This standard does not include requirements of novelty, ingenuity, or esthetic merit, and there is no intention to enlarge the standard of copyright protection to require them.

In using the phrase "original works of authorship," rather than "all the writings of an author" now in section 4 of the statute, the committee's purpose is to avoid exhausting the constitutional power of Congress to legislate in this field, and to eliminate the uncertainties arising from the latter phrase. Since the present statutory language is substantially the same as the empowering language of the Constitution, a recurring question has been whether the statutory and the constitutional provisions are coextensive. If so, the courts would be faced with the alternative of holding copyrightable something that Congress clearly did not intend to protect, or of holding constitutionally incapable of copyright something that Congress might one day want to protect. To avoid these equally undesirable results, the courts have indicated that "all the writings of an author" under the present statute is narrower in scope than the "writings" of "authors" referred to in the Constitution. The bill avoids this dilemma by using a different phrase—"original works of authorship"—in characterizing the general subject matter of statutory copyright protection.

The history of copyright law has been one of gradual expansion in the types of works accorded protection, and the subject matter affected by this expansion has fallen into two general categories. In the first, scientific discoveries and technological developments have made possible new forms of creative expression that never existed before. In some of these cases the new expressive forms-electronic music, filmstrips, and computer programs, for example-could be regarded as an extension of copyrightable subject matter Congress had already intended to protect, and were thus considered copyrightable from the outset without the need of new legislation. In other cases, such as photographs, sound recordings, and motion pictures, statutory enactment was deemed necessary to give them full recognition as copyrightable works.

Authors are continually finding new ways of expressing themselves, but it is impossible to foresee the forms that these new expressive methods will take. The bill does not intend either to freeze the scope of copyrightable technology or to allow unlimited expansion into areas completely outside the present congressional intent. Section 102 implies neither that that subject matter is unlimited nor that new forms of expression within that general area of subject matter would necessarily be unprotected.

The historic expansion of copyright has also applied to forms of expression which, although in existence for generations or centuries, have only gradually come to be recognized as creative and worthy of protection. The first copyright statute in this country, enacted in 1790, designated only "maps, charts, and books"; major forms of expression such as music, drama, and works of art achieved specific statutory recognition only in later enactments. Although the coverage of the present statute is very broad, and would be broadened further by the explicit recognition of all forms of choreography, there are unquestionably other areas of existing subject matter that this bill does not propose to protect but that future Congresses may want to.

Fixation in tangible form. As a basic condition of copyright protection, the bill perpetuates the existing requirement that a work be fixed in a "tangible medium of expression," and adds that this medium may be one "now known or later developed," and that the fixation is sufficient if the work "can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." This broad language is intended to avoid the artificial and largely unjustifiable distinctions, derived from cases such as *White-Smith Publishing Co. v. Apollo Co., 209 U.S. 1 [52 L. Ed. 2d 655] (1908),* under which statutory copyrightability in certain cases has been made to

# Add.31

17 USCS § 102

depend upon the form or medium in which the work is fixed. Under the bill it makes no difference what the form, manner, or medium of fixation may be-whether it is in words, numbers, notes, sounds, pictures, or any other graphic or symbolic indicia, whether embodied in a physical object in written, printed, photographic, sculptural, punched, magnetic, or any other stable form, and whether it is capable of perception directly or by means of any machine or device "now known or later developed."

Under the bill, the concept of fixation is important since it not only determines whether the provisions of the statute apply to a work, but it also represents the dividing line between common law and statutory protection. As will be noted in more detail in connection with section 301, an unfixed work of authorship, such as an improvisation or an unrecorded choreographic work, performance, or broadcast, would continue to be subject to protection under State common law or statute, but would not be eligible for Federal statutory protection under section 102.

The bill seeks to resolve, through the definition of "fixation" in section 101, the status of live broadcasts-sports, news coverage, live performances of music, etc.-that are reaching the public in unfixed form but that are simultaneously being recorded. When a football game is being covered by four television cameras, with a director guiding the activities of the four cameramen and choosing which of their electronic images are sent out to the public and in what order, there is little doubt that what the cameramen and the director are doing constitutes "authorship." The further question to be considered is whether there has been a fixation. If the images and sounds are to be broadcast are first recorded (on a video tape, film, etc.) and then transmitted, the recorded work would be considered a "motion picture" subject to statutory protection against unauthorized reproduction or retransmission of the broadcast. If the program content is transmitted live to the public while being recorded at the same time, the case would be treated the same; the copyright owner would not be forced to rely on common law rather than statutory rights in proceeding against an infringing user of the live broadcast.

Thus, assuming it is copyrightable-as a "motion picture" or "sound recording," for example-the content of a live transmission should be accorded statutory protection if it is being recorded simultaneously with its transmission. On the other hand, the definition of "fixation" would exclude from the concept purely evanescent or transient reproductions such as those projected briefly on a screen, shown electronically on a television or other cathode ray tube, or captured momentarily in the "memory" of a computer.

Under the first sentence of the definition of "fixed" in section 101, a work would be considered "fixed in a tangible medium of expression", if there has been an authorized embodiment in a copy or phonorecord and if that embodiment "is sufficiently permanent or stable" to permit the work "to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." The second sentence makes clear that, in the case of "a work consisting of sounds, images, or both, that are being transmitted," the work is regarded as "fixed" if a fixation is being made at the same time as the transmission.

Under this definition "copies" and "phonorecords" together will comprise all of the material objects in which copyrightable works are capable of being fixed. The definitions of these terms in section 101, together with their usage in section 102 and throughout the bill, reflect a fundamental distinction between the "original work" which is the product of "authorship" and the multitude of material objects in which it can be embodied. Thus, in the sense of the bill, a "book" is not a work of authorship, but is a particular kind of "copy." Instead, the author may write a "literary work," which in turn can be embodied in a wide range of "copies" and "phonorecords," including books, periodicals, computer punch cards, microfilm, tape recordings, and so forth. It is possible to have an "original work of authorship" without having a "copy" or "phonorecord" embodying it, and it is also possible to have a "copy" or "phonorecord" embodying something that does not qualify as an "original work of authorship." The two essential elements—original work and tangible object—must merge through fixation in order to produce subject matter copyrightable under the statute.

Categories of copyrightable works. The second sentence of section 102 lists seven broad categories which the concept of "works" of authorship is said to "include." The use of the word "include," as defined in section 101, makes clear that the listing is "illustrative and not limitative," and that the seven categories do not necessarily exhaust the scope of "original works of authorship" that the bill is intended to protect. Rather, the list sets out the general area of copyrightable subject matter, but with sufficient flexibility to free the courts from rigid or outmoded

**Add.32**

17 USCS § 102

concepts of the scope of particular categories. The items are also overlapping in the sense that a work falling within one class may encompass works coming within some or all of the other categories. In the aggregate, the list covers all classes of works now specified in section 5 of title 17; in addition, it specifically enumerates "pantomimes and choreographic works".

Of the seven items listed, four are defined in section 101. The three undefined categories—"musical works," "dramatic works," and "pantomimes and choreographic works"—have fairly settled meanings. There is no need, for example, to specify the copyrightability of electronic or concrete music in the statute since the form of a work would no longer be of any importance, nor is it necessary to specify that "choreographic works" do not include social dance steps and simple routines.

The four items defined in section 101 are "literary works," "pictorial, graphic, and sculptural works," "motion pictures and audiovisual works", and "sound recordings." In each of these cases, definitions are needed not only because the meaning of the term itself is unsettled but also because the distinction between "work" and "material object" requires clarification. The term "literary works" does not connote any criterion of literary merit or qualitative value: it includes catalogs, directories, and similar factual, reference, or instructional works and compilations of data. It also includes computer data bases, and computer programs to the extent that they incorporate authorship in the programmer's expression of original ideas, as distinguished from the ideas themselves.

Correspondingly, the definition of "pictorial, graphic, and sculptural works" carries with it no implied criterion of artistic taste, aesthetic value, or intrinsic quality. The term is intended to comprise not only "works of art" in the traditional sense but also works of graphic art and illustration, art reproductions, plans and drawings, photographs and reproductions of them, maps, charts, globes, and other cartographic works, works of these kinds intended for use in advertising and commerce, and work of "applied art." There is no intention whatever to narrow the scope of the subject matter now characterized in section 5(k) as "prints or labels used for articles of merchandise." However, since this terminology suggests the material object in which a work is embodied rather than the work itself, the bill does not mention this category separately.

In accordance with the Supreme Court's decision in *Mazer v. Stein, 347 U.S. 201 [98 L. Ed. 2d 1096]* (1954), works of "applied art" encompass all original pictorial, graphic, and sculptural works that are intended to be or have been embodied in useful articles, regardless of factors such as mass production, commercial exploitation, and the potential availability of design patent protection. The scope of exclusive rights in these works is given special treatment in section 113, to be discussed below.

The Committee has added language to the definition of "pictorial, graphic, and sculptural works" in an effort to make clearer the distinction between works of applied art protectable under the bill and industrial designs not subject to copyright protection. The declaration that "pictorial, graphic, and sculptural works" include "works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned" is classic language; it is drawn from Copyright Office regulations promulgated in the 1940's and expressly endorsed by the Supreme Court in the Mazer case.

The second part of the amendment states that "the design of a useful article . . . shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." A "useful article" is defined as "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." This part of the amendment is an adaptation of language added to the Copyright Office Regulations in the mid-1950's in an effort to implement the Supreme Court's decision in the Mazer case.

In adopting this amendatory language, the Committee is seeking to draw as clear a line as possible between copyrightable works of applied art and uncopyrighted works of industrial design. A two-dimensional painting, drawing, or graphic work is still capable of being identified as such when it is printed on or applied to utilitarian articles such as textile fabrics, wallpaper, containers, and the like. The same is true when a statute or carving is used to embellish an industrial product or, as in the Mazer case, is incorporated into a product without losing its

**Add.33**

17 USCS § 102

ability to exist independently as a work of art. On the other hand, although the shape of an industrial product may be aesthetically satisfying and valuable, the Committee's intention is not to offer it copyright protection under the bill. Unless the shape of an automobile, airplane, ladies' dress, food processor, television set, or any other industrial product contains some element that, physically or conceptually, can be identified as separable from the utilitarian aspects of that article, the design would not be copyrighted under the bill. The test of separability and independence from "the utilitarian aspects of the article" does not depend upon the nature of the design-that is, even if the appearance of an article is determined by esthetic (as opposed to functional) considerations, only elements, if any, which can be identified separately from the useful article as such are copyrightable. And, even if the three-dimensional design contains some such element (for example, a carving on the back of a chair or a floral relief design on silver flatware), copyright protection would extend only to that element, and would not cover the over-all configuration of the utilitarian article as such.

A special situation is presented by architectural works. An architect's plans and drawings would, of course, be protected by copyright, but the extent to which that protection would extend to the structure depicted would depend on the circumstances. Purely nonfunctional or monumental structures would be subject to full copyright protection under the bill, and the same would be true of artistic sculpture or decorative ornamentation or embellishment added to a structure. On the other hand, where the only elements of shape in an architectural design are conceptually inseparable from the utilitarian aspects of the structure, copyright protection for the design would not be available.

The Committee has considered, but chosen to defer, the possibility of protecting the design of typefaces. A "typeface" can be defined as a set of letters, numbers, or other symbolic characters, whose forms are related by repeating design elements consistently applied in a notational system and are intended to be embodied in articles whose intrinsic utilitarian function is for use in composing text or other cognizable combinations of characters. The Committee does not regard the design of typeface, as thus defined, to be a copyrightable "pictorial, graphic, or sculptural work" within the meaning of this bill and the application of the dividing line in section 101.

Enactment of *Public Law 92-140* in 1971 marked the first recognition in American copyright law of sound recordings as copyrightable works. As defined in section 101, copyrightable "sound recordings" are original works of authorship comprising an aggregate of musical, spoken, or other sounds that have been fixed in tangible form. The copyrightable work comprises the aggregation of sounds and not the tangible medium of fixation. Thus, "sound recordings" as copyrightable subject matter are distinguished from "phonorecords," the latter being physical objects in which sounds are fixed. They are also distinguished from any copyrighted literary, dramatic, or musical works that may be reproduced on a "phonorecord."

As a class of subject matter, sound recordings are clearly within the scope of the "writings of an author" capable of protection under the Constitution, and the extension of limited statutory protection to them was too long delayed. Aside from cases in which sounds are fixed by some purely mechanical means without originality of any kind, the copyright protection that would prevent the reproduction and distribution of unauthorized phonorecords of sound recordings is clearly justified.

The copyrightable elements in a sound recording will usually, though not always, involve "authorship" both on the part of the performers whose performance is captured and on the part of the record producer responsible for setting up the recording session, capturing and electronically processing the sounds, and compiling and editing them to make the final sound recording. There may, however, be cases where the record producer's contribution is so minimal that the performance is the only copyrightable element in the work, and there may be cases (for example, recordings of birdcalls, sounds of racing cars, et cetera) where only the record producer's contribution is copyrightable.

Sound tracks of motion pictures, long a nebulous area in American copyright law, are specifically included in the definition of "motion pictures," and excluded in the definition of "sound recordings." To be a "motion picture," as defined, requires three elements: (1) a series of images, (2) the capability of showing the images in certain successive order, and (3) an impression of motion when the images are thus shown. Coupled with the basic requirements of original authorship and fixation in tangible form, this definition encompasses a wide range of cinematographic works embodied in films, tapes, video disks, and other media. However, it would not include: (1)

**Add.34**

17 USCS § 102

unauthorized fixation of live performances or telecasts, (2) live telecasts that are not fixed simultaneously with their transmission, or (3) filmstrips and slide sets which, although consisting of a series of images intended to be shown in succession, are not capable of conveying an impression of motion.

On the other hand, the bill equates audiovisual materials such as filmstrips, slide sets, and sets of transparencies with "motion pictures" rather than with "pictorial, graphic, and sculptural works." Their sequential showing is closer to a "performance" than to a "display," and the definition of "audiovisual works," which applies also to "motion pictures," embraces works consisting of a series of related images that are by their nature, intended for showing by means of projectors or other devices.

Nature of copyright. Copyright does not preclude others from using the ideas or information revealed by the author's work. It pertains to the literary musical, graphic, or artistic form in which the author expressed intellectual concepts. Section 102(b) makes clear that copyright protection does not extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

Some concern has been expressed lest copyright in computer programs should extend protection to the methodology or processes adopted by the programmer, rather than merely to the "writing" expressing his ideas. Section 102(b) is intended, among other things, to make clear that the expression adopted by the programmer is the copyrightable element in a computer program, and that the actual processes or methods embodied in the program are not within the scope of the copyright law.

Section 102(b) in no way enlarges or contracts the scope of copyright protection under the present law. Its purpose is to restate, in the context of the new single Federal system of copyright, that the basic dichotomy between expression and idea remains unchanged.

**Effective date of section:**

Act Oct. 19, 1976, *P. L. 94-553*, § 102, *90 Stat. 2598*, provided that this section "becomes effective on January 1, 1978".

**Amendment Notes**

**1990.**

 Act Dec. 1, 1990 (applicable as provided by § 706 of such Act, which appears as 17 USCS § 101 note), in subsec. (a), in para. (6), deleted "and" following the semicolon, in para. (7), substituted "; and" for the concluding period, and added para. (8).

## NOTES TO DECISIONS

I.IN GENERAL

1.Generally

2.Purpose

3.Construction

4.Relation to First Amendment

5.Relation to patents and trademarks

**Add.35**

## 17 USCS § 107

Current through Public Law 118-13, approved August 7, 2023.

*United States Code Service > TITLE 17. COPYRIGHTS (§§ 101 — 1511) > CHAPTER 1. Subject Matter and Scope of Copyright (§§ 101 — 122)*

## § 107. Limitations on exclusive rights: Fair use

Notwithstanding the provisions of sections 106 and 106A [*17 USCS §§ 106* and *106A*], the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

**(1)** the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

**(2)** the nature of the copyrighted work;

**(3)** the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

**(4)** the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

## History

**HISTORY:**

Oct. 19, 1976, *P. L. 94-553*, Title I, § 101, *90 Stat. 2546*; Dec. 1, 1990, *P. L. 101-650*, Title VI, § 607, *104 Stat. 5132*; Oct. 24, 1992, *P. L. 102-492*, *106 Stat. 3145*.

Annotations

## Notes

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

**Prior law and revision:**

**Effective date of section:**

**Amendment Notes**

**1990.**

**1992.**

# Add.36

17 USCS § 107

**Prior law and revision:**

HOUSE REPORT NO. 94-1476.

General background of the problem. The judicial doctrine of fair use, one of the most important and well-established limitations on the exclusive right of copyright owners, would be given express statutory recognition for the first time in section 107. The claim that a defendant's acts constituted a fair use rather than an infringement has been raised as a defense in innumerable copyright actions over the years, and there is ample case law recognizing the existence of the doctrine and applying it. The examples enumerated at page 24 of the Register's 1961 Report, while by no means exhaustive, give some idea of the sort of activities the courts might regard as fair use under the circumstances: "quotation of excerpts in a review or criticism for purposes of illustration or comment; quotation of short passages in a scholarly or technical work, for illustration or clarification of the author's observations; use in a parody of some of the content of the work parodied; summary of an address or article, with brief quotations, in a news report; reproduction by a library of a portion of a work to replace part of a damaged copy; reproduction by a teacher or student of a small part of a work to illustrate a lesson; reproduction of a work in legislative or judicial proceedings or reports; incidental and fortuitous reproduction, in a newsreel or broadcast, of a work located in the scene of an event being reported."

Although the courts have considered and ruled upon the fair use doctrine over and over again, no real definition of the concept has ever emerged. Indeed, since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts. On the other hand, the courts have evolved a set of criteria which, though in no case definitive or determinative, provide some guage for balancing the equities. These criteria have been stated in various ways, but essentially they can all be reduced to the four standards which have been adopted in section 107: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work."

These criteria are relevant in determining whether the basic doctrine of fair use, as stated in the first sentence of section 107, applies in a particular case: "Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."

The specific wording of section 107 as it now stands is the result of a process of accretion, resulting from the long controversy over the related problems of fair use and the reproduction (mostly by photocopying) of copyrighted material for educational and scholarly purposes. For example, the reference to fair use "by reproduction in copies or phonorecords or by any other means" is mainly intended to make clear that the doctrine has as much application to photocopying and taping as to older forms of use; it is not intended to give these kinds of reproduction any special status under the fair use provision or to sanction any reproduction beyond the normal and reasonable limits of fair use. Similarly, the newly-added reference to "multiple copies for classroom use" is a recognition that, under the proper circumstances of fairness, the doctrine can be applied to reproductions of multiple copies for the members of a class.

The Committee has amended the first of the criteria to be considered—"the purpose and character of the use"—to state explicitly that this factor includes a consideration of "whether such use is of a commercial nature or is for non-profit educational purposes." This amendment is not intended to be interpreted as any sort of not-for-profit limitation on educational uses of copyrighted works. It is an express recognition that, as under the present law, the commercial or non-profit character of an activity, while not conclusive with respect to fair use, can and should be weighed along with other factors in fair use decisions.

General intention behind the provision. The statement of the fair use doctrine in section 107 offers some guidance to users in determining when the principles of the doctrine apply. However, the endless variety of situations and

# Add.37

17 USCS § 107

combinations of circumstances that can rise in particular cases precludes the formulation of exact rules in the statute. The bill endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change. Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis. Section 107 is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way.

Intention as to classroom reproduction. Although the works and uses to which the doctrine of fair use is applicable are as broad as the copyright law itself, most of the discussion of section 107 has centered around questions of classroom reproduction, particularly photocopying. The arguments on the question are summarized at pp. 30–31 of this Committee's 1967 report (H.R. Rep. No. 83, 90th Cong., 1st Sess.), and have not changed materially in the intervening years.

The Committee also adheres to its earlier conclusion, that "a specific exemption freeing certain reproductions of copyrighted works for educational and scholarly purposes from copyright control is not justified." At the same time the Committee recognizes, as it did in 1967, that there is a "need for greater certainty and protection for teachers." In an effort to meet this need the Committee has not only adopted further amendments to section 107, but has also amended section 504(c) to provide innocent teachers and other non-profit users of copyrighted material with broad insulation against unwarranted liability for infringement. The latter amendments are discussed below in connection with Chapter 5 of the bill.

In 1967 the Committee also sought to approach this problem by including, in its report, a very thorough discussion of "the considerations lying behind the four criteria listed in the amended section 107, in the context of typical classroom situations arising today." This discussion appeared on pp. 32-35 of the 1967 report, and with some changes has been retained in the Senate report on S. 22 (S. Rep. No. 94-473, pp. 63-65). The Committee has reviewed this discussion, and considers that it still has value as an analysis of various aspects of the problem.

At the Judiciary Subcommittee hearings in June 1975, Chairman Kastenmeier and other members urged the parties to meet together independently in an effort to achieve a meeting of the minds as to permissible educational uses of copyrighted material. The response to these suggestions was positive, and a number of meetings of three groups, dealing respectively with classroom reproduction of printed material, music, and audio-visual material, were held beginning in September 1975. In a joint letter to Chairman Kastenmeier, dated March 19, 1976, the representatives of the Ad Hoc Committee of Educational Institutions and Organizations on Copyright Law Revision, and of the Authors League of America, Inc., and the Association of American Publishers, Inc., stated:

'You may remember that in our letter of March 8, 1976 we told you that the negotiating teams representing authors and publishers and the Ad Hoc Group had reached tentative agreement on guidelines to insert in the Committee Report covering educational copying from books and periodicals under Section 107 of H.R. 2223 and S. 22, and that as part of that tentative agreement each side would accept the amendments to Sections 107 and 504 which were adopted by your Subcommittee on March 3, 1976.

'We are now happy to tell you that the agreement has been approved by the principals and we enclose a copy herewith. We had originally intended to translate the agreement into language suitable for inclusion in the legislative report dealing with Section 107, but we have since been advised by committee staff that this will not be necessary.

'As stated above, the agreement refers only to copying from books and periodicals, and it is not intended to apply to musical or audiovisual works.'.

The full text of the agreement is as follows:

Agreement on Guidelines for Classroom Copying in Not-For-Profit Educational Institutions.

With respect to books and periodicals. The purpose of the following guidelines is to state the minimum standards of educational fair use under Section 107 of H.R. 2223. The parties agree that the conditions determining the extent of permissible copying for educational purposes may change in the future; that certain types of copying permitted under these guidelines may not be permissible in the future; and

# Add.38

conversely that in the future other types of copying not permitted under these guidelines may be permissible under revised guidelines.

Moreover, the following statement of guidelines is not intended to limit the types of copying permitted under the standards of fair use under judicial decision and which are stated in Section 107 of the Copyright Revision Bill. There may be instances in which copying which does not fall within the guidelines stated below may nonetheless be permitted under the criteria of fair use.

Guidelines.

 I. Single Copying for Teachers.

  A single copy may be made of any of the following by or for a teacher at his or her individual request for his or her scholarly research or use in teaching or preparation to teach a class:

   A. A chapter from a book;

   B. An article from a periodical or newspaper;

   C. A short story, short essay or short poem, whether or not from a collective work;

   D. A chart, graph, diagram, drawing, cartoon or picture from a book, periodical, or newspaper;

 II. Multiple Copies for Classroom Use.

  Multiple copies (not to exceed in any event more than one copy per pupil in a course) may be made by or for the teacher giving the course for classroom use or discussion; provided that:

   A. The copying meets the tests of brevity and spontaneity as defined below; and,

   B. Meets the cumulative effect test as defined below; if and,

   C. Each copy includes a notice of copyright.

Definitions.

 Brevity.

  "(i) Poetry: (a) A complete poem if less than 250 words and if printed on not more than two pages or, (b) from a longer poem, an excerpt of not more than 250 words.

  "(ii) Prose: (a) Either a complete article, story or essay of less than 2,500 words, or (b) an excerpt from any prose work of not more than 1,000 words or 10% of the work, whichever is less, but in any event a minimum of 500 words. [Each of the numerical limits stated in "i" and "ii" above may be expanded to permit the completion of an unfinished line of a poem or of an unfinished prose paragraph.]

  "(iii) Illustration: One chart, graph, diagram, drawing, cartoon or picture per book or per periodical issue.

  "(iv) "Special" works: Certain works in poetry, prose or in "poetic prose" which often combine language with illustrations and which are intended sometimes for children and at other times for a more general audience fall short of 2,500 words in their entirely. Paragraph "ii" above notwithstanding such "special works" may not be reproduced in their entirety; however, an excerpt comprising not more than two of the published pages of such special work and containing not more than 10% of the words found in the text thereof, may be reproduced.

 Spontaneity.

  "(i) The copying is at the instance and inspiration of the individual teacher, and

  "(ii) The inspiration and decision to use the work and the moment of its use for maximum teaching effectiveness are so close in time that it would be unreasonable to expect a timely reply to a request for permission.

# Add.39

17 USCS § 107

Cumulative Effect.

"(i) The copying of the material is for only one course in the school in which the copies are made.

"(ii) Not more than one short poem, article, story, essay or two excerpts may be copied from the same author, nor more than three from the same collective work or periodical volume during one class term.

"(iii) There shall not be more than nine instances of such multiple copying for one course during one class term.

[The limitations stated in "ii" and "iii" above shall not apply to current news periodicals and newspapers and current news sections of other periodicals.]

III. Prohibitions as to I and II Above.

Notwithstanding any of the above, the following shall be prohibited:

"(A) Copying shall not be used to create or to replace or substitute for anthologies, compilations or collective works. Such replacement or substitution may occur whether copies of various works or excerpts therefrom are accumulated or reproduced and used separately.

"(B) There shall be no copying of or from works intended to be "consumable" in the course of study or of teaching. These include workbooks, exercises, standardized tests and test booklets and answer sheets and like consumable material.

"(C) Copying shall not:

"(a) substitute for the purchase of books, publishers' reprints or periodicals;

"(b) be directed by higher authority;

"(c) be repeated with respect to the same item by the same teacher from term to term.

"(D) No charge shall be made to the student beyond the actual cost of the photocopying.

Agreed March 19, 1976.

Ad Hoc Committee on Copyright Law Revision:

By Sheldon Elliott Steinbach.

Author-Publisher Group:

Authors League of America:

By Irwin Karp, Counsel.

Association of American Publishers, Inc.:

By Alexander C. Hoffman,

Chairman, Copyright Committee.

In a joint letter dated April 30, 1976, representatives of the Music Publishers' Association of the United States, Inc., the National Music Publishers' Association, Inc., the Music Teachers National Association, the Music Educators National Conference, the National Association of Schools of Music, and the Ad Hoc Committee on Copyright Law Revision, wrote to Chairman Kastenmeier as follows:

'During the hearings on H.R. 2223 in June 1975, you and several of your subcommittee members suggested that concerned groups should work together in developing guidelines which would be helpful to clarify Section 107 of the bill.

# Add.40

17 USCS § 107

'Representatives of music educators and music publishers delayed their meetings until guidelines had been developed relative to books and periodicals. Shortly after that work was completed and those guidelines were forwarded to your subcommittee, representatives of the undersigned music organizations met together with representatives of the Ad Hoc Committee on Copyright Law Revision to draft guidelines relative to music.

'We are very pleased to inform you that the discussions thus have been fruitful on the guidelines which have been developed. Since private music teachers are an important factor in music education, due consideration has been given to the concerns of that group.

'We trust that this will be helpful in the report on the bill to clarify Fair Use as it applies to music.'

The text of the guidelines accompanying this letter is as follows:

Guidelines for educational uses of music. The purpose of the following guidelines is to state the minimum and not the maximum standards of educational fair use under Section 107 of HR 2223. The parties agree that the conditions determining the extent of permissible copying for educational purposes may change in the future; that certain types of copying permitted under these guidelines may not be permissible in the future, and conversely that in the future other types of copying not permitted under these guidelines may be permissible under revised guidelines.

Moreover, the following statement of guidelines is not intended to limit the types of copying permitted under the standards of fair use under judicial decision and which are stated in Section 107 of the Copyright Revision Bill. There [71] may be instances in which copying which does not fall within the guidelines stated below may nonetheless be permitted under the criteria of fair use.

"(A) Permissible Uses.

"(1) Emergency copying to replace purchased copies which for any reason are not available for an imminent performance provided purchased replacement copies shall be substituted in due course.

" (2)(a) For academic purposes other than performance, multiple copies of excerpts of works may be made, provided that the excerpts do not comprise a part of the whole which would constitute a performable unit such as a section, movement or aria, but in no case more than (10% of the whole work. The number of copies shall not exceed one copy per pupil.

"(b) For academic purposes other than performance, a single copy of an entire performable unit (section, movement, aria, etc.) that is, (1) confirmed by the copyright proprietor to be out of print or (2) unavailable except in a larger work, may be made by or for a teacher solely for the purpose of his or her scholarly research or in preparation to teach a class.

"(3) Printed copies which have been purchased may be edited or simplified provided that the fundamental character of the work is not distorted or the lyrics, if any, altered or lyrics added if none exist.

"(4) A single copy of recordings of performances by students may be made for evaluation or rehearsal purposes and may be retained by the educational institution or individual teacher.

"(5) A single copy of a sound recording (such as a tape, disc or cassette) of copyrighted music may be made from sound recordings owned by an educational institution or an individual teacher for the purpose of constructing aural exercises or examinations and may be retained by the educational institution or individual teacher. (This pertains only to the copyright of the music itself and not to any copyright which may exist in the sound recording.).

"(B) Prohibitions.

"(1) Copying to create or replace or substitute for anthologies, compilations or collective works.

"(2) Copying of or from works intended to be "consumable" in the course of study or of teaching such as workbooks, exercises, standardized tests and answer sheets and like material.

# Add.41

17 USCS § 107

"(3) Copying for the purpose of performance, except as in A(1) above.

"(4) Copying for the purpose of substituting for the purchase of music, except as in A(1) and A(2) above.

"(5) Copying without inclusion of the copyright notice which appears on the printed copy.

The problem of off-the-air taping for nonprofit classroom use of copyrighted audiovisual works incorporated in radio and television broadcasts has proved to be difficult to resolve. The Committee believes that the fair use doctrine has some limited application in this area, but it appears that the development of detailed guidelines will require a more thorough exploration than has so far been possible of the needs and problems of a number of different interests affected, and of the various legal problems presented. Nothing in section 107 or elsewhere in the bill is intended to change or prejudge the law on the point. On the other hand, the Committee is sensitive to the importance of the problem, and urges the representatives of the various interests, if possible under the leadership of the Register of Copyrights, to continue their discussions actively and in a constructive spirit. If it would be helpful to a solution, the Committee is receptive to undertaking further consideration of the problem in a future Congress.

The Committee appreciates and commends the efforts and the cooperative and reasonable spirit of the parties who achieved the agreed guidelines on books and periodicals and on music. Representatives of the American Association of University Professors and of the Association of American Law Schools have written to the Committee strongly criticizing the guidelines, particularly with respect to multiple copying, as being too restrictive with respect to classroom situations at the university and graduate level. However, the Committee notes that the Ad Hoc group did include representatives of higher education, that the stated "purpose of the. . . guidelines is to state the minimum and not the maximum standards of educational fair use" and that the agreement acknowledges "there may be instances in which copying which does not fall within the guidelines. . . may nonetheless be permitted under the criteria of fair use."

The Committee believes the guidelines are a reasonable interpretation of the minimum standards of fair use. Teachers will know that copying within the guidelines is fair use. Thus, the guidelines serve the purpose of fulfilling the need for greater certainty and protection for teachers. The Committee expresses the hope that if there are areas where standards other than these guidelines may be appropriate, the parties will continue their efforts to provide additional specific guidelines in the same spirit of good will and give and take that has marked the discussion of this subject in recent months.

Reproduction and uses for other purposes. The concentrated attention given the fair use provision in the context of classroom teaching activities should not obscure its application in other areas. It must be emphasized again that the same general standards of fair use are applicable to all kinds of uses of copyrighted material, although the relative weight to be given them will differ from case to case.

The fair use doctrine would be relevant to the use of excerpts from copyrighted works in educational broadcasting activities not exempted under section 110(2) or 112, and not covered by the licensing provisions of section 118. In these cases the factors to be weighed in applying the criteria of this section would include whether the performers, producers, directors, and others responsible for the broadcast were paid, the size and nature of the audience, the size and number of excerpts taken and, in the case of recordings made for broadcast, the number of copies reproduced and the extent of their reuse or exchange. The availability of the fair use doctrine to educational broadcasters would be narrowly circumscribed in the case of motion pictures and other audiovisual works, but under appropriate circumstances it could apply to the nonsequential showing of an individual still or slide, or to the performance of a short excerpt from a motion picture for criticism or comment.

Another special instance illustrating the application of the fair use doctrine pertains to the making of copies or phonorecords of works in the special forms needed for the use of blind persons. These special forms, such as copies in Braille and phonorecords of oral readings (talking books), are not usually made by the publishers for commercial distribution. For the most part, such copies and phonorecords are made by the Library of Congress' Division for the Blind and Physically Handicapped with permission obtained from the copyright owners, and are circulated to blind persons through regional libraries covering the nation. In addition, such copies and phonorecords

**Add.42**

17 USCS § 107

are made locally by individual volunteers for the use of blind persons in their communities, and the Library of Congress conducts a program for training such volunteers. While the making of multiple copies or phonorecords of a work for general circulation requires the permission of the copyright owner, a problem addressed in section 70 of the bill, the making of a single copy or phonorecord by an individual as a free service for a blind persons would properly be considered a fair use under section 107.

A problem of particular urgency is that of preserving for posterity prints of motion pictures made before 1942. Aside from the deplorable fact that in a great many cases the only existing copy of a film has been deliberately destroyed, those that remain are in immediate danger of disintegration; they were printed on film stock with a nitrate base that will inevitably decompose in time. The efforts of the Library of Congress, the American Film Institute, and other organizations to rescue and preserve this irreplaceable contribution to our cultural life are to be applauded, and the making of duplicate copies for purposes of archival preservation certainly falls within the scope of "fair use."

When a copyrighted work contains unfair, inaccurate, or derogatory information concerning an individual or institution, the individual or institution may copy and reproduce such parts of the work as are necessary to permit understandable comment on the statements made in the work.

The Committee has considered the question of publication, in Congressional hearings and documents, of copyrighted material. Where the length of the work or excerpt published and the number of copies authorized are reasonable under the circumstances, and the work itself is directly relevant to a matter of legitimate legislative concern, the Committee believes that the publication would constitute fair use.

During the consideration of the revision bill in the 94th Congress it was proposed that independent newsletters, as distinguished from house organs and publicity or advertising publications, be given separate treatment. It is argued that newsletters are particularly vulnerable to mass photocopying, and that most newsletters have fairly modest circulations. Whether the copying of portions of a newsletter is an act of infringement or a fair use will necessarily turn on the facts of the individual case. However, as a general principle, it seems clear that the scope of the fair use doctrine should be considerably narrower in the case of newsletters than in that of either mass-circulation periodicals or scientific journals. The commercial nature of the user is a significant factor in such cases: Copying by a profit-making user of even a small portion of a newsletter may have a significant impact on the commercial market for the work.

The Committee has examined the use of excerpts from copyrighted works in the art work of calligraphers. The committee believes that a single copy reproduction of an excerpt from a copyrighted work by a calligrapher for a single client does not represent an infringement of copyright. Likewise, a single reproduction of excerpts from a copyrighted work by a student calligrapher or teacher in a learning situation would be a fair use of the copyrighted work.

The Register of Copyrights has recommended that the committee report describe the relationship between this section and the provisions of section 108 relating to reproduction by libraries and archives. The doctrine of fair use applies to library photocopying, and nothing contained in section 108 "in any way affects the right of fair use." No provision of section 108 is intended to take away any rights existing under the fair use doctrine. To the contrary, section 108 authorizes certain photocopying practices which may not qualify as a fair use.

The criteria of fair use are necessarily set forth in general terms. In the application of the criteria of fair use to specific photocopying practices of libraries, it is the intent of this legislation to provide an appropriate balancing of the rights of creators, and the needs of users.


**Effective date of section:**

Act Oct. 19, 1976, *P. L. 94-553*, § 102, *90 Stat. 2598*, provided that this section "becomes effective on January 1, 1978".

# Add.43

17 USCS § 107

**Amendment Notes**

**1990.**

Act Dec. 1, 1990 (effective 6 months after enactment as provided by § 610 of such Act, which appears as 17 USCS § 106A note), in the introductory matter, substituted "sections 106 and 106A" for "section 106".

**1992.**

Act Oct. 24, 1992 added the concluding matter.

## NOTES TO DECISIONS

**I.IN GENERAL**

**1.Generally**

**2.Purpose**

**3.Effect of codification**

**4.First Amendment**

**5.Relationship to other laws**

**II.DETERMINATION OF FAIR USE, GENERALLY**

**6.Generally**

**7.Mixed questions of law and fact**

**8.Procedure**

**9.Evidence of fair use**

**10.—Intent of user**

**11.Particular facts where fair use found**

**12.—Evidence of litigation**

**13.Particular facts where fair use not found**

**III.FAIR USE FOR PARTICULAR PURPOSES**

**14.Criticism and comment**

**15.News reporting**

**16.Teaching, scholarship and research**

**17.Parody, satire and burlesque**

**18.—Character likeness**

**Add.44**

## 17 USCS § 410

Current through Public Law 118-13, approved August 7, 2023.

*United States Code Service > TITLE 17. COPYRIGHTS (§§ 101 — 1511) > CHAPTER 4. Copyright Notice, Deposit, and Registration (§§ 401 — 412)*

## § 410. Registration of claim and issuance of certificate

(a) When, after examination, the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited constitutes copyrightable subject matter and that the other legal and formal requirements of this title have been met, the Register shall register the claim and issue to the applicant a certificate of registration under the seal of the Copyright Office. The certificate shall contain the information given in the application, together with the number and effective date of the registration.

(b) In any case in which the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited does not constitute copyrightable subject matter or that the claim is invalid for any other reason, the Register shall refuse registration and shall notify the applicant in writing of the reasons for such refusal.

(c) In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

(d) The effective date of a copyright registration is the day on which an application, deposit, and fee, which are later determined by the Register of Copyrights or by a court of competent jurisdiction to be acceptable for registration, have all been received in the Copyright Office.

## History

**HISTORY:**

Oct. 19, 1976, *P. L. 94-553*, Title I, § 101, *90 Stat. 2582*.

Annotations

## Notes

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

   **Prior law and revision:**

   **Effective date of section:**

   **Other provisions:**

**Prior law and revision:**

**Add.45**

HOUSE REPORT NO. 94-1476.

The first two subsections of section 410 set forth the two basic duties of the Register of Copyrights with respect to copyright registration: (1) to register the claim and issue a certificate if the Register determines that "the material deposited constitutes copyrightable subject matter and that the other legal and formal requirements of this title have been met," and (2) to refuse registration and notify the applicant if the Register determines that "the material deposited does not constitute copyrightable subject matter or that the claim is invalid for any other reason."

Subsection (c) deals with the probative effect of a certificate of registration issued by the Register under subsection (a). Under its provisions, a certificate is required to be given prima facie weight in any judicial proceedings if the registration it covers was made "before or within five years after first publication of the work"; thereafter the court is given discretion to decide what evidentiary weight the certificate should be accorded. This five-year period is based on a recognition that the longer the lapse of time between publication and registration the less likely to be reliable are the facts stated in the certificate.

Under section 410(c), a certificate is to "constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." The principle that a certificate represents prima facie evidence of copyright validity has been established in a long line of court decisions, and it is a sound one. It is true that, unlike a patent claim, a claim to copyright is not examined for basic validity before a certificate is issued. On the other hand, endowing a copyright claimant who has obtained a certificate with a rebuttable presumption of the validity of the copyright does not deprive the defendant in an infringement suit of any rights; it merely orders the burdens of proof. The plaintiff should not ordinarily be forced in the first instance to prove all of the multitude of facts that underline the validity of the copyright unless the defendant, by effectively challenging them, shifts the burden of doing so to the plaintiff.

Section 410(d), which is in accord with the present practice of the Copyright Office, makes the effective date of registration the day when an application, deposit, and fee "which are later determined by the Register of Copyrights or by a court of competent jurisdiction to be acceptable for registration" have all been received. Where the three necessary elements are received at different times the date of receipt of the last of them is controlling, regardless of when the Copyright Office acts on the claim. The provision not only takes account of the inevitable timelag between receipt of the application and other material and the issuance of the certificate, but it also recognizes the possibility that a court might later find the Register wrong in refusing registration.

**Effective date of section:**

Act Oct. 19, 1976, *P. L. 94-553*, § 102, *90 Stat. 2598*, provided that this section "becomes effective on January 1, 1978".

**Other provisions:**

**Registration of claims received before Jan. 1, 1978.** Act Oct. 19, 1976, *P. L. 94-563*, Title I, § 109, *90 Stat. 2600*, provided: "The registration of claims to copyright for which the required deposit, application, and fee were received in the Copyright Office before January 1, 1978, and the recordation of assignments of copyright or other instruments received in the Copyright Office before January 1, 1978, shall be made in accordance with title 17 as it existed on December 31, 1977.".

## NOTES TO DECISIONS

**I.IN GENERAL**

**1.Generally**

**Add.46**

## *17 USCS § 411*

Current through Public Law 118-13, approved August 7, 2023.

*United States Code Service > TITLE 17. COPYRIGHTS (§§ 101 — 1511) > CHAPTER 4. Copyright Notice, Deposit, and Registration (§§ 401 — 412)*

## § 411. Registration and civil infringement actions

**(a)** Except for an action brought for a violation of the rights of the author under section 106A(a) [*17 USCS § 106A(a)*], and subject to the provisions of subsection (b), no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title. In any case, however, where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute a civil action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights. The Register may, at his or her option, become a party to the action with respect to the issue of registrability of the copyright claim by entering an appearance within sixty days after such service, but the Register's failure to become a party shall not deprive the court of jurisdiction to determine that issue.

**(b)**

  **(1)** A certificate of registration satisfies the requirements of this section and section 412 [*17 USCS § 412*], regardless of whether the certificate contains any inaccurate information, unless—

  **(A)** the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and

  **(B)** the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

  **(2)** In any case in which inaccurate information described under paragraph (1) is alleged, the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration.

  **(3)** Nothing in this subsection shall affect any rights, obligations, or requirements of a person related to information contained in a registration certificate, except for the institution of and remedies in infringement actions under this section and section 412 [*17 USCS § 412*].

**(c)** In the case of a work consisting of sounds, images, or both, the first fixation of which is made simultaneously with its transmission, the copyright owner may, either before or after such fixation takes place, institute an action for infringement under section 501 [*17 USCS § 501*], fully subject to the remedies provided by sections 502 through 505 [*17 USCS §§ 502* through *505*] and section 510 [*17 USCS § 510*], if, in accordance with requirements that the Register of Copyrights shall prescribe by regulation, the copyright owner—

  **(1)** serves notice upon the infringer, not less than 48 hours before such fixation, identifying the work and the specific time and source of its first transmission, and declaring an intention to secure copyright in the work; and

  **(2)** makes registration for the work, if required by subsection (a), within three months after its first transmission.

## History

**Add.47**

17 USCS § 411

**HISTORY:**

Oct. 19, 1976, *P. L. 94-553*, Title I, § 101, *90 Stat. 2583*; Oct. 31, 1988, *P. L. 100-568*, § 9(b)(1), *102 Stat. 2859*; Dec. 1, 1990, *P. L. 101-650*, Title VI, § 606(c)(1), *104 Stat. 5131*; Nov. 13, 1997, *P. L. 105-80*, § 6, *111 Stat. 1532*; Oct. 28, 1998, *P. L. 105-304*, Title I, § 102(d), *112 Stat. 2863*; April 27, 2005, *P. L. 109-9*, Title I, § 104(b), *119 Stat. 222*; Oct. 13, 2008, *P. L. 110-403*, Title I, § 101(a), Title II, § 209(a)(6), *122 Stat. 4257*, 4264.

Annotations

## Notes

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

    **Prior law and revision:**

    **Effective date of section:**

    **Amendment Notes**

    **1988.**

    **1990.**

    **1997.**

    **1998.**

    **2005.**

    **2008.**

    **Prior law and revision:**

HOUSE REPORT NO. 94-1476.

The first sentence of section 411(a) restates the present statutory requirement that registration must be made before a suit for copyright infringement is instituted. Under the bill, as under the law now in effect, a copyright owner who has not registered his claim can have a valid cause of action against someone who has infringed his copyright, but he cannot enforce his right in the courts until he has made registration.

The second and third sentences of section 411(a) would alter the present law as interpreted in *Vacheron & Constantin-Le Coultre Watches, Inc. v. Benrus Watch Co., 260 F.2d 637* (2d Cir. 1958). That case requires an applicant, who has sought registration and has been refused, to bring an action against the Register of Copyrights to compel the issuance of a certificate, before suit can be brought against an infringer. Under section 411, a rejected claimant who has properly applied for registration may maintain an infringement suit if notice of it is served on the Register of Copyrights. The Register is authorized, though not required, to enter the suit within 60 days; the Register would be a party on the issue of registrability only, and a failure by the Register to join the action would "not deprive the court of jurisdiction to determine that issue."

Section 411(b) is intended to deal with the special situation presented by works that are being transmitted "live" at the same time they are being fixed in tangible form for the first time. Under certain circumstances, where the

**Add.48**

## [17 USCS § 512](#)

Current through Public Law 118-13, approved August 7, 2023.

*United States Code Service > TITLE 17. COPYRIGHTS (§§ 101 — 1511) > CHAPTER 5. Copyright Infringement and Remedies (§§ 501 — 513)*

## § 512. Limitations on liability relating to material online

**(a) Transitory digital network communications.** A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider, or by reason of the intermediate and transient storage of that material in the course of such transmitting, routing, or providing connections, if—

    **(1)** the transmission of the material was initiated by or at the direction of a person other than the service provider;

    **(2)** the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider;

    **(3)** the service provider does not select the recipients of the material except as an automatic response to the request of another person;

    **(4)** no copy of the material made by the service provider in the course of such intermediate or transient storage is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing, or provision of connections; and

    **(5)** the material is transmitted through the system or network without modification of its content.

**(b) System caching.**

    **(1)** Limitation on liability. A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the intermediate and temporary storage of material on a system or network controlled or operated by or for the service provider in a case in which—

        **(A)** the material is made available online by a person other than the service provider;

        **(B)** the material is transmitted from the person described in subparagraph (A) through the system or network to a person other than the person described in subparagraph (A) at the direction of that other person; and

        **(C)** the storage is carried out through an automatic technical process for the purpose of making the material available to users of the system or network who, after the material is transmitted as described in subparagraph (B), request access to the material from the person described in subparagraph (A),

    if the conditions set forth in paragraph (2) are met.

    **(2)** Conditions. The conditions referred to in paragraph (1) are that—

# Add.49

17 USCS § 512

**(A)** the material described in paragraph (1) is transmitted to the subsequent users described in paragraph (1)(C) without modification to its content from the manner in which the material was transmitted from the person described in paragraph (1)(A);

**(B)** the service provider described in paragraph (1) complies with rules concerning the refreshing, reloading, or other updating of the material when specified by the person making the material available online in accordance with a generally accepted industry standard data communications protocol for the system or network through which that person makes the material available, except that this subparagraph applies only if those rules are not used by the person described in paragraph (1)(A) to prevent or unreasonably impair the intermediate storage to which this subsection applies;

**(C)** the service provider does not interfere with the ability of technology associated with the material to return to the person described in paragraph (1)(A) the information that would have been available to that person if the material had been obtained by the subsequent users described in paragraph (1)(C) directly from that person, except that this subparagraph applies only if that technology—

　　**(i)** does not significantly interfere with the performance of the provider's system or network or with the intermediate storage of the material;

　　**(ii)** is consistent with generally accepted industry standard communications protocols; and

　　**(iii)** does not extract information from the provider's system or network other than the information that would have been available to the person described in paragraph (1)(A) if the subsequent users had gained access to the material directly from that person;

**(D)** if the person described in paragraph (1)(A) has in effect a condition that a person must meet prior to having access to the material, such as a condition based on payment of a fee or provision of a password or other information, the service provider permits access to the stored material in significant part only to users of its system or network that have met those conditions and only in accordance with those conditions; and

**(E)** if the person described in paragraph (1)(A) makes that material available online without the authorization of the copyright owner of the material, the service provider responds expeditiously to remove, or disable access to, the material that is claimed to be infringing upon notification of claimed infringement as described in subsection (c)(3), except that this subparagraph applies only if—

　　**(i)** the material has previously been removed from the originating site or access to it has been disabled, or a court has ordered that the material be removed from the originating site or that access to the material on the originating site be disabled; and

　　**(ii)** the party giving the notification includes in the notification a statement confirming that the material has been removed from the originating site or access to it has been disabled or that a court has ordered that the material be removed from the originating site or that access to the material on the originating site be disabled.

**(c) Information residing on systems or networks at direction of users.**

**(1)** In general. A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

　　**(A)**

　　**(i)** does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

**Add.50**

17 USCS § 512

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

**(B)** does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

**(C)** upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

**(2) Designated agent.** The limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:

**(A)** the name, address, phone number, and electronic mail address of the agent.

**(B)** other contact information which the Register of Copyrights may deem appropriate.

The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, and may require payment of a fee by service providers to cover the costs of maintaining the directory.

**(3) Elements of notification.**

**(A)** To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

**(i)** A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

**(ii)** Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

**(iii)** Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

**(iv)** Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

**(v)** A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

**(vi)** A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

**(B)**

**(i)** Subject to clause (ii), a notification from a copyright owner or from a person authorized to act on behalf of the copyright owner that fails to comply substantially with the provisions of subparagraph (A) shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent.

# Add.51

17 USCS § 512

(ii) In a case in which the notification that is provided to the service provider's designated agent fails to comply substantially with all the provisions of subparagraph (A) but substantially complies with clauses (ii), (iii), and (iv) of subparagraph (A), clause (i) of this subparagraph applies only if the service provider promptly attempts to contact the person making the notification or takes other reasonable steps to assist in the receipt of notification that substantially complies with all the provisions of subparagraph (A).

**(d) Information location tools.** A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link, if the service provider—

**(1)**

**(A)** does not have actual knowledge that the material or activity is infringing;

**(B)** in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

**(C)** upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

**(2)** does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

**(3)** upon notification of claimed infringement as described in subsection (c)(3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity, except that, for purposes of this paragraph, the information described in subsection (c)(3)(A)(iii) shall be identification of the reference or link, to material or activity claimed to be infringing, that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate that reference or link.

**(e) Limitation on liability of nonprofit educational institutions.**

**(1)** When a public or other nonprofit institution of higher education is a service provider, and when a faculty member or graduate student who is an employee of such institution is performing a teaching or research function, for the purposes of subsections (a) and (b) such faculty member or graduate student shall be considered to be a person other than the institution, and for the purposes of subsections (c) and (d) such faculty member's or graduate student's knowledge or awareness of his or her infringing activities shall not be attributed to the institution, if—

**(A)** such faculty member's or graduate student's infringing activities do not involve the provision of online access to instructional materials that are or were required or recommended, within the preceding 3-year period, for a course taught at the institution by such faculty member or graduate student;

**(B)** the institution has not, within the preceding 3-year period, received more than two notifications described in subsection (c)(3) of claimed infringement by such faculty member or graduate student, and such notifications of claimed infringement were not actionable under subsection (f); and

**(C)** the institution provides to all users of its system or network informational materials that accurately describe, and promote compliance with, the laws of the United States relating to copyright.

**(2)** For the purposes of this subsection, the limitations on injunctive relief contained in subsections (j)(2) and (j)(3), but not those in (j)(1), shall apply.

**(f) Misrepresentations.** Any person who knowingly materially misrepresents under this section—

**(1)** that material or activity is infringing, or

**(2)** that material or activity was removed or disabled by mistake or misidentification,

shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

**(g) Replacement of removed or disabled material and limitation on other liability.**

**(1)** No liability for taking down generally. Subject to paragraph (2), a service provider shall not be liable to any person for any claim based on the service provider's good faith disabling of access to, or removal of, material or activity claimed to be infringing or based on facts or circumstances from which infringing activity is apparent, regardless of whether the material or activity is ultimately determined to be infringing.

**(2)** Exception. Paragraph (1) shall not apply with respect to material residing at the direction of a subscriber of the service provider on a system or network controlled or operated by or for the service provider that is removed, or to which access is disabled by the service provider, pursuant to a notice provided under subsection (c)(1)(C), unless the service provider—

**(A)** takes reasonable steps promptly to notify the subscriber that it has removed or disabled access to the material;

**(B)** upon receipt of a counter notification described in paragraph (3), promptly provides the person who provided the notification under subsection (c)(1)(C) with a copy of the counter notification, and informs that person that it will replace the removed material or cease disabling access to it in 10 business days; and

**(C)** replaces the removed material and ceases disabling access to it not less than 10, nor more than 14, business days following receipt of the counter notice, unless its designated agent first receives notice from the person who submitted the notification under subsection (c)(1)(C) that such person has filed an action seeking a court order to restrain the subscriber from engaging in infringing activity relating to the material on the service provider's system or network.

**(3)** Contents of counter notification. To be effective under this subsection, a counter notification must be a written communication provided to the service provider's designated agent that includes substantially the following:

**(A)** A physical or electronic signature of the subscriber.

**(B)** Identification of the material that has been removed or to which access has been disabled and the location at which the material appeared before it was removed or access to it was disabled.

**(C)** A statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled.

**(D)** The subscriber's name, address, and telephone number, and a statement that the subscriber consents to the jurisdiction of Federal District Court for the judicial district in which the address is located, or if the subscriber's address is outside of the United States, for any judicial district in which the service provider may be found, and that the subscriber will accept service of process from the person who provided notification under subsection (c)(1)(C) or an agent of such person.

**(4)** Limitation on other liability. A service provider's compliance with paragraph (2) shall not subject the service provider to liability for copyright infringement with respect to the material identified in the notice provided under subsection (c)(1)(C).

**(h) Subpoena to identify infringer.**

**(1)** Request. A copyright owner or a person authorized to act on the owner's behalf may request the clerk of any United States district court to issue a subpoena to a service provider for identification of an alleged infringer in accordance with this subsection.

**(2)** Contents of request. The request may be made by filing with the clerk—

    **(A)** a copy of a notification described in subsection (c)(3)(A);

    **(B)** a proposed subpoena; and

    **(C)** a sworn declaration to the effect that the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under this title.

**(3)** Contents of subpoena. The subpoena shall authorize and order the service provider receiving the notification and the subpoena to expeditiously disclose to the copyright owner or person authorized by the copyright owner information sufficient to identify the alleged infringer of the material described in the notification to the extent such information is available to the service provider.

**(4)** Basis for granting subpoena. If the notification filed satisfies the provisions of subsection (c)(3)(A), the proposed subpoena is in proper form, and the accompanying declaration is properly executed, the clerk shall expeditiously issue and sign the proposed subpoena and return it to the requester for delivery to the service provider.

**(5)** Actions of service provider receiving subpoena. Upon receipt of the issued subpoena, either accompanying or subsequent to the receipt of a notification described in subsection (c)(3)(A), the service provider shall expeditiously disclose to the copyright owner or person authorized by the copyright owner the information required by the subpoena, notwithstanding any other provision of law and regardless of whether the service provider responds to the notification.

**(6)** Rules applicable to subpoena. Unless otherwise provided by this section or by applicable rules of the court, the procedure for issuance and delivery of the subpoena, and the remedies for noncompliance with the subpoena, shall be governed to the greatest extent practicable by those provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena duces tecum.

**(i) Conditions for eligibility.**

    **(1)** Accommodation of technology. The limitations on liability established by this section shall apply to a service provider only if the service provider—

        **(A)** has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and

        **(B)** accommodates and does not interfere with standard technical measures.

    **(2)** Definition. As used in this subsection, the term "standard technical measures" means technical measures that are used by copyright owners to identify or protect copyrighted works and—

        **(A)** have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;

        **(B)** are available to any person on reasonable and nondiscriminatory terms; and

        **(C)** do not impose substantial costs on service providers or substantial burdens on their systems or networks.

**(j) Injunctions.** The following rules shall apply in the case of any application for an injunction under section 502 [*17 USCS § 502*] against a service provider that is not subject to monetary remedies under this section:

    **(1)** Scope of relief.

# Add.54

17 USCS § 512

**(A)** With respect to conduct other than that which qualifies for the limitation on remedies set forth in subsection (a), the court may grant injunctive relief with respect to a service provider only in one or more of the following forms:

**(i)** An order restraining the service provider from providing access to infringing material or activity residing at a particular online site on the provider's system or network.

**(ii)** An order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is engaging in infringing activity and is identified in the order, by terminating the accounts of the subscriber or account holder that are specified in the order.

**(iii)** Such other injunctive relief as the court may consider necessary to prevent or restrain infringement of copyrighted material specified in the order of the court at a particular online location, if such relief is the least burdensome to the service provider among the forms of relief comparably effective for that purpose.

**(B)** If the service provider qualifies for the limitation on remedies described in subsection (a), the court may only grant injunctive relief in one or both of the following forms:

**(i)** An order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is using the provider's service to engage in infringing activity and is identified in the order, by terminating the accounts of the subscriber or account holder that are specified in the order.

**(ii)** An order restraining the service provider from providing access, by taking reasonable steps specified in the order to block access, to a specific, identified, online location outside the United States.

**(2)** Considerations. The court, in considering the relevant criteria for injunctive relief under applicable law, shall consider—

**(A)** whether such an injunction, either alone or in combination with other such injunctions issued against the same service provider under this subsection, would significantly burden either the provider or the operation of the provider's system or network;

**(B)** the magnitude of the harm likely to be suffered by the copyright owner in the digital network environment if steps are not taken to prevent or restrain the infringement;

**(C)** whether implementation of such an injunction would be technically feasible and effective, and would not interfere with access to noninfringing material at other online locations; and

**(D)** whether other less burdensome and comparably effective means of preventing or restraining access to the infringing material are available.

**(3)** Notice and ex parte orders. Injunctive relief under this subsection shall be available only after notice to the service provider and an opportunity for the service provider to appear are provided, except for orders ensuring the preservation of evidence or other orders having no material adverse effect on the operation of the service provider's communications network.

**(k) Definitions.**

**(1)** Service provider.

**(A)** As used in subsection (a), the term "service provider" means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received.

**(B)** As used in this section, other than subsection (a), the term "service provider" means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A).

**Add.55**

17 USCS § 512

**(2)** Monetary relief. As used in this section, the term "monetary relief" means damages, costs, attorneys' fees, and any other form of monetary payment.

**(l) Other defenses not affected.**   The failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense.

**(m) Protection of privacy.**   Nothing in this section shall be construed to condition the applicability of subsections (a) through (d) on—

**(1)** a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i); or

**(2)** a service provider gaining access to, removing, or disabling access to material in cases in which such conduct is prohibited by law.

**(n) Construction.**   Subsections (a), (b), (c), and (d) describe separate and distinct functions for purposes of applying this section. Whether a service provider qualifies for the limitation on liability in any one of those subsections shall be based solely on the criteria in that subsection, and shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other such subsection.

## History

**HISTORY:**

Added Oct. 28, 1998, *P. L. 105-304*, Title II, § 202(a), *112 Stat. 2877*; Aug. 5, 1999, *P. L. 106-44*, § 1(d), *113 Stat. 222*; Dec. 9, 2010, *P. L. 111-295*, § 3(a), *124 Stat. 3180*.

Annotations

## Notes

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

**Explanatory notes:**

**Effective date of section:**

**Amendment Notes**

**1999.**

**2010.**

**Other provisions:**

**Explanatory notes:**

Another *17 USCS § 512*, relating to determination of reasonable license fees for individual proprietors, was redesignated *17 USCS § 513* by Act Aug. 5, 1999, *P. L. 106-44*, § 1(c)(1), *113 Stat. 221*.

**Effective date of section:**

**Add.56**

This section took effect on October 28, 1998, pursuant to § 203 of Act Oct. 28, 1998, *P. L. 105-304*, which appears as a note to this section.


**Amendment Notes**


**1999.**

Act Aug. 5, 1999, in subsec. (e), made technical corrections to the heading and, in para. (2), deleted "Injunctions." preceding "For the purposes of"; and, in subsec. (j)(3), made technical corrections to the heading.


**2010.**

Act Dec. 9, 2010, in subsec. (c)(2), in the concluding matter, deleted ", in both electronic and hard copy formats" following "Internet".


**Other provisions:**

**Effective date of Title II of Act Oct. 28, 1998, *P. L. 105-304*.** Act Oct. 28, 1998, *P. L. 105-304*, Title II, § 203, *112 Stat. 2886*, provides: "This title and the amendments made by this title [adding this section and amending the chapter analysis preceding *17 USCS § 501*] shall take effect on the date of the enactment of this Act.".

## NOTES TO DECISIONS


**I.IN GENERAL**

**1.Generally**

**2.Applicability**

**3.Construction**

**4."Service provider"**

**5.John Doe actions**

**II.SAFE HARBOR REQUIREMENTS**

**6.Generally**

**7.Construction**

**8.Immunity of ISP employees**

**9.Notice of claimed infringement**

**10.Particular circumstances where ISP eligible for safe harbor protection**

**11.Particular circumstances where ISP not eligible for safe harbor protection**


**I. IN GENERAL**

### *28 USCS § 1915, Part 1 of 2*

Current through Public Law 118-13, approved August 7, 2023.

*United States Code Service > TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE (§§ 1 — 5001) > Part V. Procedure (Chs. 111 — 133) > CHAPTER 123. Fees and Costs (§§ 1911 — 1960)*

## § 1915. Proceedings in forma pauperis

(a)

(1) Subject to subsection (b), any court of the United States may authorize the commencement, prosecution or defense of any suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees or security therefor, by a person who submits an affidavit that includes a statement of all assets such prisoner [person] possesses that the person is unable to pay such fees or give security therefor. Such affidavit shall state the nature of the action, defense or appeal and affiant's belief that the person is entitled to redress.

(2) A prisoner seeking to bring a civil action or appeal a judgment in a civil action or proceeding without prepayment of fees or security therefor, in addition to filing the affidavit filed under paragraph (1), shall submit a certified copy of the trust fund account statement (or institutional equivalent) for the prisoner for the 6-month period immediately preceding the filing of the complaint or notice of appeal, obtained from the appropriate official of each prison at which the prisoner is or was confined.

(3) An appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith.

(b)

(1) Notwithstanding subsection (a), if a prisoner brings a civil action or files an appeal in forma pauperis, the prisoner shall be required to pay the full amount of a filing fee. The court shall assess and, when funds exist, collect, as a partial payment of any court fees required by law, an initial partial filing fee of 20 percent of the greater of—

(A) the average monthly deposits to the prisoner's account; or

(B) the average monthly balance in the prisoner's account for the 6-month period immediately preceding the filing of the complaint or notice of appeal.

(2) After payment of the initial partial filing fee, the prisoner shall be required to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account. The agency having custody of the prisoner shall forward payments from the prisoner's account to the clerk of the court each time the amount in the account exceeds $10 until the filing fees are paid.

(3) In no event shall the filing fee collected exceed the amount of fees permitted by statute for the commencement of a civil action or an appeal of a civil action or criminal judgment.

(4) In no event shall a prisoner be prohibited from bringing a civil action or appealing a civil or criminal judgment for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee.

(c) Upon the filing of an affidavit in accordance with subsections (a) and (b) and the prepayment of any partial filing fee as may be required under subsection (b), the court may direct payment by the United States of the expenses of (1) printing the record on appeal in any civil or criminal case, if such printing is required by the appellate court; (2) preparing a transcript of proceedings before a United States magistrate [United States magistrate judge] in any civil or criminal case, if such transcript is required by the district

**Add.58**

28 USCS § 1915, Part 1 of 2

court, in the case of proceedings conducted under section 636(b) of this title [*28 USCS § 636(b)*] or under *section 3401(b) of title 18, United States Code*; and (3) printing the record on appeal if such printing is required by the appellate court, in the case of proceedings conducted pursuant to section 636(c) of this title [*28 USCS § 636(c)*]. Such expenses shall be paid when authorized by the Director of the Administrative Office of the United States Courts.

**(d)** The officers of the court shall issue and serve all process, and perform all duties in such cases. Witnesses shall attend as in other cases, and the same remedies shall be available as are provided for by law in other cases.

**(e)**

   **(1)** The court may request an attorney to represent any person unable to afford counsel.

   **(2)** Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that—

      **(A)** the allegation of poverty is untrue; or

      **(B)** the action or appeal—

         **(i)** is frivolous or malicious;

         **(ii)** fails to state a claim on which relief may be granted; or

         **(iii)** seeks monetary relief against a defendant who is immune from such relief.

**(f)**

   **(1)** Judgment may be rendered for costs at the conclusion of the suit or action as in other proceedings, but the United States shall not be liable for any of the costs thus incurred. If the United States has paid the cost of a stenographic transcript or printed record for the prevailing party, the same shall be taxed in favor of the United States.

   **(2)**

      **(A)** If the judgment against a prisoner includes the payment of costs under this subsection, the prisoner shall be required to pay the full amount of the costs ordered.

      **(B)** The prisoner shall be required to make payments for costs under this subsection in the same manner as is provided for filing fees under subsection (a)(2).

      **(C)** In no event shall the costs collected exceed the amount of the costs ordered by the court.

**(g)** In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

**(h)** As used in this section, the term "prisoner" means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.

## History

**HISTORY:**

June 25, 1948, ch 646, *62 Stat. 954*; May 24, 1949, ch 139, § 98, *63 Stat. 104*; Oct. 31, 1951, ch 655, § 51 (b), (c), *65 Stat. 727*; Sept. 21, 1959, *P. L. 86-320*, *73 Stat. 590*; Oct. 10, 1979, *P. L. 96-82*, § 6, *93 Stat. 645*; April 26,

**Add.59**

*USCS Const. Art. I, § 8, Cl 8*

Current through the ratification of the 27th Amendment on May 7, 1992.

*United States Code Service* **>** *ARTICLE I. LEGISLATIVE DEPARTMENT.* **>** *Sec. 8.*

## Cl 8. Patents and copyrights.

To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;

Annotations

## Notes

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

**Explanatory notes:**

This clause is popularly known as the "Patent and Copyright Clauses" or the "Copyright and Patent Clause" or the "Intellectual Property Clause". Parts of this clause are known as the "Copyright Clause" and the "Patent Clause".

## NOTES TO DECISIONS

**I.IN GENERAL**

**1.Generally**

**2.Construction and interpretation**

**3.Trademarks and trade dress**

**4.Miscellaneous**

**II.COPYRIGHTS**

**5.Generally**

**6.Relationship to other provisions of Constitution**

**7.Material protected**

**8.Originality requirement**

**9.—Particular cases**

**10.Duration, extension and renewal of copyright**

**11.Fair use**

**Add.60**

12.Miscellaneous

III.PATENTS

13.Generally

14.Grant or issuance of patent

15.—Particular cases

16.Fees

17.State laws or regulation and validity thereof

18.—Taxes and taxation

19.Miscellaneous

**I. IN GENERAL**

**1. Generally**

Art. I, § 8, cl. 8, contemplates that exclusive right shall exist for limited period, which period shall be subject to discretion of Congress. *Pennock v. Dialogue, 27 U.S. 1, 7 L. Ed. 327, 1829 U.S. LEXIS 388 (1829)*.

Incorporeal rights under Art. I, § 8, cl. 8, are co-extensive with United States and do not exist in any particular state or district. *Stevens v. Gladding, 58 U.S. 447, 15 L. Ed. 155, 1854 U.S. LEXIS 532 (1855)*.

To encourage people to devote themselves to intellectual and artistic creation, Congress, under Article 1, § 8, cl 8, of Constitution, may guarantee to authors and inventors reward in form of control over sale or commercial use of copies of their works. *Goldstein v. California, 412 U.S. 546, 93 S. Ct. 2303, 37 L. Ed. 2d 163, 178 U.S.P.Q. (BNA) 129, 1973 U.S. LEXIS 15*, reh'g denied, *414 U.S. 883, 94 S. Ct. 27, 38 L. Ed. 2d 131, 1973 U.S. LEXIS 926 (1973)*.

Under Article I, § 8, cl 8 of Constitution, monopoly privileges that Congress may authorize are neither unlimited nor primarily designed to provide special private benefit; rather, limited grant is intended to motivate creative activity of authors and inventors by provision of special reward, and to allow public access to products of their genius after limited period of exclusive control has expired. *Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574, 220 U.S.P.Q. (BNA) 665, 1984 U.S. LEXIS 19*, reh'g denied, *465 U.S. 1112, 104 S. Ct. 1619, 80 L. Ed. 2d 148, 224 U.S.P.Q. (BNA) 736, 1984 U.S. LEXIS 5264 (1984)*.

The temporary monopoly granted under Art I, § 8, cl 8 as a reward for innovation is a property right. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 122 S. Ct. 1831, 152 L. Ed. 2d 944, 15 Fla. L. Weekly Fed. S. 320, 2002 Cal. Daily Op. Service 4539, 2002 D.A.R. 5803, 62 U.S.P.Q.2d (BNA) 1705, 2002 U.S. LEXIS 3818 (2002)*, remanded, *344 F.3d 1359, 68 U.S.P.Q.2d (BNA) 1321, 2003 U.S. App. LEXIS 19867 (Fed. Cir. 2003)*.

Federal government sponsorship of research and development is not unconstitutional or in violation of provision of Article I, § 8, Clause 8 referring to promotion of progress of science, since Article I, § 8, Clause 8 does not state that federal government may promote the progress of useful arts only through patent and copyright system, and ample constitutional power for funding research and development is found in Clauses 1, 3, 12, 13, and 18 of Article I, § 8; Congress has discretion to authorize expenditure of money to promote general welfare and the means as to how to promote such welfare. *Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 7 U.S.P.Q.2d (BNA) 1057, 1988 U.S. App. LEXIS 7814 (Fed. Cir.)*, cert. denied, *488 U.S. 892, 109 S. Ct. 228, 102 L. Ed. 2d 218, 1988 U.S. LEXIS 4290 (1988)*.

**Add.61**

**2. Construction and interpretation**

Word "securing" could not mean protection of acknowledged legal right; it refers to inventors as well as authors, and it never has been pretended that inventor has perpetual right, at common law, to sell thing invented. *Wheaton v. Peters, 33 U.S. 591, 8 L. Ed. 1055, 1834 U.S. LEXIS 619 (1834)*.

Constitution does not limit "useful" to that which satisfies immediate bodily needs, and painting and engraving, not for mechanical end, are among useful arts, progress of which Congress is empowered by Constitution to promote. *Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 23 S. Ct. 298, 47 L. Ed. 460, 1903 Dec. Comm'r Pat. 650, 1903 U.S. LEXIS 1278 (1903)*.

Article I, § 8, cl 8 gives Congress power to secure to authors exclusive right to their respective "writings" and term "writings" is intended to be read expansively, and thus, term covers sets of questions as well as other forms of expression. *Rubin v. Boston Magazine Co., 645 F.2d 80, 7 Media L. Rep. (BNA) 1148, 209 U.S.P.Q. (BNA) 1073, 1981 U.S. App. LEXIS 18838 (1st Cir. 1981)*.

Purposive language of Copyright Clause does not constitute substantive limit on Congress' legislative power; introductory phrase "to promote progress of science and useful arts" is tended to expand Congressional authority rather than limit it. *Schnapper v. Foley, 667 F.2d 102, 215 U.S. App. D.C. 59, 212 U.S.P.Q. (BNA) 235, 1981 U.S. App. LEXIS 17231 (D.C. Cir. 1981)*, cert. denied, *455 U.S. 948, 102 S. Ct. 1448, 71 L. Ed. 2d 661, 215 U.S.P.Q. (BNA) 96, 1982 U.S. LEXIS 927 (1982)*.

*35 USCS § 282*, which allows federal courts to adjudicate validity of patents when invalidity is raised as affirmative defense in patent infringement suits, does not violate Article I, § 8, Clause 8 by allowing judicial review of validity of patents, since term "securing" in Article I does not mean patents issued by Patent and Trademark Office are conclusively valid and unchallengeable, and public policy requires only that inventions which fully meet statutory standards are entitled to patents and such policy is furthered when validity of patent is subject to judicial review. *Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 7 U.S.P.Q.2d (BNA) 1057, 1988 U.S. App. LEXIS 7814 (Fed. Cir.)*, cert. denied, *488 U.S. 892, 109 S. Ct. 228, 102 L. Ed. 2d 218, 1988 U.S. LEXIS 4290 (1988)*.

**3. Trademarks and trade dress**

Congress has no power to legislate respecting trademarks under Art. I, § 8, cl. 8. *Trade-Mark Cases, 100 U.S. 82, 25 L. Ed. 550, 1879 Dec. Comm'r Pat. 619, 1879 U.S. LEXIS 1808 (1879)*.

Power of Congress over trademarks is dependent on Art. I, § 8, cl. 3, and not on Art. I, § 8, cl. 8. *Ironite Co. v. Guarantee Waterproofing Co., 64 F.2d 608, 17 U.S.P.Q. (BNA) 148, 1933 U.S. App. LEXIS 4169 (8th Cir. 1933)*.

Allowing product configurations to be eligible for trademark status does not conflict with patent clause since it is not equivalent of impermissible perpetual patent protection. *Kohler Co. v. Moen Inc., 12 F.3d 632, 29 U.S.P.Q.2d (BNA) 1241, 1993 U.S. App. LEXIS 32752 (7th Cir. 1993)*.

Although state trade-dress protection is barred by intellectual property clause, federal trademark protection is not; federal trademark laws are other federal statutory protection and their protection of product designs and configurations does not conflict with federal patent laws or intellectual property clause. *Pebble Beach Co. v. Tour 18 I, 155 F.3d 526, 48 U.S.P.Q.2d (BNA) 1065, 1998 U.S. App. LEXIS 22363 (5th Cir. 1998)*, reh'g denied, *1998 U.S. App. LEXIS 29648 (5th Cir. Oct. 26, 1998)*.

Trademark and trade dress law cannot be used to evade limits on monopolies imposed by patent clause. *I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 49 U.S.P.Q.2d (BNA) 1225, 1998 U.S. App. LEXIS 32520 (1st Cir. 1998)*.

**4. Miscellaneous**

Laws passed to give effect to Art. I, § 8, cl. 8, should be construed in spirit in which they have been made. *Grant v. Raymond, 31 U.S. 218, 8 L. Ed. 376, 1832 U.S. LEXIS 469 (1832)*.

Art. I, § 8, cl. 8, does not include mere labels, object of which is only to indicate contents of packages to which they are affixed. *Higgins v. Keuffel, 140 U.S. 428, 11 S. Ct. 731, 35 L. Ed. 470, 1891 Dec. Comm'r Pat. 403, 1891 U.S. LEXIS 2476 (1891)*.

Patent and copyright clauses do not, by their own force or by negative implication, deprive states of power to adopt rules for promotion of intellectual creation within their own jurisdiction; thus, where Congress determines that neither federal protection nor freedom from restraint is required by national interest, states remain free to promote originality and creativity in their own domains. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 109 S. Ct. 971, 103 L. Ed. 2d 118, 9 U.S.P.Q.2d (BNA) 1847, 1989 U.S. LEXIS 629 (1989)*.

*18 USCS § 2319A*, which prohibits unauthorized recording of performances as well as copying, distribution, sale, rental and trafficking of bootlegged phonorecords, is not copyright law because § 2319A does not create, bestow, or allocate rights in expression; thus, § 2319A is not subject to limitations of Copyright Clause, *U.S. Const. art. I, § 8, cl. 8*; the conclusion that *18 USCS § 2319A* is not copyright law is reinforced by its failure to provide performers with extensive rights that *17 USCS § 106* grants to copyright holders. *United States v. Martignon, 492 F.3d 140, 83 U.S.P.Q.2d (BNA) 1180, 2007 U.S. App. LEXIS 13800 (2d Cir. 2007)*.

Eleventh Amendment restricts judicial power under Article III, and Article I cannot be used to circumvent constitutional limitations placed upon federal jurisdiction. *Nat'l Ass'n of Bds. of Pharm. v. Bd. of Regents, 633 F.3d 1297, 22 Fla. L. Weekly Fed. C 1809, 78 Fed. R. Serv. 3d (Callaghan) 1386, 97 U.S.P.Q.2d (BNA) 1931, 2011 U.S. App. LEXIS 3543 (11th Cir. 2011)*.

## II. COPYRIGHTS

**5. Generally**

Copyright property under federal law is wholly statutory and depends upon right created under acts of Congress passed in pursuance of authority conferred under Art. I, § 8, cl. 8. *Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 28 S. Ct. 722, 52 L. Ed. 1086, 1908 U.S. LEXIS 1513 (1908)*; *Metro-Goldwyn-Mayer Distributing Corp. v. Bijou Theatre Co., 59 F.2d 70, 13 U.S.P.Q. (BNA) 147, 1932 U.S. App. LEXIS 3314 (1st Cir. 1932)*.

Granting copyright protection to foreign works previously in public domain under § 514 of Uruguay Round Agreements Act, *17 USCS §§ 104A*, *109(a)*, does not exceed congressional authority to regulate copyright protection under *U.S. Const. art. I, § 8, cl. 8*, since such authority does not exclude application of such protection to works in public domain or require that works remain in public domain, and requirement that term of copyright be limited remains applicable after copyrights are granted. *Golan v. Holder, 565 U.S. 302, 132 S. Ct. 873, 181 L. Ed. 2d 835, 23 Fla. L. Weekly Fed. S 71, 33 Int'l Trade Rep. (BNA) 1769, 40 Media L. Rep. (BNA) 1169, 101 U.S.P.Q.2d (BNA) 1297, 2012 U.S. LEXIS 907 (2012)*.

Congress has affirmative constitutional duty to promote progress of science and useful arts and this duty is evidence of judgment of constitution that free expression is enriched by protecting creations of authors from exploitation by others, and Copyright Act, *17 USCS §§ 101* et seq., is congressional implementation of that judgment. *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc., 600 F.2d 1184, 5 Media L. Rep. (BNA) 1904, 203 U.S.P.Q. (BNA) 321, 1979 U.S. App. LEXIS 12366 (5th Cir. 1979)*.

**Add.63**

USCS Const. Art. I, § 8, Cl 8

Basic tenet of patent law is to provide original inventor with benefits of exclusive rights to invention. *Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 76 U.S.P.Q.2d (BNA) 1741, 2005 U.S. App. LEXIS 21516 (Fed. Cir. 2005).*

*U.S. Const. art 1, § 8, cl. 8* confers on Congress power to promote progress of science and useful arts by securing for limited times to authors and inventors exclusive rights to their respective writings and discoveries; in exercise of that power, Congress regulates copyright of creative works through Copyright Act. *Davis v. Blige, 505 F.3d 90, 84 U.S.P.Q.2d (BNA) 1353, 2007 U.S. App. LEXIS 23375 (2d Cir. 2007),* cert. denied, *555 U.S. 822, 129 S. Ct. 117, 172 L. Ed. 2d 36, 2008 U.S. LEXIS 6459 (2008).*

### 6. Relationship to other provisions of Constitution

Assuming without deciding that Congress may obligate Eleventh Amendment immunity of the states when acting under Article I power, Congress did not exercise such power when enacting Copyright Act of 1976, since obligation of Immunity may be found only where Congress has included in such statute unequivocal and specific language indicating intent to subject states to suit in federal court and such language is absent from Copyright Act. *BV Engineering v. University of California, 858 F.2d 1394, 8 U.S.P.Q.2d (BNA) 1421, 1988 U.S. App. LEXIS 13643 (9th Cir. 1988),* cert. denied, *489 U.S. 1090, 109 S. Ct. 1557, 103 L. Ed. 2d 859, 1989 U.S. LEXIS 1392 (1989).*

Change from "opt-in" to "opt-out" copyright system pursuant to Copyright Renewal Act of 1992, *Pub. L. No. 102-307, 106 Stat. 264,* and Sonny Bono Copyright Term Extension Act, *Pub. L. No. 105-298, 112 Stat. 2827,* did not require First Amendment review because change merely extended existing copyrights to achieve parity with future copyrights and did not exceed power granted to Congress under *U.S. Const. art. I, § 8, cl. 8. Kahle v. Gonzales, 487 F.3d 697, 35 Media L. Rep. (BNA) 1786, 82 U.S.P.Q.2d (BNA) 1797, 2007 U.S. App. LEXIS 11264 (9th Cir. 2007).*

Congress exceeds its power under Commerce Clause, *U.S. Const. art. I, § 8, cl. 3,* by transgressing limitations of Copyright Clause, *U.S. Const. art. I, § 8, cl. 8,* only when (1) law it enacts is exercise of power granted Congress by Copyright Clause and (2) resulting law violates one or more specific limits of Copyright Clause. *United States v. Martignon, 492 F.3d 140, 83 U.S.P.Q.2d (BNA) 1180, 2007 U.S. App. LEXIS 13800 (2d Cir. 2007).*

### 7. Material protected

Art. I, § 8, cl. 8 is broad enough to justify copyright of photographs. *Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 4 S. Ct. 279, 28 L. Ed. 349, 1884 Dec. Comm'r Pat. 186, 1884 U.S. LEXIS 1757 (1884).*

Federal statute relating to copyrights on books and to dramatization of same excludes moving picture company from exhibiting incidents of copyrighted work, and this construction does not violate Art. I, § 8, cl. 8. *Kalem Co. v. Harper Bros., 222 U.S. 55, 32 S. Ct. 20, 56 L. Ed. 92, 1911 U.S. LEXIS 1856 (1911).*

Bank night theater scheme, being in no sense a writing, could not be copyrighted. *Affiliated Enterprises, Inc. v. Gruber, 86 F.2d 958, 32 U.S.P.Q. (BNA) 94, 1936 U.S. App. LEXIS 3902 (1st Cir. 1936).*

In view of federal policy of encouraging intellectual creation by granting limited monopoly at best, it is sensible to say that Art. I, § 8, cl. 8, extends to any concrete, describable manifestation of intellectual creation; to extent that creation may be ineffable, it is ineligible for protection against copying simplicter under either state or federal law. *Columbia Broadcasting System, Inc. v. Decosta, 377 F.2d 315, 153 U.S.P.Q. (BNA) 649, 1967 U.S. App. LEXIS 6407 (1st Cir.),* cert. denied, *389 U.S. 1007, 88 S. Ct. 565, 19 L. Ed. 2d 603, 156 U.S.P.Q. (BNA) 719, 1967 U.S. LEXIS 2961 (1967).*

Enforcing television station's copyrights against company that videotapes television newsclips and sells copies to subjects benefits public and thus does not violate copyright clause. *Pacific & S. Co. v. Duncan, 744 F.2d 1490, 11*

**Add.64**

USCS Const. Art. I, § 8, Cl 8

*Media L. Rep. (BNA) 1135, 224 U.S.P.Q. (BNA) 131, 1984 U.S. App. LEXIS 17334 (11th Cir. 1984)*, reh'g denied en banc *749 F.2d 733 (11th Cir. 1984)*, cert. denied, *471 U.S. 1004, 105 S. Ct. 1867, 85 L. Ed. 2d 161, 1985 U.S. LEXIS 240 (1985)*.

Protection of compilations is consistent with objectives of copyright law which are, as dictated by Constitution, to promote advancement of knowledge and learning by giving authors economic incentives in form of exclusive rights to their creations to labor on creative, knowledge-enriching works. *CCC Info. Servs. v. MacLean Hunter Mkt. Reports, 44 F.3d 61, 33 U.S.P.Q.2d (BNA) 1183, 1994 U.S. App. LEXIS 34212 (2d Cir. 1994)*, cert. denied, *516 U.S. 817, 116 S. Ct. 72, 133 L. Ed. 2d 32, 1995 U.S. LEXIS 5436 (1995)*.

Section 514 of Uruguay Round Agreements Act, *17 USCS §§ 104A, 109*, which established copyrights in various works that had previously entered public domain, did not violate Copyright Clause, U.S. Const., art. 1, § 1, cl. 1. *Luck's Music Library, Inc. v. Gonzales, 407 F.3d 1262, 366 U.S. App. D.C. 66, 28 Int'l Trade Rep. (BNA) 1189, 74 U.S.P.Q.2d (BNA) 1861, 2005 U.S. App. LEXIS 9419 (D.C. Cir. 2005)*, reh'g, en banc, denied, *2005 U.S. App. LEXIS 18268 (D.C. Cir. Aug. 24, 2005)*.

Production company's adaptation of photograph of girl riding piggyback on her father's shoulders did not infringe photographer's copyright, because, inter alia, subsequent events, including father's abduction of daughter, did not transform unoriginal elements of visual work into protectable subject matter, and almost none of protectable aspects of photograph were replicated. *Harney v. Sony Pictures TV, Inc., 704 F.3d 173, 41 Media L. Rep. (BNA) 1134, 105 U.S.P.Q.2d (BNA) 1334, 2013 U.S. App. LEXIS 427 (1st Cir. 2013)*.

In copyright infringement suit regarding sequence of yoga poses and breathing exercises, plaintiffs' yoga sequence was not proper subject of copyright protection, because, under idea/expression dichotomy, sequence was idea, process, or system designed to improve health; also, plaintiffs could not obtain copyright protection for sequence as "compilation," and sequence was not copyrightable choreographic work, because it remained process ineligible for copyright protection. *Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC, 803 F.3d 1032, 116 U.S.P.Q.2d (BNA) 1357, 2015 U.S. App. LEXIS 17615 (9th Cir. 2015)*.

Where plaintiff alleged that defendants copied plaintiff's copyrighted floor plan of three-bedroom ranch house by building two houses, plaintiff's copyright infringement claim failed because, inter alia, plaintiff did not show that plan included any protectable element or arrangement of elements since defendants' expert's report showed that plan consisted of standard elements and standard arrangements of elements; as to one element identified as potentially protectable, iron bars on garage windows of plan, plaintiff failed to dispute defendants' evidence that garage windows of accused houses were entirely distinct, as they lacked any iron bars. *Savant Homes, Inc. v. Collins, 809 F.3d 1133, 2016 U.S. App. LEXIS 6 (10th Cir. 2016)*.

**8. Originality requirement**

Copyrighted work that is copied so as to constitute infringement must satisfy constitutional requirement of originality as set forth in copyright clause; mere fact that work is copyrighted does not mean that every element of it may be protected. *MiTek Holdings v. Arce Eng'g Co., 89 F.3d 1548, 10 Fla. L. Weekly Fed. C 248, 39 U.S.P.Q.2d (BNA) 1609, 1996 U.S. App. LEXIS 19230 (11th Cir. 1996)*, remanded, *198 F.3d 840, 13 Fla. L. Weekly Fed. C 267, 53 U.S.P.Q.2d (BNA) 1220, 1999 U.S. App. LEXIS 32874 (11th Cir. 1999)*.

Although requirement of originality for copyright is constitutional one inherent in grant to Congress of power to promote science and useful arts, required level of originality is minimal. *CDN Inc. v. Kapes, 197 F.3d 1256, 99 Cal. Daily Op. Service 9421, 99 D.A.R. 12157, 53 U.S.P.Q.2d (BNA) 1032, 1999 U.S. App. LEXIS 31372 (9th Cir. 1999)*.

Originality required for copyright protection does not mean that work must be either novel or unique, but simply work independently created by its author, not copied from pre-existing works, and work that comes from exercise of

creative powers of author's mind. *Boisson v. Banian, Ltd., 273 F.3d 262, 60 U.S.P.Q.2d (BNA) 1974, 2001 U.S. App. LEXIS 25966 (2d Cir. 2001)*.

U.S. Supreme Court has emphasized that power afforded by *U.S. Const. art. I, § 8, cl. 8*—namely, to give author exclusive authority over work—rests in part on presupposition that work contains degree of originality, and Congress has recognized this same point in *17 USCS § 102* by extending copyright protection only to original works of authorship; originality is said to be sine qua non of copyright. *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., 528 F.3d 1258, 87 U.S.P.Q.2d (BNA) 1055, 2008 U.S. App. LEXIS 12774 (10th Cir. 2008)*, cert. denied, *555 U.S. 1138, 129 S. Ct. 1006, 173 L. Ed. 2d 294, 2009 U.S. LEXIS 727 (2009)*.

### 9. —Particular cases

Names, towns, and telephone numbers listed alphabetically according to name and telephone directory's white pages are not protected by copyright because such listings in white pages are not original to telephone company since names, towns, and telephone numbers, rather than owing their origin to telephone company, are uncopyrightable facts, and telephone company has not selected, coordinated, or arranged these uncopyrightable facts in original way sufficient to satisfy minimum standards for copyright protection. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 111 S. Ct. 1282, 113 L. Ed. 2d 358, 91 Cal. Daily Op. Service 2217, 91 D.A.R. 3580, 18 Media L. Rep. (BNA) 1889, 121 Pub. Util. Rep. 4th (PUR) 1, 18 U.S.P.Q.2d (BNA) 1275, 1991 U.S. LEXIS 1856 (1991)*.

Plaintiff manufacturer's serial numbers for parts lacked sufficient originality as required by *U.S. Const. art. I, § 8*, and *17 USCS § 102(a)*, to be copyrighted because once system for assigning numbers, based on objective characteristics, was in place, all of parts in class were numbered without creativity, and thus, manufacturer's claim of copyright infringement failed. *Southco, Inc. v. Kanebridge Corp., 390 F.3d 276, 73 U.S.P.Q.2d (BNA) 1071, 2004 U.S. App. LEXIS 24935 (3d Cir. 2004)*, cert. denied, *546 U.S. 813, 126 S. Ct. 336, 163 L. Ed. 2d 48, 2005 U.S. LEXIS 5541 (2005)*.

Plaintiff former employer's part numbers were not uncopyrightable as primary objective of copyright was not to reward labor of authors, but to promote progress of science and useful arts as stated in U.S. Const. art. I, § 8, and permitting uncopyrightable materials to receive protection simply by virtue of adding number or label would allow end run around that constitutional requirement. *ATC Distrib. Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc., 402 F.3d 700, 2005 FED App. 0149P, 74 U.S.P.Q.2d (BNA) 1161, 2005 U.S. App. LEXIS 5059 (6th Cir. 2005)*, reh'g denied, reh'g, en banc, denied, *2005 U.S. App. LEXIS 12391 (6th Cir. June 20, 2005)*.

### 10. Duration, extension and renewal of copyright

Extending duration of existing copyrights is not categorically beyond Congress' authority under Copyright and Patent Clause, *U.S. Const. art. I, § 8, cl. 8*, and Copyright Term Extension Act complies with "limited times" prescription. *Eldred v. Ashcroft, 537 U.S. 186, 123 S. Ct. 769, 154 L. Ed. 2d 683, 16 Fla. L. Weekly Fed. S. 44, 2003 Cal. Daily Op. Service 426, 2003 D.A.R. 512, 65 U.S.P.Q.2d (BNA) 1225, 2003 U.S. LEXIS 751*, reh'g denied, *538 U.S. 916, 123 S. Ct. 1505, 155 L. Ed. 2d 243, 2003 U.S. LEXIS 2133 (2003)*.

On appeal challenging constitutionality of Copyright Term Extension Act, court did not err in disregarding amicus's argument that Act violated preamble to copyright clause because extending term of subsisting copyright does not promote progress of science and useful arts, since plaintiffs themselves took opposite view and declined to adopt amicus view when expressly offered opportunity at oral argument to do so, and it was thus not necessary to reach constitutional issue raised. *Eldred v. Ashcroft, 255 F.3d 849, 347 U.S. App. D.C. 121, 59 U.S.P.Q.2d (BNA) 1604, 2001 U.S. App. LEXIS 15628 (D.C. Cir. 2001)*.

**Add.66**

USCS Const. Art. I, § 8, Cl 8

District court properly granted U.S. Attorney General's motion to dismiss action by companies that provided free access to copyrighted works on Internet in which companies challenged constitutionality of Sonny Bono Copyright Term Extension Act, *Pub. L. No. 105-298, 112 Stat. 2827* (1998) (*17 USCS § 101* note); companies asserted that change from discretionary to automatic renewal of copyrights for works created between 1964 and 1977 altered "traditional contours of copyright protection" and thus required First Amendment review, but United States Supreme Court's explicit holding in Eldred that efforts to achieve parity were constitutionally valid refuted companies' claim that eliminating renewal requirement should trigger First Amendment scrutiny; Eldred also rejected companies' claim that copyright term was effectively perpetual in violation of "limited Times" prescription of Copyright Clause, *U.S. Const. art. I, § 8, cl. 8*. *Kahle v. Gonzales, 474 F.3d 665, 35 Media L. Rep. (BNA) 1167, 81 U.S.P.Q.2d (BNA) 1440, 2007 U.S. App. LEXIS 1337 (9th Cir.)*, op. withdrawn, *487 F.3d 697, 2007 U.S. App. LEXIS 11270 (9th Cir. 2007)*, sub. op., *487 F.3d 697, 35 Media L. Rep. (BNA) 1786, 82 U.S.P.Q.2d (BNA) 1797, 2007 U.S. App. LEXIS 11264 (9th Cir. 2007)*.

Copyright Term Extension Act (CTEA), *Pub. L. No. 105-298, 102*(b) and (d), *112 Stat. 2827-28* (amending *17 USCS §§ 302, 304*), which increased duration of existing and future copyrights from life-plus-50 years to life-plus-70-years, did not exceed limitations that were inherent in Copyright Clause, *U.S. Const. art. I, § 8, cl. 8*; outer boundary of "limited times" was determined by weighing impetus provided to authors by longer terms against benefit provided to public by shorter terms, and such weighing was left to Congress, subject to rationality review. *Golan v. Gonzales, 501 F.3d 1179, 35 Media L. Rep. (BNA) 2249, 84 U.S.P.Q.2d (BNA) 1076, 2007 U.S. App. LEXIS 21199 (10th Cir. 2007)*.

Writer was free to use material from stories and novels that were no longer under copyright because copyright protection of fictional character could not be extended beyond expiration of copyright on it even though original author altered character in subsequent work. *Klinger v. Conan Doyle Estate, Ltd., 755 F.3d 496, 111 U.S.P.Q.2d (BNA) 1065, 2014 U.S. App. LEXIS 11319 (7th Cir.)*, cert. denied, *574 U.S. 976, 135 S. Ct. 458, 190 L. Ed. 2d 331, 2014 U.S. LEXIS 7283 (2014)*.

## 11. Fair use

Ultimate test of fair use is whether copyright law's goal of promoting progress of science and useful arts would be better served by allowing use than by preventing it. *Castle Rock Entertainment v. Carol Publ'g Group, 150 F.3d 132, 47 U.S.P.Q.2d (BNA) 1321, 1998 U.S. App. LEXIS 16242 (2d Cir. 1998)*.

Injunction barring software owners from posting decryption program on their web site and knowingly linking their web site to any other web site on which such program was posted did not prevent constitutionally permitted fair use of copyrighted DVD movies since fair use has never been held to guarantee access to copyrighted material in order to copy it by fair user's preferred technique or in format of original. *Universal City Studios, Inc. v. Corley, 273 F.3d 429, 60 U.S.P.Q.2d (BNA) 1953, 2001 U.S. App. LEXIS 25330 (2d Cir. 2001)*.

In authors' copyright infringement suit against libraries, doctrine of fair use allowed libraries to digitize copyrighted works for purpose of permitting full-text searches because, inter alia, creation of full-text searchable database was quintessentially transformative use, copying was not excessive, and full-text search function did not serve as substitute for books that were being searched; doctrine of fair use also allowed libraries to provide full digital access to copyrighted works to their print-disabled patrons. *Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 42 Media L. Rep. (BNA) 1898, 111 U.S.P.Q.2d (BNA) 1001, 2014 U.S. App. LEXIS 10803 (2d Cir. 2014)*.

Goal of copyright is to stimulate creation of new works, not to furnish copyright holders with control over all markets; accordingly, ability to license does not demand finding against fair use. *Cambridge Univ. Press v. Patton, 769 F.3d 1232, 25 Fla. L. Weekly Fed. C 547, 112 U.S.P.Q.2d (BNA) 1697, 2014 U.S. App. LEXIS 19978 (11th Cir. 2014)*.

Congress devoted extensive effort to ensure that fair use would allow for educational copying under proper circumstances and was sufficiently determined to achieve this goal that it amended text of fair use statute in order

to expressly state it; furthermore, allowing latitude for educational fair use promotes goals of copyright. *Cambridge Univ. Press v. Patton, 769 F.3d 1232, 25 Fla. L. Weekly Fed. C 547, 112 U.S.P.Q.2d (BNA) 1697, 2014 U.S. App. LEXIS 19978 (11th Cir. 2014)*.

Court's review of defendants' statutory fair use defense was necessarily informed by basic principle that copyright protection was not simply to promote individual interests but also progress of science and useful arts for benefit of society as whole. *TCA TV Corp. v. McCollum, 839 F.3d 168, 44 Media L. Rep. (BNA) 2421, 120 U.S.P.Q.2d (BNA) 1248, 2016 U.S. App. LEXIS 18333 (2d Cir. 2016)*, cert. denied, *581 U.S. 994, 137 S. Ct. 2175, 198 L. Ed. 2d 235, 2017 U.S. LEXIS 3351 (2017)*.

## 12. Miscellaneous

State statute, insofar as it imposes tax upon gross receipts of royalties under licenses of copyrighted motion pictures, is valid. *Fox Film Corp. v. Doyal, 286 U.S. 123, 52 S. Ct. 546, 76 L. Ed. 1010, 13 U.S.P.Q. (BNA) 243, 1932 U.S. LEXIS 795 (1932)*.

Congress's adjustment of author/publisher balance in copyright law is permissible expression of economic philosophy behind Federal Constitution's copyright clause (Art I, § 8, cl 8), that is, conviction that encouragement of individual effort motivated by personal gain is best way to advance public welfare. *N.Y. Times Co. v. Tasini, 533 U.S. 483, 121 S. Ct. 2381, 150 L. Ed. 2d 500, 14 Fla. L. Weekly Fed. S 414, 2001 Cal. Daily Op. Service 5260, 2001 Colo. J. C.A.R. 3509, 2001 D.A.R. 6435, 29 Media L. Rep. (BNA) 1865, 59 U.S.P.Q.2d (BNA) 1001, 2001 U.S. LEXIS 4667 (2001)*.

Copyright law does not prohibit registration of works for copyright which have been commissioned by government and when there is no allegation that government or contractor attempted to subvert copyright laws through assignment subsequent to registration of commissioned work, copyright laws, in their present form, permit such assignment. *Schnapper v. Foley, 667 F.2d 102, 215 U.S. App. D.C. 59, 212 U.S.P.Q. (BNA) 235, 1981 U.S. App. LEXIS 17231 (D.C. Cir. 1981)*, cert. denied, *455 U.S. 948, 102 S. Ct. 1448, 71 L. Ed. 2d 661, 215 U.S.P.Q. (BNA) 96, 1982 U.S. LEXIS 927 (1982)*.

Copyright deposit requirement of *17 USCS § 407* is constitutional. *Ladd v. Law & Technology Press, 762 F.2d 809, 11 Media L. Rep. (BNA) 2439, 226 U.S.P.Q. (BNA) 774, 1985 U.S. App. LEXIS 19770 (9th Cir. 1985)*, cert. denied, *475 U.S. 1045, 106 S. Ct. 1260, 89 L. Ed. 2d 570, 1986 U.S. LEXIS 568 (1986)*.

Court's abstraction-filtration-comparison test for determine scope of copyright protection for computer programs comported with constitutional policy of balancing protection with dissemination; court should dissect program according to varying levels of generality as provided in abstractions test, then examine each level of abstraction to filter out unprotectable elements of program, then compare remaining protectable elements with allegedly infringing program to determine whether defendants have misappropriated substantial elements of plaintiff's program. *Gates Rubber Co. v. Bando Chem. Indus., 9 F.3d 823, 28 U.S.P.Q.2d (BNA) 1503, 1993 U.S. App. LEXIS 27045 (10th Cir. 1993)*.

Movie trailer distributor's online display of its clip previews of movie producer's films infringed copyrighted work for personal profit; distributor would not likely succeed on its copyright misuse defense since movie producer's licensing agreements did not significantly interfere with copyright policy. *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 342 F.3d 191, 31 Media L. Rep. (BNA) 2185, 67 U.S.P.Q.2d (BNA) 1705, 2003 U.S. App. LEXIS 17757 (3d Cir. 2003)*, cert. denied, *540 U.S. 1178, 124 S. Ct. 1410, 158 L. Ed. 2d 79, 2004 U.S. LEXIS 1052 (2004)*.

*18 USCS § 2319A*, which prohibits unauthorized recording of performances as well as copying, distribution, sale, rental and trafficking of bootlegged phonorecords, is not copyright law because § 2319A does not create, bestow, or allocate rights in expression; thus, § 2319A is not subject to limitations of Copyright Clause, *U.S. Const. art. I, § 8, cl. 8*; the conclusion that *18 USCS § 2319A* is not copyright law is reinforced by its failure to provide performers with

extensive rights that *17 USCS § 106* grants to copyright holders. *United States v. Martignon, 492 F.3d 140, 83 U.S.P.Q.2d (BNA) 1180, 2007 U.S. App. LEXIS 13800 (2d Cir. 2007).*

Section 514 of Uruguay Round Agreements Act, *17 USCS §§ 104A*, *109*, does not violate Copyright Clause, *U.S. Const. art. I, § 8, cl. 8*, as decision to comply with *Berne Convention* for Protection of Literary and Artistic Works, which secures copyright protections for American works abroad, is not so irrational or so unrelated to aims of Copyright Clause that it exceeds reach of U.S. Congressional power. *Golan v. Gonzales, 501 F.3d 1179, 35 Media L. Rep. (BNA) 2249, 84 U.S.P.Q.2d (BNA) 1076, 2007 U.S. App. LEXIS 21199 (10th Cir. 2007).*

Where author developed medieval-themed play for use at summer camp and program director subsequently wrote medieval-themed adventure trail for camp, author's copyright infringement claim failed because finding that two works were not substantially similar was not clearly erroneous since, after filtering out ideas and scenes faire, any remaining similarities between two works were insubstantial. *Frye v. YMCA Camp Kitaki, 617 F.3d 1005, 95 U.S.P.Q.2d (BNA) 1990, 2010 U.S. App. LEXIS 17389 (8th Cir. 2010).*

Where artist alleged that park district violated artist's moral rights under Visual Artists Rights Act of 1990 (VARA), *17 USCS § 106A*, by modifying park garden, VARA claim failed because artist's garden could not qualify for moral-rights protection under VARA since garden was neither "authored" nor "fixed" in senses required for basic copyright. *Kelley v. Chi. Park Dist., 635 F.3d 290, 97 U.S.P.Q.2d (BNA) 1841, 2011 U.S. App. LEXIS 2915 (7th Cir. 2011),* reh'g denied, reh'g, en banc, denied, *2011 U.S. App. LEXIS 8273 (7th Cir. Apr. 19, 2011),* cert. denied, *565 U.S. 934, 132 S. Ct. 380, 181 L. Ed. 2d 240, 2011 U.S. LEXIS 6338 (2011).*

In suit regarding dicor paper design that was digital photograph depicting time-worn wood planks for laminate wood flooring, summary judgment was inappropriate regarding competitor's argument that copyright was invalid, because design was original enough to be copyright eligible; court rejected competitor's argument that copyright holder's patents protecting methods for finishing wood implied that its copyright in design depicting finished wood also had to be directed toward those same methods. *Home Legend, LLC v. Mannington Mills, Inc., 784 F.3d 1404, 25 Fla. L. Weekly Fed. C 1153, 114 U.S.P.Q.2d (BNA) 1644, 2015 U.S. App. LEXIS 7075 (11th Cir.),* cert. denied, *577 U.S. 874, 136 S. Ct. 232, 193 L. Ed. 2d 132, 2015 U.S. LEXIS 6190 (2015).*

## III. PATENTS

### 13. Generally

Legislation based on Art. I, § 8, cl. 8, regards right of property in inventor as medium of public advantage derived from his invention, so that in every grant of limited monopoly, two interests are involved, that of public, who are grantors, and that of patentee. *Butterworth v. United States ex rel. Hoe, 112 U.S. 50, 5 S. Ct. 25, 28 L. Ed. 656, 1884 Dec. Comm'r Pat. 429, 1884 U.S. LEXIS 1852 (1884).*

Congress may provide such instrumentalities in securing to inventors exclusive right to their discoveries as in its judgment will be best calculated to effect that object. *United States v. Duell, 172 U.S. 576, 19 S. Ct. 286, 43 L. Ed. 559, 1899 Dec. Comm'r Pat. 287, 1899 U.S. LEXIS 1398 (1899).*

Need for uniformity in construction of patent law is important, but that is factor which belongs to patent-power calculus of Federal Constitution's Article I, rather than to determination whether state plea of sovereign immunity deprives patentee of property without due process of law. *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank, 527 U.S. 627, 119 S. Ct. 2199, 144 L. Ed. 2d 575, 12 Fla. L. Weekly Fed. S 458, 99 Cal. Daily Op. Service 4945, 1999 Colo. J. C.A.R. 3688, 99 D.A.R. 6371, 51 U.S.P.Q.2d (BNA) 1081, 1999 U.S. LEXIS 4376,* remanded, *215 F.3d 1346, 1999 U.S. App. LEXIS 38502 (Fed. Cir. 1999).*

Policy of patent law as expressed by Constitution and statutes does not favor monopoly to inventor beyond limited time. *Macbeth-Evans Glass Co. v. General Electric Co., 246 F. 695, 1918 Dec. Comm'r Pat. 239, 1917 U.S. App. LEXIS 1403 (6th Cir. 1917)*, cert. denied, *246 U.S. 659, 38 S. Ct. 316, 62 L. Ed. 926, 1918 U.S. LEXIS 2088 (1918)*.

Patent laws are not intended merely to shift wealth from public to inventors; rather, their purpose is to promote progress of useful arts, ultimately providing public with benefit of lower price through unfettered competition, and that goal is underscored by Constitutional command that periods of exclusivity are for limited times. *Biotechnology Indus. Org. v. District of Columbia, 496 F.3d 1362, 83 U.S.P.Q.2d (BNA) 1639, 2007 U.S. App. LEXIS 18236 (Fed. Cir.)*, reh'g denied, reh'g, en banc, denied, *505 F.3d 1343, 85 U.S.P.Q.2d (BNA) 1144, 2007 U.S. App. LEXIS 25351 (Fed. Cir. 2007)*.

U.S. Supreme Court did not hold in *eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)*, that there is presumption against exclusivity on successful infringement litigation; Court did not cancel *35 USCS § 154*, which states that every patent shall contain grant of right to exclude others from making, using, offering for sale, or selling invention, nor did Court overrule *U.S. Const. art. I, § 8, cl. 8*, which grants Congress power to secure for limited times to authors and inventors exclusive right to their respective writings and discoveries. *Edwards Lifesciences AG v. CoreValve, Inc., 699 F.3d 1305, 105 U.S.P.Q.2d (BNA) 1039, 2012 U.S. App. LEXIS 23385 (Fed. Cir. 2012)*, cert. denied, *571 U.S. 820, 134 S. Ct. 82, 187 L. Ed. 2d 31, 2013 U.S. LEXIS 5409 (2013)*, injunction granted, *2014 U.S. Dist. LEXIS 51778 (D. Del. Apr. 15, 2014)*.

Constitutional provision is a grant of legislative power to Congress, and Congress has chosen to act pursuant to that power by passing the Patent Act, such that it cannot be argued that limiting inventorship to human beings is unconstitutional. *Thaler v. Vidal, 43 F.4th 1207, 2022 U.S. App. LEXIS 21712 (Fed. Cir. 2022)*, cert. denied, *143 S. Ct. 1783, 215 L. Ed. 2d 671, 2023 U.S. LEXIS 1763 (2023)*.

## 14. Grant or issuance of patent

Government of United States, when it grants letters patent for new invention or discovery in arts, confers upon patentee exclusive property in patented invention which cannot be appropriated or used by government itself without just compensation. *United States v. Palmer, 128 U.S. 262, 9 S. Ct. 104, 32 L. Ed. 442, 24 Ct. Cl. 525, 1888 U.S. LEXIS 2219 (1888)*.

Power to issue patent implies exercise of power of government according to mode regulated by acts of Congress. *United States v. American Bell Tel. Co., 128 U.S. 315, 9 S. Ct. 90, 32 L. Ed. 450, 1888 Dec. Comm'r Pat. 558, 1888 U.S. LEXIS 2222 (1888)*.

Constitution does not authorize monopoly grant to one whose product lacks all creative originality. *Chamberlin v. Uris Sales Corp., 150 F.2d 512, 65 U.S.P.Q. (BNA) 544, 1945 U.S. App. LEXIS 4578 (2d Cir. 1945)*.

Patent confers monopoly on its holder, and law does not allow granting of these valuable franchises to private individuals, with consequent public detriment, unless there is concomitant public benefit; requirement of public benefit is constitutional one. *Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555, 1970 U.S. App. LEXIS 9794 (5th Cir. 1970)*.

## 15. —Particular cases

As progress beginning from higher levels of achievement is expected in normal course, results of ordinary innovation are not subject of exclusive rights under patent laws, in order to preclude stifling, rather than promoting, progress of useful arts as contemplated by *U.S. Const. art. I, § 8, cl. 8*; these premises lead to bar on patents claiming obvious subject matter established by case law and codified in *35 USCS § 103*, and application of bar must not be confined within test or formulation too constrained to serve its purpose. *KSR Int'l Co. v. Teleflex Inc.,*

**Add.70**

USCS Const. Art. I, § 8, Cl 8

*550 U.S. 398, 127 S. Ct. 1727, 167 L. Ed. 2d 705, 20 Fla. L. Weekly Fed. S. 248, 82 U.S.P.Q.2d (BNA) 1385, 2007 U.S. LEXIS 4745 (2007)*.

District court properly granted *Fed. R. Civ. P. 12(c)* motion for judgment on pleadings in favor of owner of drug patent in drug manufacturer's action alleging antitrust violations under Sherman Antitrust Act, *15 USCS §§ 1*, *2*, and Fla. Stat. chs. 542.18, 542.19, arising from two patent infringement actions that were filed by patent owner; Noerr-Pennington doctrine shielded patent owner from liability and sham litigation exception was inapplicable; *U.S. Const. art. I, § 8, cl. 8* expressly permitted government to grant exclusive monopolies in form of patents, and engaging in litigation to seek anticompetitive outcome was First Amendment activity that was immune from antitrust liability. *Andrx Pharms., Inc. v. Elan Corp., PLC, 421 F.3d 1227, 18 Fla. L. Weekly Fed. C 936, 2005-2 Trade Cas. (CCH) ¶ 74906, 76 U.S.P.Q.2d (BNA) 1295, 2005 U.S. App. LEXIS 18580 (11th Cir. 2005)*.

## 16. Fees

Lower court properly granted government summary judgment on patent applicant's constitutional challenge to fees imposed for filing patent application and issuing patent where *U.S. Const. art. I, § 8, cl. 8*, did not limit Congress to imposing fees for operating Patent and Trademark Office (PTO), Congress had authority to impose fees for patent application and issuance to serve purpose other than raising revenue, and there was rational basis for imposing fees as they funded overall patent system and were necessary to keep pace with future costs of administering PTO and patent system. *Figueroa v. United States, 466 F.3d 1023, 80 U.S.P.Q.2d (BNA) 1437, 2006 U.S. App. LEXIS 25413 (Fed. Cir. 2006)*, cert. denied, *550 U.S. 933, 127 S. Ct. 2248, 167 L. Ed. 2d 1089, 2007 U.S. LEXIS 5175 (2007)*.

Where patentee challenged increase in patent holder fees and alleged improper diversion of those fees, patentee stated valid claim under Patent Clause that increased fees were illegal exaction because patentee alleged that action exceeded constitutional limitations. *Figueroa v. United States, 57 Fed. Cl. 488, 68 U.S.P.Q.2d (BNA) 1555, 2003 U.S. Claims LEXIS 240 (Fed. Cl. Aug. 15, 2003)*, aff'd, *466 F.3d 1023, 80 U.S.P.Q.2d (BNA) 1437, 2006 U.S. App. LEXIS 25413 (Fed. Cir. 2006)*.

Government was entitled to summary judgment for plaintiff's illegal extraction claim, alleging that *Pub. L. No. 108-199, 118 Stat. 3* (2004) and its predecessors were unconstitutional because Congress charged inventors fees that were not entirely used solely for purpose of supporting operations of patent system, because intellectual property policy judgments were vested in Congress pursuant to *U.S. Const. art. I, § 8, cl. 8*, and, under rational basis test applicable to Necessary and Proper Clause analysis, plaintiff failed to meet heavy burden of showing that Patent and Trademark Office (PTO) appropriations legislation was neither appropriate nor plainly adapted to achieve legitimate constitutional objective of promoting useful arts; PTO had issued more than 2 million patents since Fiscal Year 1991, and requirements that patentable invention be useful, novel, and non-obvious remained in *35 USCS §§ 101–103*, conforming to constitutional command of Intellectual Property Clause. *Figueroa v. United States, 66 Fed. Cl. 139, 75 U.S.P.Q.2d (BNA) 1462, 2005 U.S. Claims LEXIS 170 (Fed. Cl. June 28, 2005)*, aff'd, *466 F.3d 1023, 80 U.S.P.Q.2d (BNA) 1437, 2006 U.S. App. LEXIS 25413 (Fed. Cir. 2006)*.

Court of Federal Claims would not find patent maintenance fee regime unconstitutional since powers of Congress in field of intellectual property stemmed from Constitution and were therefore plenary. *Michels v. United States, 72 Fed. Cl. 426, 81 U.S.P.Q.2d (BNA) 1575, 2006 U.S. Claims LEXIS 259 (Fed. Cl. Sept. 1, 2006)*.

Court granted government's motion to dismiss patent holder's action to recover damages for early expiration of her patent in 2010 because nothing in Constitution foreclosed Congress from requiring patent fees which rationally related to promotion of scientific progress; thus, maintenance fees were constitutional. *Lucree v. United States, 117 Fed. Cl. 750, 2014 U.S. Claims LEXIS 721 (Fed. Cl. July 31, 2014)*, aff'd, *596 Fed. Appx. 922, 2015 U.S. App. LEXIS 4042 (Fed. Cir. 2015)*.

USCS Const. Art. I, § 8, Cl 8

#### 17. State laws or regulation and validity thereof

Right of patentee and his assigns to use and vend oil for illuminating purposes must be exercised in subordination of police regulations of states. *Patterson v. Kentucky, 97 U.S. 501, 24 L. Ed. 1115, 1878 U.S. LEXIS 1479 (1879)*.

State law regulating sale of patent rights is not invalid. *Allen v. Riley, 203 U.S. 347, 27 S. Ct. 95, 51 L. Ed. 216, 1906 U.S. LEXIS 1596 (1906)*.

State law requiring negotiable instrument taken on sale of patent rights to show on its face for what it is given is not invalid. *John Woods & Sons v. Carl, 203 U.S. 358, 27 S. Ct. 99, 51 L. Ed. 219, 1906 U.S. LEXIS 1597 (1906)*; *J. B. Colt Co. v. Mitcham, 172 Ark. 55, 287 S.W. 1008, 1926 Ark. LEXIS 26 (1926)*.

State statute making it unlawful without manufacturer's consent to use "direct molding process"--form of reverse engineering--to duplicate for purpose of sale any manufactured vessel hull or component part thereof, or knowingly to sell any such duplicates, is pre-empted by federal patent system because state statute, by offering patent-like protection for ideas deemed unprotected under federal scheme, substantially restricts public's ability to exploit unpatented designs in general circulation and thus conflicts with strong federal policy favoring free competition in ideas which do not merit patent protection. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 109 S. Ct. 971, 103 L. Ed. 2d 118, 9 U.S.P.Q.2d (BNA) 1847, 1989 U.S. LEXIS 629 (1989)*.

Securing patent on device for attachment of passenger's policy to railroad ticket does not preclude regulation by state of insurance contract involved. *State ex rel. United States Fidelity & Guaranty Co. v. Smith, 184 Wis. 309, 199 N.W. 954, 1924 Wisc. LEXIS 289 (Wis. 1924)*.

#### 18. —Taxes and taxation

State has power to tax as income royalties received from use of patents. *Fox Film Corp. v. Doyal, 286 U.S. 123, 52 S. Ct. 546, 76 L. Ed. 1010, 13 U.S.P.Q. (BNA) 243, 1932 U.S. LEXIS 795 (1932)*.

State excise tax assessed upon domestic corporations for privilege of transacting business was not invalid because part of income was from royalties on patents granted by United States. *Thomson Electric Welding Co. v. Commonwealth, 275 Mass. 426, 176 N.E. 203, 1931 Mass. LEXIS 1415 (Mass. 1931)*.

#### 19. Miscellaneous

Inventor who designedly, and with view of applying it indefinitely and exclusively for his own profit, withholds his invention from public, comes not within policy or objects of Constitution. *Kendall v. Winsor, 62 U.S. 322, 16 L. Ed. 165, 1858 U.S. LEXIS 649 (1859)*.

Congress may not validly abrogate state sovereign immunity under *Federal Constitution's Eleventh Amendment* pursuant to Congress' powers under Constitution's Article I; hence Patent Remedy Act (*35 USCS §§ 271(h), 296(a)*), which expressly abrogates states' sovereign immunity under Eleventh Amendment, cannot be sustained either under Constitution's commerce clause (Art I, § 8, cl 3) or patent clause (Art I, § 8, cl 8). *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank, 527 U.S. 627, 119 S. Ct. 2199, 144 L. Ed. 2d 575, 12 Fla. L. Weekly Fed. S 458, 99 Cal. Daily Op. Service 4945, 1999 Colo. J. C.A.R. 3688, 99 D.A.R. 6371, 51 U.S.P.Q.2d (BNA) 1081, 1999 U.S. LEXIS 4376*, remanded, *215 F.3d 1346, 1999 U.S. App. LEXIS 38502 (Fed. Cir. 1999)*.

U.S. Constitution's acknowledgement that inventors possess rights to their inventions does not confer constitutional protection over those rights any more than it does for other types of intellectual property; because Count I, which asserted that Patent Clause created private cause of action on behalf of inventors, contained no legal merit and was not supported by any reasonable explanation, it was frivolous. *Carter v. ALK Holdings, Inc., 605 F.3d 1319, 76 Fed. R. Serv. 3d (Callaghan) 1137, 94 U.S.P.Q.2d (BNA) 1769, 2010 U.S. App. LEXIS 10456 (Fed. Cir. 2010)*.

**Add.72**

USCS Const. Art. I, § 8, Cl 8

District court abused its discretion when it did not enjoin defendant's infringement in case involving cell phone features as district court should have required patent holder to show some connection between patented features and demand for defendant's products to establish irreparable harm, which record evidence established that those features did influence consumers' perceptions of and desire for those products. *Apple Inc. v. Samsung Elecs. Co., 809 F.3d 633, 117 U.S.P.Q.2d (BNA) 1469, 2015 U.S. App. LEXIS 21803 (Fed. Cir. 2015)*.

## Research References & Practice Aids

**Research References and Practice Aids**

**Cross References:**

Copyrights, generally, *17 USCS §§ 101* et seq.

Patents, generally, *35 USCS §§ 1* et seq.

**Am Jur:**

15B Am Jur 2d, Community Property § 220.

18 Am Jur 2d, Copyright and Literary Property §§ 1, 25, 157, 189.

60 Am Jur 2d, Patents § 1

60 Am Jur 2d, Penal and Correctional Institutions §§ 1, 4

**Am Jur Trials:**

77 Am Jur Trials, Copyright Infringement Litigation, p. 449.

**Am Jur Proof of Facts:**

92 Am Jur Proof of Facts 3d, Proof of Facts Establishing Damages and Other Relief Under the Federal Copyright Act, p. 249.

**Forms:**

19 Bender's Federal Practice Forms, Form SCt15:3, Rules of the Supreme Court.

**Law Review Articles:**

Shipley. Interdisciplinary conference on the impact of technological change on the creation, dissemination, and protection of intellectual property: Congressional authority over intellectual property policy after Eldred v. Ashcroft: Deference, empty limitations, and risks to the public domain. *70 Alb L Rev 1255, 2007*.

Mota. Eldred v. Reno — is the Copyright Term Extension Act Constitutional? *12 Alb LJ Sci & Tech 167, 2001*.

Walterscheid. Musings on the copyright power: A critique of Eldred v. Ashcroft. *14 Alb LJ Sci & Tech 309, 2004*.

Blanke. Vincent Van Gogh, "Sweat of the Brow," and database protection. *39 Am Bus LJ 645, Summer 2002*.

Casey et al. Symposium beyond Napster: Debating the future of copyright on the internet: panel two: Which legal rules control?: Evaluating arguments. *50 Am U L Rev 389, December 2000*.

# Add.73

Cohen. Copyright and the Jurisprudence of Self-Help. *13 Berkeley Tech LJ 1089, Fall 1998*.

Benkler. Symposium: Constitutional Bounds of Database Protection: The Role of Judicial Review in the Creation and Definition of Private Rights in Information. *15 Berkeley Tech LJ 535, Spring 2000*.

Quinn. An Unconstitutional Patent in Disguise: Did Congress Overstep its Constitutional Authority in Adopting the Circumvention Prevention Provisions of the Digital Millennium Copyright Act? *41 Brandeis LJ 33, Fall 2002*.

Ghosh. A Rose is a Rose is . . .: The Thorny Case of Morris Communications Corp. v. Professional Golf Association Tour, Inc. *3 Buff Intell Prop LJ 1, Fall 2005*.

Durham. "Useful Arts" in the Information Age. *1999 BYU L Rev 1419, 1999*.

Pollack. The right to know?: Delimiting Database Protection at the Juncture of the Commerce Clause, the Intellectual Property Clause and the First Amendment. *17 Cardozo Arts & Ent LJ 47, 1999*.

Hamilton. Symposium: Art and the Marketplace of Expression. *17 Cardozo Arts & Ent LJ 167, 1999*.

Garon. Media & Monopoly in the Information Age: Slowing the Convergence at the Marketplace of Ideas. *17 Cardozo Arts & Ent LJ 491, 1999*.

Ginsburg et al. The Constitutionality of Copyright Term Extension: How Long is Too Long? *18 Cardozo Arts & Ent LJ 651, 2000*.

Holbrook. The Treaty Power and the Patent Clause: Are There Limits on the United States' Ability to Harmonize? *22 Cardozo Arts & Ent LJ 1, 2004*.

Bohannan. Reclaiming Copyright. *23 Cardozo Arts & Ent LJ 567, 2006*.

Gruenberger. A Duty to Protect the Rights of Performers? Constitutional foundations of an Intellectual Property Right. *24 Cardozo Arts & Ent LJ 617, 2006*.

Hamilton ; Kohnen. The Jurisprudence of Information Flow: How the Constitution Constructs the Pathways of Information. *25 Cardozo L Rev 267, November 2003*.

Copyright and Privacy Protection of Unpublished Works—The Author's Dilemma. 13 Colum J L & Soc Prob 351.

Austin. Does the Copyright Clause Mandate Isolationism? 26 Colum JL & Arts 17, Fall 2002.

Efroni. A Momentary Lapse of Reason: Digital Copyright, the DMCA and a Dose of Common Sense. 28 Colum JL & Arts 249, Spring 2005.

Besek; Peters. Symposium: Constitutional Challenges to Copyright: Introduction: Keynote Address. 30 Colum JL & Arts 245, Spring 2007.

Sprigman; Reese; Austin. Symposium: Constitutional Challenges to Copyright: Congressional Power and Limitations Inherent in the Copyright Clause. 30 Colum JL & Arts 259, Spring 2007.

Oliar; Dinwoodie. Symposium: Constitutional Challenges to Copyright: Alternatives to the Copyright Power: The Relationship of the Copyright Clause to the Commerce Clause and the Treaty Power. 30 Colum JL & Arts 287, Spring 2007.

Austin. Symposium: Constitutional Challenges to Copyright: International Copyright Law and Domestic Constitutional Doctrines. 30 Colum JL & Arts 337, Spring 2007.

**Add.74**

Page 16 of 24

USCS Const. Art. I, § 8, Cl 8

Dinwoodie. Symposium: Constitutional Challenges to Copyright: Copyright Lawmaking Authority: An (Inter)Nationalist Perspective on the Treaty Clause. 30 Colum JL & Arts 355, Spring 2007.

Oliar. Symposium: Constitutional challenges to copyright: Resolving Conflicts Among Congress's Powers Regarding Statutes' Constitutionality: The Case of Anti-Bootlegging Statutes. 30 Colum JL & Arts 467, Spring 2007.

Peters. Symposium: Constitutional Challenges to Copyright: Constitutional Challenges to Copyright Law. 30 Colum JL & Arts 509, Spring 2007.

Reese. Symposium: Constitutional Challenges to Copyright: Is the Public Domain Permanent?: Congress's Power to Grant Exclusive Rights in Unpublished Public Domain Works. 30 Colum JL & Arts 531, Spring 2007.

Sprigman. Symposium: Constitutional Challenges to Copyright: Indirect Enforcement of the Intellectual Property Clause. 30 Colum JL & Arts 565, Spring 2007.

Jacobs. Trademark Dilution on the Constitutional Edge. *104 Colum L Rev 161, January 2004*.

Nachbar. Intellectual Property and Constitutional Norms. *104 Colum L Rev 272, March 2004*.

Olson. Preserving the Copyright Balance: Statutory and Constitutional Preemption of Contract-Based Claims. *11 Comm L & Pol'y 83, Winter 2006*.

Mossoff. Who cares what Thomas Jefferson thought about Patents? Reevaluating the Patent "Privilege" in Historical Context. *92 Cornell L Rev 953, July 2007*.

Bender. The Constitutionality of Proposed Federal Database Protection Legislation. *28 Dayton L Rev 143, 2002*.

Hughes. How Extra-Copyright Protection of Databases can be Constitutional. *28 Dayton L Rev 159, 2002*.

Ochoa. Origins and Meanings of the Public Domain. *28 Dayton L Rev 215, 2002*.

Clifford. Simultaneous Copyright and Trade Secret Claims: Can the Copyright Misuse Defense Prevent Constitutional Doublethink? *104 Dick L Rev 247, Winter 2000*.

Patterson; Joyce. Copyright in 1791: An Essay Concerning the Founders' View of the Copyright Power Granted to Congress in *Article I, section 8, clause 8 of the U.S. Constitution. 52 Emory LJ 909, Spring 2003*.

Davis. Extending Copyright and the Constitution: "Have I Stayed Too Long?". 52 Fla L Rev 989, December 2000.

Galbraith. Forever on the Installment Plan? An Examination of the Constitutional History of the Copyright Clause and Whether the Copyright Term Extension Act of 1998 Squares with the Founders' Intent. 12 Fordham Intell Prop Media & Ent LJ, Spring 2002.

Carson et al. Symposium: Panel II: Mickey Mice? Potential Ramifications of Eldred v. Ashcroft. *13 Fordham Intell Prop Media & Ent LJ 771, Spring 2003*.

Mtima. Tasini and Its Progeny: The New Exclusive Right or Fair Use on the Electronic Publishing Frontier? *14 Fordham Intell Prop Media & Ent LJ 369, Winter 2004*.

Afori. Human Rights and Copyright: The Introduction of Natural Law Considerations Into American Copyright Law. *14 Fordham Intell Prop Media & Ent LJ 497, Winter 2004*.

Patton. Symposium: The Correct-Like Decision in United States v. Martignon. *16 Fordham Intell Prop Media & Ent LJ 1287, Summer 2006*.

**Add.75**

USCS Const. Art. I, § 8, Cl 8

Zimmerman. Is there a right to have something to say? One view of the public domain. *73 Fordham L Rev 297, October 2004*.

Lee. Freedom of the Press 2.0.*42 Ga L Rev 309, Winter 2008*.

Oliar. Making Sense of the Intellectual Property Clause: Promotion of Progress as a Limitation on Congress's Intellectual Property Power. *94 Geo LJ 1771, August 2006*.

Patry. The Enumerated Powers Doctrine and Intellectual Property: An Imminent Constitutional Collision. *67 Geo Wash L Rev 359, January 1999*.

Merges; Reynolds. The Proper Scope of the Copyright and Patent Power. *37 Harv J on Legis 45, Winter 2000*.

Walterscheid. Conforming the General Welfare Clause and the Intellectual Property Clause. 13 Harv J Law & Tec 87, Fall 1999.

Hatch; Lee. "To Promote the Progress of Science": The Copyright Clause and Congress's Power to Extend Copyrights. 16 Harv J Law & Tec 1, Fall 2002.

Miller. Common Law Protection for Products of the Mind: An "Idea" Whose Time has Come. *119 Harv L Rev 703, January 2006*.

Ginsburg. "An Idea Whose Time Has Come" — But Where Will It Go? 119 Harv L Rev F. 65, January 2006.

Pollack. The Owned Public Domain: The Constitutional Right Not to be Excluded—Or the Supreme Court Chose the Right Breakfast Cereal in Kellogg v. National Biscuit Co. *22 Hastings Comm & Ent LJ 265, Winter 2000*.

Oddi. The Tragicomedy of the Public Domain in Intellectual Property Law. *25 Hastings Comm & Ent LJ 1, Fall 2002*.

Lee. The Public's Domain: The Evolution of Legal Restraints on the Government's Power to Control Public Access Through Secrecy or Intellectual Property. *55 Hastings LJ 91, November 2003*.

Thomas. Symposium 2002: The Future of Patent Law: Liberty and Property in the Patent Law. *39 Hous L Rev 569, 2002*.

Walterscheid. To Promote the Progress of Science and Useful Arts: The Anatomy of a Congressional Power. *43 IDEA 1, 2002*.

Walterscheid. The Preambular Argument: The Dubious Premise of Eldred v. Ashcroft. *44 IDEA 331, 2004*.

Efroni. Towards a Doctrine of "Fair Access" in Copyright: The Federal Circuit's Accord. *46 IDEA 99, 2005*.

Walterscheid. Defining the Patent and Copyright Term: Term Limits and the Intellectual Property Clause. *7 J Intell Prop L 315, Spring 2000*.

Walterscheid. "Within the Limits of the Constitutional Grant": Constitutional Limitations on the Patent Power. *9 J Intell Prop L 291, Spring 2002*.

Packard. Copyright Term Extensions, the Public Domain and Intertextuality Intertwined. *10 J Intell Prop L 1, Fall 2002*.

Patterson. What's Wrong with Eldred? An Essay on Copyright Jurisprudence. *10 J Intell Prop L 345, Spring 2003*.

# Add.76

Grace. Losing the Forest Among the Trees in the Festo Saga—Rationalizing the Doctrine of Equivalents and Prosecution History Estoppel in view of the Historical Justifications for Patent Protection. *11 J Intell Prop L 275, Spring 2004*.

Walterscheid. The Hotchkiss Unobviousness Standard: Early Judicial Activism in the Patent Law. *13 J Intell Prop L 103, Fall 2005*.

Mohr. Collateral Damage: The Effect of the Database Debate on Other Acts of Congress. *5 J Marshall Rev Intell Prop L 78, Fall 2005*.

Snow. A Copyright Conundrum: Protecting Email Privacy. *55 Kan L Rev 501, April 2007*.

Ciolino. Why Copyrights Are Not Community Property. *60 La L Rev 127, Fall 1999*.

Boyle. The Public Domain: Foreword: The Opposite of Property? *66 Law & Contemp Prob 1*, Winter/Spring 2003.

Alstyne. The Public Domain: Reconciling What the First Amendment Forbids with what the Copyright Clause Permits: A Summary Explanation and Review. *66 Law & Contemp Prob 225*, Winter/Spring 2003.

Ciolino. How Copyrights Became Community Property (sort of): Through the Rodrigue v. Rodrigue Looking Glass. *47 Loy L Rev 631, Summer 2001*.

Solum. Symposium: Eldred v. Ashcroft: Intellectual Property, Congressional Power, and the Constitution: Congress's Power to Promote the Progress of Science: Eldred v. Ashcroft. *36 Loy LA L Rev 1, Fall 2002*.

Coenen; Heald. Symposium: Eldred v. Ashcroft: Intellectual Property, Congressional Power, and the Constitution: Means/ends Analysis in Copyright Law: Eldred v. Ashcroft in one Act. *36 Loy LA L Rev 99, Fall 2002*.

Epstein. Symposium: Eldred v. Ashcroft: Intellectual Property, Congressional Power, and the Constitution: The Dubious Constitutionality of the Copyright Term Extension Act. *36 Loy LA L Rev 123, Fall 2002*.

Karjala. Symposium: Eldred v. Ashcroft: Intellectual Property, Congressional Power, and the Constitution: Judicial Review of Copyright Term Extension Legislation. *36 Loy LA L Rev 199, Fall 2002*.

Martin. Symposium: Eldred v. Ashcroft: Intellectual Property, Congressional Power, and the Constitution: The Mythology of the Public Domain: Exploring the Myths Behind Attacks on the Duration of Copyright Protection. *36 Loy LA L Rev 253, Fall 2002*.

Perlmutter. Symposium: Eldred v. Ashcroft: Intellectual Property, Congressional Power, and the Constitution: Participation in the International Copyright System as a means to Promote the Progress of Science and Useful Arts. *36 Loy LA L Rev 323, Fall 2002*.

Ghosh. When Exclusionary Conduct Meets the Exclusive Rights of Intellectual Property: Morris v. PGA Tour and the Limits of Free Riding As an Antitrust Business Justification. *37 Loy U Chi LJ 723, Summer 2006*.

Walterscheid. Divergent Evolution of the Patent Power and the Copyright Power. *9 Marq Intell Prop L Rev 307, Summer 2005*.

Galbraith. Access Denied: Improper use of the Computer Fraud and abuse act to Control Information on Publicly Accessible Internet Websites. *63 Md L Rev 320, 2004*.

McJohn. Eldred's Aftermath: Tradition, the Copyright Clause, and the Constitutionalization of fair use. *10 Mich Telecomm Tech L Rev 95, Fall 2003*.

**Add.77**

Page 19 of 24

USCS Const. Art. I, § 8, Cl 8

Bitton. Trends in Protection for Informational Works Under Copyright Law during the 19th and 20th Centuries. *13 Mich Telecomm Tech L Rev 115, Fall 2006*.

Langvardt; Langvardt. Unwise or Unconstitutional?: The Copyright Term Extension Act, the Eldred Decision, and the Freezing of the Public Domain for Private Benefit. 5 Minn JL Sci & Tech. 193, 2004.

Bagley. Patently Unconstitutional: The Geographical Limitation on Prior Art in a Small World. *87 Minn L Rev 679, February 2003*.

Slavitt. The Copyright Term Extension Act: We May Know the Words, But Can We Find the Harmony? *11 MSU-DCL J Int'l L 457, Fall 2002*.

Dickson. Paradigms of Plagiarism: Fair Use and Plagiarism Detection Software in A.V. ex rel. Vanderhye v. iParadigms, LLC. 89 N CL Rev. 29A, 2011.

Graves. Private Rights, Public Uses, and the Future of the Copyright Clause. *80 Neb L Rev 64, 2001*.

Kwall. Inspiration and Innovation: The Intrinsic Dimension of the Artistic Soul. *81 Notre Dame L Rev 1945, June 2006*.

Lao. Federalizing Trade Secrets Law in an Information Economy. *59 Ohio St LJ 1633, 1998*.

Patterson. Resolving the Conflict between Property Rights and Political Rights. *62 Ohio St LJ 703, 2001*.

Heald. The Extraction/Duplication Dichotomy: Constitutional Line-Drawing in the Database Debate. *62 Ohio St LJ 933, 2001*.

Langvardt. The Beat Should Not Go On: Resisting Early Calls for Further Extensions of Copyright Duration. *112 Penn St L Rev 783, Winter 2008*.

Fitzgerald. Symposium — Information and Electronic Commerce Law: Comparative Perspective Digital Property: The Ultimate Boundary? *7 Roger Williams U L Rev 47, Fall 2001*.

Pollack. Symposium Articles: E-Commerce in the Digital Millennium: The Legal Ramifications of the DMCA and business method patents: The Multiple Unconstitutionality of Business Method Patents: Common Sense, Congressional Consideration, and Constitutional History. *28 Rutgers Computer & Tech LJ 61, 2002*.

Tritt. Liberating Estates Law from the Constraints of Copyright. *38 Rutgers LJ 109, Fall 2006*.

Birnhack. Copyright Law and Free Speech after Eldred v. Ashcroft. *76 S Cal L Rev 1275, September 2003*.

Hughes. Copyright and Incomplete Historiographies: Of Piracy, Propertization, and Thomas Jefferson. *79 S Cal L Rev 993, July 2006*.

Schnaps. Do Consumers have the Right to Space-Shift, as they do Time-Shift, their Television Content? Intellectual Property Rights In The Face Of New Technology. 17 Seton Hall J Sports & Ent L 51, 2007.

Dallon. Original Intent and the Copyright Clause: Eldred v. Ashcroft Gets it Right. 50 St Louis LJ 307, Winter 2006.

Posner. The Constitutionality of the Copyright Term Extension Act: Economics, Politics, Law, and Judicial Technique in Eldred v Ashcroft. *2003 Sup Ct Rev 143, 2003*.

Pollack. Purveyance and Power, or Over-priced Free Lunch: The Intellectual Property Clause as an Ally of the Takings Clause in the Public's Control of Government. *30 Sw U L Rev 1, 2000*.

**Add.78**

USCS Const. Art. I, § 8, Cl 8

Kuhne. Forcing the Copyright Genie Back into the Bottle: Public Policy Implications of Copyright Extension Legislation. *33 Sw U L Rev 327, 2004*.

McGreal. Saving Article I from Seminole Tribe: A View from The Federalist Papers. *55 SMU L Rev 393, Spring 2002*.

Lee. Eldred v. Ashcroft and the (Hypothetical) Copyright Term Extension Act of 2020. *12 Tex Intell Prop LJ 1, Fall 2003*.

Reese. Public but Private: Copyright's New Unpublished Public Domain. *85 Tex L Rev 585, February 2007*.

Farid. Not in My Library: Eldred v. Ashcroft and the Demise of the Public Domain. *5 Tul J Tech & Intell Prop 1, Spring 2003*.

Noga. Securitizing Copyrights: An Answer to the Sonny Bono Copyright Term Extension Act. *9 Tul J Tech. & Intell Prop 1, Spring 2007*.

Easton. Annotating the news: Mitigating the effects of media convergence and consolidation. *23 U Ark Little Rock L Rev 143, Fall 2000*.

McLain. Thoughts on Dastar from a copyright perspective: A welcome step toward respite for the public domain. *11 U Balt Intell Prop LJ 71, Fall 2002*/Spring 2003.

Anderson. Return of the Guilds: A reflection on the domestic and international implications of Eldred v. Ashcroft. *12 U Balt Intell Prop LJ 49, Fall 2003*.

Shipley. What do flexible road signs, children's clothes and the allied campaign in Europe during WWII have in common? The public domain and the Supreme Court's intellectual property jurisprudence. *13 U Balt Intell Prop LJ 57, Spring 2005*.

Bell. Escape from Copyright: Market Success vs. Statutory Failure in the Protection of Expressive Works. *69 U Cin L Rev 741, Spring 2001*.

Kuhner. The Foreign Source Doctrine: Explaining the Role of Foreign and International Law in Interpreting the Constitution. *75 U Cin L Rev 1389, Summer 2007*.

Hughes. How Extra-Copyright Protection of Databases Can Be Constitutional. *28 U Dayton L Rev 159, 2003*.

Heald; Sherry. Implied Limits on the Legislative Power: The Intellectual Property Clause as an Absolute Constraint on Congress. *2000 U Ill L Rev 1119, 2000*.

Kwall. Article Preserving Personality and Reputational Interests of Constructed Personas through Moral Rights: A Blueprint for the Twenty-First Century. *2001 U Ill L Rev 151, 2001*.

Tehranian. Et Tu, Fair Use? The Triumph of Natural-Law Copyright. *38 UC Davis L Rev 465, February 2005*.

Moffat. Super-Copyright: Contracts, Preemption, and the Structure of Copyright Policymaking. *41 UC Davis L Rev 45, November 2007*.

Appel. Copyright, Digitization of Images, and Art Museums: Cyberspace and Other New Frontiers. *6 UCLA Ent L Rev 149, Spring 1999*.

Lunney. The Death of Copyright: Digital Technology, Private Copying, and the Digital Millennium Copyright Act. *87 Va L Rev 813, September 2001*.

**Add.79**

USCS Const. Art. I, § 8, Cl 8

Bauer. Addressing the Incoherency of the Preemption Provision of the Copyright Act of 1976. 10 Vand J Ent & Tech L 1, Fall 2007.

Oppenheimer. Harmonization Through Condemnation: Is New London the Key to World Patent Harmony? *40 Vand J Transnat'l L 445, March 2007*.

Okediji. Through the Years: The Supreme Court and the Copyright Clause. *30 Wm Mitchell L Rev 1633, 2004*.

Schwartz; Treanor. Eldred and Lochner: Copyright Term Extension and Intellectual Property as Constitutional Property. *112 Yale LJ 2331, June 2003*.

**Federal Procedure:**

1 Administrative Law (Matthew Bender), ch 2, Preemption §§ 2.01, 2.02.

**Intellectual Property:**

1 Chisum on Patents (Matthew Bender), ch 1, Eligible Subject Matter § 1.03.

1 Chisum on Patents (Matthew Bender), ch 2, Originality § 2.01.

1 Chisum on Patents (Matthew Bender), ch 4, Utility §§ 4.01, 4.02.

2 Chisum on Patents (Matthew Bender), ch 5, Nonobviousness § 5.02.

3 Chisum on Patents (Matthew Bender), ch 8, Claims § 8.03.

5 Chisum on Patents (Matthew Bender), ch 16, Direct Infringement §§ 16.02, 16.05, 16.06.

5A Chisum on Patents (Matthew Bender), ch 18, Interpretation and Application of Claims—Doctrine of Equivalents—Prosecution History Estoppel § 18.02.

5B Chisum on Patents (Matthew Bender), ch 18, Interpretation and Application of Claims—Doctrine of Equivalents—Prosecution History Estoppel § 18.04.

6 Chisum on Patents (Matthew Bender), ch 19, Defenses §§ 19.02, 19.04.

7 Chisum on Patents (Matthew Bender), ch 20, Remedies §§ 20.02, 20.03.

8 Chisum on Patents (Matthew Bender), ch 21, Jurisdiction and Procedure in Patent Litigation § 21.02.

8 Chisum on Patents (Matthew Bender), ch 22, Ownership and Transfer § 22.02.

8 Chisum on Patents (Matthew Bender), ch 23, Design Patents § 23.07.

8 Chisum on Patents (Matthew Bender), ch 24, Plant Protection § 24.03.

1 Gilson on Trademarks (Matthew Bender), ch 2A, Trade Dress Protection §§ 2A.04, 2A.06, 2A.10, 2A.11.

1 Gilson on Trademarks (Matthew Bender), ch 2B, The Right of Publicity § 2B.04.

2 Gilson on Trademarks (Matthew Bender), ch 5A, Dilution § 5A.01.

2 Gilson on Trademarks (Matthew Bender), ch 7, Federal Unfair Competition Law § 7.04.

3 Gilson on Trademarks (Matthew Bender), ch 11, Jurisdiction, Claims and Defenses § 11.02.

1 Nimmer on Copyright (Matthew Bender), ch 1, Constitutional Aspects of Copyright §§ 1.01–1.09.

# Add.80

USCS Const. Art. I, § 8, Cl 8

1 Nimmer on Copyright (Matthew Bender), ch 2, Subject Matter of Copyright §§ 2.02, 2.03, 2.09, 2.10, 2.15–2,.17.

1 Nimmer on Copyright (Matthew Bender), ch 3, Derivative and Collective Works § 3.07.

1 Nimmer on Copyright (Matthew Bender), ch 4, Publication § 4.03.

2 Nimmer on Copyright (Matthew Bender), ch 7, Statutory Formalities § 7.17.

2 Nimmer on Copyright (Matthew Bender), ch 8A, Semiconductor Chips and Boat Hulls §§ 8A.02, 8A.04, 8A.13.

3 Nimmer on Copyright (Matthew Bender), ch 8E, Rights Against Bootlegging Musical Performances §§ 8E.01, 8E.05.

3 Nimmer on Copyright (Matthew Bender), ch 9, Duration and Renewal of Copyright §§ 9.01, 9.04, 9.07, 9.11.

3 Nimmer on Copyright (Matthew Bender), ch 9A, Copyrights Restored from the Public Domain § 9A.07.

3 Nimmer on Copyright (Matthew Bender), ch 10, Assignments, Licenses, and Other Transfers of Rights § 10.02.

3 Nimmer on Copyright (Matthew Bender), ch 12, Infringement Actions—Procedural Aspects § 12.01.

3 Nimmer on Copyright (Matthew Bender), ch 12A, Copyright Protection Systems and Management Information §§ 12A.06, 12A.16, 12A.19.

4 Nimmer on Copyright (Matthew Bender), ch 13, Infringement Actions—Substantive Aspects § 13.03.

4 Nimmer on Copyright (Matthew Bender), ch 14, Infringement Actions—Remedies § 14.04.

4 Nimmer on Copyright (Matthew Bender), ch 18, World Trade § 18.06.

4 Nimmer on Copyright (Matthew Bender), ch 19E, Freedom of Speech §§ 19E.01–19E.03, 19E.05, 19E.06.

6 Nimmer on Copyright (Matthew Bender), ch 39, Trial § 39.06.

2 Milgrim on Trade Secrets (Matthew Bender), ch 8, Trade Secrets As, and Related to, Patentable Matter § 8.02.

2 Milgrim on Trade Secrets (Matthew Bender), ch 9, Kindred Intellectual Property §§ 9.01, 9.02.

3 Milgrim on Trade Secrets (Matthew Bender), ch 12, Public Law Aspects of Trade Secrets: Regulatory Agencies; Criminal Prosecution § 12.02.

4 Milgrim on Trade Secrets (Matthew Bender), ch 17, Intellectual Property and the Internet § 17.01.

**Criminal Law and Practice:**

4 Criminal Defense Techniques (Matthew Bender), ch 84, Computer Crime § 84.09.

**Corporate and Business Law:**

4 Antitrust Laws and Trade Regulation, 2nd Edition (Matthew Bender), ch 72, Antitrust and Intellectual Property: An Introduction §§ 72.02, 72.03.

2 Antitrust Counseling and Litigation Techniques (Matthew Bender), ch 13, The Interface Between Antitrust Principles and Those of Intellectual Property Law § 13.01.

2 Kintner, Federal Antitrust Law (Matthew Bender), ch 13, Vertical Exclusionary Restraints § 13.28.

**Annotations:**

# Add.81

USCS Const. Art. I, § 8, Cl 8

Supreme Court's views as to when books or other written or printed materials are copyrightable under federal law. *113 L Ed 2d 771*.

Supreme Court's construction and application of provision in *Federal Constitution's Art I, § 8, cl 8* authorizing Congress to provide "for limited Times" copyright and patent protection. *154 L Ed 2d 1185*.

Validity, Construction, and Application of § 514(a) of Uruguay Round Agreements Act, Codified at *17 U.S.C.A. § 104A* [*17 USCS § 104A*], Restoring Copyright Protection to Certain Foreign Works That Had Fallen Into Public Domain. 29 ALR Fed 2d 501.

Anti-Bootlegging Provisions of Uruguay Round Agreements Act, §§ 512 and 513, Imposing Civil (*17 U.S.C.A. § 1101* [*17 USCS § 1101*]) and Criminal (*18 U.S.C.A. § 2319A* [*18 USCS § 2319A*]) Liability for Unauthorized Fixation of and Trafficking in Sound Recordings and Music Videos of Live Musical Performances. 41 ALR Fed 2d 429.

Validity, Construction, and Application of Copyright Remedy Clarification Act, *Pub. L. No. 101-553*, *104 Stat. 2749* (codified at *17 U.S.C.A. §§ 501(a)*, *511* [*17 USCS §§ 501(a)*, *511*]). 60 ALR Fed 2d 625.

Construction and Application by U.S. Supreme Court of Necessary and Proper Clause of U.S. Constitution—*U.S. Const. Art. I, § 8, cl. 18*. 65 ALR Fed 2d 161.

Copyright, under federal copyright laws, of architectural plans, drawings, or designs. 3 ALR Fed 793.

Maps or charts as protected by copyright under federal copyright acts. 4 ALR Fed 466.

Copyright, under Federal Copyright Act (17 USCS §§ 1 et seq.), in advertising materials, catalogs, and price lists. 5 ALR Fed 625.

Patentability of computer programs. 6 ALR Fed 156.

Copyright, under federal copyright laws, of forms, or form books. 8 ALR Fed 869.

Right to jury trial in patent infringement action in federal court. 18 ALR Fed 690.

Unauthorized photocopying by library as infringement of copyright. 21 ALR Fed 212.

Application and effect of *35 USCS § 103*, requiring nonobvious subject matter, in determining validity of patents. 23 ALR Fed 326.

Literary property in lectures. 38 ALR3d 779.

**Other Treatises:**

Cohen's Handbook of Federal Indian Law (Matthew Bender), ch 20, Tribal Cultural Resources § 20.02.

2 Computer Law (Matthew Bender), ch 3D, Internet Issues §§ 3D.04, 3D.09.

2 Computer Law (Matthew Bender), ch 4, Copyright Protection of Software §§ 4.07, 4.08, 4.10.

3 Computer Law (Matthew Bender), ch 4A, Trade Secret, Contractual, and Extralegal Protection of Software § 4A.01.

5 Rapp, Education Law (Matthew Bender), ch 14, Copyrights, Patents, and Trademarks in the Educational Community §§ 14.01, 14.02.

1 The Law of Advertising (Matthew Bender), ch 11, Federal Remedies Available to Competitors § 11.03.

# Add.82

USCS Const. Art. I, § 8, Cl 8

1 The Law of Advertising (Matthew Bender), ch 12, Exercise, Division and Conflicts of Powers and Conflict of Laws § 12.02.

1 The Law of Advertising (Matthew Bender), ch 13, State Remedies Available to Competitors § 13.02.

3 The Law of Advertising (Matthew Bender), ch 53, Cable Television Advertising § 53.04.

United States Code Service
Copyright © 2023 All rights reserved.

**End of Document**

# Add.83

The moving party must specifically show reasonable diligence in bringing the motion and one of the following:

**(1)** That at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought. The party also must show that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or

**(2)** The emergence of new material facts or a change of law occurring after the time of such order; or

**(3)** A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order.

**(c)** **Prohibition Against Repetition of Argument**. No motion for leave to file a motion for reconsideration may repeat any oral or written argument made by the applying party in support of or in opposition to the interlocutory order which the party now seeks to have reconsidered. Any party who violates this restriction shall be subject to appropriate sanctions.

**(d)** **Determination of Motion**. Unless otherwise ordered by the assigned Judge, no response need be filed and no hearing will be held concerning a motion for leave to file a motion to reconsider. If the judge decides to order the filing of additional papers or that the matter warrants a hearing, the judge will fix an appropriate schedule.

## 7-10.  Ex Parte Motions

Unless otherwise ordered by the assigned Judge, a party may file an *ex parte* motion, that is, a motion filed without notice to opposing party, only if a statute, Federal Rule, local rule or Standing Order authorizes the filing of an *ex parte* motion in the circumstances and the party has complied with the applicable provisions allowing the party to approach the Court on an *ex parte* basis. The motion must include a citation to the statute, rule or order which permits the use of an *ex parte* motion to obtain the relief sought.

**Cross Reference**
See, e.g., Civil L.R. 65-1 *"Temporary Restraining Orders."*

## 7-11.  Motion for Administrative Relief

The Court recognizes that during the course of case proceedings a party may require a Court order with respect to miscellaneous administrative matters, not otherwise governed by a federal statute, Federal or local rule or standing order of the assigned judge. These motions would include matters such as motions to exceed otherwise applicable page limitations or motions to file documents under seal, for example.

**(a)** **Form and Content of Motions**. A motion for an order concerning a miscellaneous administrative matter may not exceed 5 pages (not counting declarations and exhibits), must set forth specifically the action requested and the reasons supporting the motion and must be accompanied by a proposed order and by either a stipulation under Civil L.R. 7-12 or by a declaration that explains why a stipulation could not be obtained. If the motion is manually filed, the moving party must deliver the motion and all attachments to all other parties on the same day as the motion is filed.

**(b)** **Opposition to or Support for Motion for Administrative Relief**. Any opposition to or support for a Motion for Administrative Relief may not exceed 5 pages (not counting declarations and exhibits), must set forth succinctly the reasons, must be accompanied by a proposed order, and must be filed no later than 4 days after the motion has been

filed. The opposition or support and all attachments to it, if manually filed, must be delivered to all other parties the same day it is manually filed.

**(c)** **Action by the Court**. Unless otherwise ordered, a Motion for Administrative Relief is deemed submitted for immediate determination without hearing on the day after the opposition is due.

### 7-12. Stipulations

Every stipulation requesting judicial action must be in writing signed by all affected parties or their counsel. A proposed form of order may be submitted with the stipulation and may consist of an endorsement on the stipulation of the words, "PURSUANT TO STIPULATION, IT IS SO ORDERED," with spaces designated for the date and the signature of the Judge.

### 7-13. Notice Regarding Submitted Matters

Whenever any motion or other matter has been under submission for more than 120 days, a party, individually or jointly with another party, may file with the Court or may ask the Northern District of California Ombudsperson to provide such notice to the Court a notice that the matter remains under submission. If judicial action is not taken, subsequent notices may be filed at the expiration of each 120-day period thereafter until a ruling is made.

**Commentary**

This rule does not preclude a party from filing an earlier notice if it is warranted by the nature of the matter under submission (e.g., motion for extraordinary relief).

### 7-14. Designation Not for Citation

It is within the sole discretion of the issuing Judge to determine whether an order or opinion issued by that Judge shall not be citable. Any order or opinion which the issuing Judge determines shall not be citable shall bear in the caption before the title of the Court "NOT FOR CITATION."

**Cross Reference**

See Civil L.R. 3-4(e) "*Prohibition of Citation to Uncertified Opinion or Order*."